ACCEPTED
01-15-00374-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
6/26/2015 7:31:10 PM
CHRISTOPHER PRINE
CLERK

No. 01-15-00374-CV

## IN THE FIRST COURT OF APPEALS
## HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
6/26/2015 7:31:10 PM
CHRISTOPHER A. PRINE
Clerk

THE UPPER TRINITY REGIONAL WATER DISTRICT and
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Appellants*,

v.

NATIONAL WILDLIFE FEDERATION,
*Appellee*.

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
6/26/2015 7:31:10 PM
CHRISTOPHER A. PRINE
Clerk

Appealed from the 126th Judicial District Court of
Travis County, Texas

## BRIEF FOR APPELLANT
## UPPER TRINITY REGIONAL WATER DISTRICT

LAMBETH TOWNSEND
State Bar No. 20167500
ltownsend@lglawfirm.com

JASON T. HILL
State Bar No. 24046075
jhill@lglawfirm.com

ELIZABETH P. HERNANDEZ
State Bar No. 24080942
ehernandez@lglawfirm.com

**LLOYD GOSSELINK
 ROCHELLE & TOWNSEND, P.C.**
816 Congress Ave., Suite 1900
Austin, Texas  78701
(512) 322-5800
(512) 472-0532 (fax)

**ATTORNEYS FOR APPELLANT
THE UPPER TRINITY REGIONAL
WATER DISTRICT**

## APPELLANT REQUESTS ORAL ARGUMENT

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS..................................................................................... ii

INDEX OF AUTHORITIES............................................................................ iv

STATEMENT OF THE CASE..........................................................................1

STATEMENT REGARDING ORAL ARGUMENT ............................................2

ISSUES PRESENTED.....................................................................................3

STATEMENT OF FACTS ...............................................................................4

SUMMARY OF THE ARGUMENT .................................................................9

ARGUMENT ...............................................................................................10

    I.    The substantial evidence standard of review governs this appeal.................................................................................................10

    II.    The Commission reasonably interpreted Section 11.085(*l*)(2) of the Texas Water Code. ................................................12

    III.    Substantial evidence supports the Commission's decision to grant the permit. .......................................................................13

        A.    A substantial evidence review standard is a high hurdle for NWF to cross. ........................................................13

        B.    NWF does not overcome its burden of proof. ..........................14

        C.    Substantial evidence exists that the 2012 Water Conservation Plan will result in the "highest practicable levels" of conservation and efficiency. ..................16

            1.    The District reasonably relied on various sources of expert guidance to determine practicability. ................................................................16

            2.    The District reasonably relied on Report 362 as an additional guidance in development of its water conservation plans.............................................18

            3.    Other authorities turned to Report 362 for water conservation standards.......................................20

            4.    NWF failed to offer credible evidence discounting the District's development of its water conservation plans. ..............................................22

D. Substantial evidence in the record demonstrates that the 2012 Water Conservation Plan is the most efficient "achievable within the jurisdiction" of the District....................................................................24

    1. "Achievable within the jurisdiction of the applicant" is a subjective standard. ................................24

    2. The District's jurisdiction is that of a wholesaler....................................................................24

    3. The District developed multiple water-saving procedures. .........................................................25

    4. The law recognizes the distinction between wholesale and retail suppliers for purposes of conservation, but NWF does not..............................29

IV. The District has satisfied all applicable Commission rules in 30 Texas Administrative Code Chapter 288..................................30

A. NWF did not preserve error regarding Chapter 288 of the Commission's rules. ......................................31

B. The record nonetheless demonstrates that the 2012 Water Conservation Plan complies with Chapter 288 of the Commission's rules. ...............................34

    1. The 2012 Water Conservation Plan includes enforcement provisions.....................................35

    2. The 2012 Water Conservation Plan details the five-year and ten-year targets. ................................36

V. The substantial rights of NWF have not been prejudiced...................38

CONCLUSION AND PRAYER ........................................................................40

CERTIFICATE OF COMPLIANCE..................................................................41

CERTIFICATE OF SERVICE ..........................................................................42

INDEX OF APPENDICES ................................................................................43

# INDEX OF AUTHORITIES

**Page**

**Cases**

*CenterPoint Energy Houston Elec., LLC v. Pub. Util. Comm'n*, 212 S.W.3d 389 (Tex. App.—Austin 2006, judgm't vacated w.r.m.)................30

*City of El Paso v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 179 (Tex. 1994)...................................................................................... 11, 14

*City of San Antonio v. Tex. Water Comm'n*, 407 S.W.2d 752 (Tex. 1966)..............................................................................................14

*Hamamcy v. Texas State Bd. of Med. Examiners*, 900 S.W.2d 423 (Tex. App.—Austin 1995, writ denied) ........................................34

*Heritage on San Gabriel Homeowners Ass'n v. Tex. Comm'n on Envtl. Quality*, 393 S.W.3d 417 (Tex. App.—Austin 2012, pet. denied) .............................................................................................14

*Lone Star R.V. Sales, Inc. v. Motor Vehicle Bd. of Tex. Dep't of Transp.*, 49 S.W.3d 492 (Tex. App.—Austin 2001, no pet.)........................39

*Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559 (Tex. 2000) ....................12

*Pub. Util. Comm'n v. Gulf States Util. Co.*, 809 S.W.2d 201 (Tex. 1991)..............................................................................................30

*R.R. Comm'n of Tex. v. Pend Oreille Oil & Gas Co.*, 817 S.W.2d 36 (Tex. 1991) .............................................................................................11

*R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619 (Tex. 2011) ..................................................... 12, 30

*R.R. Comm'n of Tex. v. Torch Operating Co.*, 912 S.W.2d 790 (Tex. 1995)...................................................................................... 10, 11

*Ramirez v. Tex. State Bd. of Med. Exam'rs*, 995 S.W.2d 915 (Tex. App.—Austin 1999, pet. denied) ..............................................30

*State v. Shumake*, 199 S.W.3d 279 (Tex. 2006) ....................................................16

*Tex. Dep't of Pub. Safety v. Varme*, 262 S.W.3d 34 (Tex. App.—Houston [1st Dist.], no pet.)...................................................................23

*Tex. Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 446 (Tex. 1984) ............................................................... 11, 13, 24, 39

*United Sav. Ass'n of Tex. v. Vandygriff*, 594 S.W.2d 163 (Tex. Civ. App.—Austin 1980, writ ref. n.r.e.) ............................................................39

**Statutes**

Tex. Gov't Code § 2001.174 ............................................................... 10, 23

Tex. Gov't Code § 311.011 ............................................................................16

Tex. Gov't Code § 311.021 ............................................................................13

Tex. Gov't Code § 2001.171 ............................................................................1

Tex. Gov't Code § 2001.174(2) ............................................................... 10, 38, 39

Tex. Gov't Code § 2001.174(2)(A) ............................................................... 38, 39

Tex. Gov't Code § 2001.174(2)(B) ............................................................... 38, 39

Tex. Gov't Code § 2001.174(2)(C) ............................................................... 38, 39

Tex. Gov't Code § 2001.174(2)(D) ............................................................... 38, 39

Tex. Gov't Code § 2001.174(2)(E) ............................................................... 38, 39

Tex. Gov't Code § 2001.174(2)(F) ............................................................... 38, 39

Tex. Water Code § 11.022 ............................................................................5

Tex. Water Code § 11.085 ............................................................... 1, 5, 15, 16, 24

Tex. Water Code § 11.085(*l*)(2) ............................................................... passim

Tex. Water Code § 11.121 ............................................................................5

Tex. Water Code § 11.1271 ............................................................................19

Tex. Water Code § 11.134 ............................................................................1

Act of May 20, 1989, 71st R.S., ch. 1053, 1989 Tex. Gen. Laws 4269 (1989 Act) ............................................................... 4, 8, 25

Act of May 24, 1995, 74th R.S., ch. 494, 1995 Tex. Gen. Laws 3233 (1995 Act) ............................................................... 4, 8, 25

Act of April 20, 2001, 77th R.S., ch. 46, 2001 Tex. Gen. Laws 76
(2001 Act)..................................................................................... 4, 8, 25

Act of May 28, 2003, 78th Leg., R.S. ch. 688, § 1, 2003 Tex. Gen.
Laws 2116 ...................................................................................19

**Rules**

Tex. R. App. P. 38.1(e) ...................................................................................2

Tex. R. App. P. 39.1.........................................................................................2

30 Tex. Admin. Code Ch. 288 ........................................................ 31, 32, 33, 34

30 Tex. Admin. Code § 288.2.........................................................................29

30 Tex. Admin. Code § 288.5................................................ 3, 9, 15, 29, 35, 40

30 Tex. Admin. Code § 288.7.........................................................................31

30 Tex. Admin. Code § 288.30(1) .................................................................8, 27

30 Tex. Admin. Code § 288.30(10)(B).........................................................8, 27

30 Tex. Admin. Code Ch. 295 ........................................................................31

30 Tex. Admin. Code § 295.9.......................................................... 31, 32, 33, 34

30 Tex. Admin. Code § 295.9(2) ................................................................. 32, 33

30 Tex. Admin. Code Ch. 297 ........................................................................31

30 Tex. Admin. Code § 297.11.........................................................................5

30 Tex. Admin. Code § 297.18.........................................................................5

## STATEMENT OF THE CASE

This is an appeal of a district court judgment that reversed, in part, an order by appellant Texas Commission on Environmental Quality (the "Commission" or "TCEQ") granting appellant, the Upper Trinity Regional Water District (the "District"), a permit for a reservoir and an interbasin transfer of water. After a contested case hearing, the Commission found that the District satisfied the requirements of Sections 11.085 and 11.134 of the Texas Water Code and granted a permit to construct Lake Ralph Hall and transfer water from the Sulphur River Basin to the Trinity River Basin. Appellee, National Wildlife Federation ("NWF"), filed a motion for rehearing and then appealed the Commission's decision to district court pursuant to Section 2001.171 of the Texas Government Code. The District Court of Travis County held that the Commission erred in deciding that the District's water conservation plan complied with Section 11.085(*l*)(2) of the Texas Water Code, and reversed and remanded that portion of the order to the Commission. The District filed this appeal seeking reversal of the decision of the district court to request that the Court affirm the Commission's decision to grant the permit. On April 21, 2015, the Supreme Court of Texas ordered the case transferred from the Third Court of Appeals to this Court.

1

**STATEMENT REGARDING ORAL ARGUMENT**

The District requests that the Court grant oral argument because this is a case of first impression. Specifically, this case represents the first time Texas courts have been asked to review the standard an applicant must meet to receive a permit for an interbasin transfer of water under Section 11.085(*l*)(2) of the Texas Water Code. This Court's decision will have a significant impact on the future of water planning in Texas. Oral arguments would significantly aid the Court's decisional process. Tex. R. App. P. 38.1(e); 39.1.

## ISSUES PRESENTED

1.  Does substantial evidence support the Commission's decision that the Upper Trinity Regional Water District has developed and implemented a water conservation plan that will result in the ***highest practicable levels*** of conservation and efficiency ***achievable within the jurisdiction*** of the District, as prescribed by Section 11.085(*l*)(2) of the Texas Water Code?

2.  Did NWF fail to preserve its argument that the District did not comply with Section 288.5 of the Texas Administrative Code?

3.  Did NWF fail to demonstrate that its substantial rights have been prejudiced by the Commission's order?

## STATEMENT OF FACTS

The Upper Trinity Regional Water District is a wholesale water provider in rapidly growing North Texas.[1] The Texas Legislature created the District to provide reliable, treated surface water to the cities and utilities it serves.[2] Its physical jurisdiction includes all of Denton County and portions of Dallas, Collin, Cooke, Grayson, and Wise counties.[3] The District counts approximately 30 cities and utilities as members and customers.[4] They each buy their water from the District and, in turn, sell it to retail end-users such as homeowners and businesses.[5]

In the next 50 years, the populations served by the District's member cities and customers are expected to skyrocket—more than tripling to 850,000 people.[6] The water needs of retail water users will increase by 250 percent during this same time.[7] Conservation efforts alone will not offset this projected increase in

---

[1] 12 AR 154 at 13:20-14:4.

[2] The District was created by three laws, which are referred to collectively in this brief as the "District Enabling Act" and attached as Appx. G. Act of May 20, 1989, 71st R.S., ch. 1053, 1989 Tex. Gen. Laws 4269 (1989 Act); Act of May 24, 1995, 74th R.S., ch. 494, 1995 Tex. Gen. Laws 3233 (1995 Act); Act of April 20, 2001, 77th R.S., ch. 46, 2001 Tex. Gen. Laws 76 (2001 Act)

[3] 12 AR 154 at 10:22-11:2; 154 at 11; 12 AR 155.

[4] 12 AR 154 at 14:6-8.

[5] 12 AR 154 at 10; 1989 Act §§ 20, 22.

[6] 12 AR 154 at 27:3-5.

[7] 12 AR 154 at 27:3-5; 18 AR 222.

4

demand.[8] In fact, without a new reservoir, the District's existing water supplies will be inadequate in less than 15 years.[9]

***The District applied for a reservoir and interbasin transfer permit to meet long-term water demand.***

The District filed the application with the Commission to secure a water use permit for the Lake Ralph Hall reservoir project. The Lake Ralph Hall project will give the District a long-term, reliable, and low-cost water supply for the projected population in its service area and will allow it to meet its planning obligations.[10] The Texas Water Code[11] and Commission rules[12] both require the District to first obtain a water use permit before the District can: (1) build the reservoir to impound water; and (2) transfer water from the Sulphur River Basin to the Trinity River Basin for beneficial use. The Commission approved both components of the application. NWF has appealed only the portion of the Commission's decision to authorize the interbasin transfer.

The District is situated within the area defined by the Texas Water Development Board ("TWDB") as the Region C Water Planning Area.[13] Each of the 16 regional water planning areas develop water plans specific to their

---

[8]  12 AR 154 at 27:7-8.

[9]  12 AR 154 at 24.

[10]  12 AR 154 at 28:18-30:4.

[11]  Tex. Water Code Ann. §§ 11.022, .121, .085.

[12]  30 Tex. Admin. Code §§ 297.11, .18.

[13]  18 AR 220.

respective regions, and the plans are then combined to create the State Water Plan. The 2011 Region C Water Plan includes findings and strategies to address the District's urgent water supply needs.[14] In the Region C Water Plan, the Lake Ralph Hall project is among the recommended management strategies[15] to meet the District's projected water supply shortfall.[16]

***Channel erosion has damaged the environment at the site of the proposed reservoir.***

Lake Ralph Hall is a water-management project that not only is consistent with the Region C Water Plan and the State Water Plan, but it also promises to create aquatic and terrestrial habitats where they have been annihilated by nearly a century of channel erosion.[17] In the late 1920s, landowners wanted to improve field drainage in the North Sulphur River watershed.[18] To achieve their goal, they dredged a channel approximately 16 feet wide and 10 feet deep for almost 20 miles.[19] The resulting channel was designed to serve as a surrogate for the naturally formed North Sulphur River.[20] As a drainage tool, the channel was very

---

[14]   12 AR 154 at 24-25.

[15]   12 AR 154 at 38:6-13; 18 AR 230.

[16]   12 AR 154 at 24:23-25:3. The existing contract with Dallas will supply 26,412 acre-feet of water, which leaves approximately 74,000 acre-feet of shortfall to be met by new water supplies, including Lake Ralph Hall. *Id*.

[17]   17 AR 208 at 20:20-21:5; 18 AR 218 at 40:5-41:18; 19 AR 245-46 (attached as Appx. A).

[18]   12 AR 159 at 1-5.

[19]   12 AR 154 at 36:4-8.

[20]   12 AR 154 at 36:4-8.

effective at carrying away water, but it came with an unfortunate side effect: it immediately began to erode away the blackland prairie soils.[21] Since the 1920s, nearly 14,000 acre-feet of soil from the man-made channel and watershed have been washed downstream.[22] The erosion created a 40-mile channel that is 60 feet deep and 300 feet wide,[23] and a sterile aquatic environment.[24]

The Lake Ralph Hall project will have a stabilizing effect on these massive erosional forces.[25] It will help nature restore the environment and natural beauty taken by earlier channelization and the resulting erosion.[26] The project will provide new habitat and food sources for animals while helping to stop, or significantly diminish, continued soil erosion.[27]

### District conservation initiatives are limited to those of a wholesale, not retail, supplier.

The District does not have a direct or contractual relationship with retail customers—that is, the end-users of water.[28] These end-of-the-line retail customers are the households, businesses, and industrial entities that ultimately

---

[21]  12 AR 154 at 36:12-16, 39:13-16.

[22]  25 AR 382 at 2163:23-2164:2.

[23]  12 AR 154 at 36:19-23; Appx. A.

[24]  17 AR 208 at 20:20-21:5.

[25]  12 AR 154 at 39:18-20.

[26]  12 AR 154 at 39.

[27]  12 AR 154 at 39.

[28]  12 AR 154 at 14.

create the demand for water within the District's service area.[29] The Texas Legislature did not give the District authority to penalize retail water consumers for their water-consumption practices.[30] Nevertheless, the District has leveraged the limited tools it does have to maximize conservation of every drop of water it develops for its member cities and customers.[31] These efforts include prohibiting the use of "take-or-pay" contracts,[32] structuring contracts around a water year rather than a calendar year to discourage increased water use during peak times,[33] and reusing treated wastewater effluent.[34] These and many other water-saving protocols are explained in detail in the District's conservation plans.[35] Water conservation plans must be developed and filed with the TCEQ no later than every five years. 30 Tex. Admin. Code §§ 288.30(1), (10)(B). The District revised its 2009 plan earlier than required, in September 2012.[36] Since then, the District has been executing the plan as prescribed.[37]

---

[29] 24 AR 377 at 1011:15-24.

[30] 12 AR 154 at 47:22-23-48:1; 12 AR 163 at 10; District Enabling Act, attached as Appx. G.

[31] 12 AR 154 at 47:15-48:7.

[32] 12 AR 154 at 15:22-16:3.

[33] 12 AR 154 at 16:22-17:2.

[34] 12 AR 154 at 27:6-7, 43:16-17, 44:17-20, 45:5-8, 50:21-51:13.

[35] 12 AR 154 at 47:3-9.

[36] 12 AR 163 at 38.

[37] 12 AR 162; 23 AR 374 at 47:15-18.

## SUMMARY OF THE ARGUMENT

NWF challenges the District's 2012 Water Conservation Plan on the ground that the District did not satisfy Section 11.085(*l*)(2) of the Texas Water Code. The portion of the statute relevant to this appeal reads:

> (2) the applicant for the interbasin transfer has prepared a drought contingency plan and has developed and implemented a water conservation plan that will result in the ***highest practicable levels*** of water conservation and efficiency ***achievable within the jurisdiction of the applicant***.

Tex. Water Code Ann. § 11.085(*l*)(2) (emphasis added). NWF seeks a one-size-fits-all litmus test that will fulfill Section 11.085(*l*)(2).

The District contends that the "highest practicable levels achievable within the jurisdiction" standard in Section 11.085(*l*)(2) requires a fact-based, case-by-case inquiry. The District developed a water conservation plan that included the water conservation strategies that could reasonably be employed by a wholesale—not retail—water supplier in North Texas with the District's unique member and customer base, and statutory tools. After considering the evidence, the Commission correctly determined the District met that standard.

NWF also complains that the District's plan could not have met the "highest practicable levels achievable within the jurisdiction" standard because it failed to comply with Title 30, Section 288.5 of the Texas Administrative Code—the Commission's standard requirements for all water conservation plans. NWF's

9

argument fails for two reasons. First, NWF failed to preserve the alleged error because it did not object to key findings reached and conclusions made by the Commission in its decision on the application. Second, the record contains substantial evidence demonstrating that the District's 2012 Water Conservation Plan meets Commission requirements by describing its enforcement authority and explaining the bases for the District's five-year and ten-year water conservation goals.

Also, NWF has failed to demonstrate that its substantial rights have been prejudiced by the Commission's decision and any of the alleged errors, which is a prerequisite to reversal by this Court under Section 2001.174(2) of the Texas Government Code.

The Commission made a reasonable decision to grant the permit, and that decision is supported by substantial evidence. The Court should affirm the Commission's decision and reverse the district court.

## ARGUMENT

### I. The substantial evidence standard of review governs this appeal.

The Court must review the Commission's decision under the substantial evidence rule, which is a limited standard of review that gives significant deference to the agency in its field of expertise. Tex. Gov't Code Ann. § 2001.174; *R.R. Comm'n of Tex. v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995) (citing

*Tex. Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984)). This Court is charged with determining the reasonableness of the agency's order, not its correctness. *City of El Paso v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 179, 185 (Tex. 1994) (citing *R.R. Comm'n of Tex. v. Pend Oreille Oil & Gas Co.*, 817 S.W.2d 36, 41 (Tex. 1991)). In applying the substantial evidence rule, the Court may not substitute its judgment for that of the agency. *Torch Operating Co.*, 912 S.W.2d at 792 (citing *Charter Medical*, 665 S.W.2d at 452). The Court is prevented from "usurping the agency's adjudicative authority even though the court would have struck a different balance." *City of El Paso*, 883 S.W.2d at 185 (citing *Pend Oreille Oil & Gas*, 817 S.W.2d at 41).

Substantial evidence is more than a mere scintilla but less than a preponderance. *City of El Paso*, 883 S.W.2d at 185. Evidence in the record may actually preponderate against the decision of the agency, but nevertheless amount to substantial evidence. *Id.* In a substantial evidence review, the test is "whether some reasonable basis exists in the record for the action taken by the agency." *Id.*

The agency's findings, inferences, conclusions, and decisions are presumed to be supported by substantial evidence. *Charter Medical*, 665 S.W.2d at 453. The party seeking to set aside the agency's decision bears the burden of showing that it was not supported by substantial evidence. *Id.* It is a question of law whether the Commission satisfied the substantial evidence test; therefore, the

district court decision is not entitled to deference from this Court on this appeal. *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 562 (Tex. 2000). The focus on this appeal, as it was with the district court, is on the agency's decision. *Id*.

## II. The Commission reasonably interpreted Section 11.085(*l*)(2) of the Texas Water Code.

In its appeal to the district court, NWF asserted that the Commission misinterpreted Section 11.085(*l*)(2) of the Texas Water Code. The District disagrees. The statute required the District to show, in relevant part: (1) that it developed and implemented a water conservation plan and (2) that the plan will result in the highest practicable levels of water conservation and efficiency achievable within the District's jurisdiction. Tex. Water Code Ann. § 11.085(*l*)(2). Based on the evidence presented, the Commission reasonably determined that the District fulfilled each requirement of Section 11.085(*l*)(2).

A reviewing court must provide deference to an agency's decision if the decision is reasonable and consistent with the plain language of the statute. *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011) (noting that Texas courts "have long held that an agency's interpretation of a statute it is charged with enforcing is entitled to 'serious consideration,' so long as the construction is reasonable and does not conflict with the statute's language," and further noting that Texas courts "have stated this

12

principle in differing ways, but our opinions consistently state that we should grant an administrative agency's interpretation of a statute it is charged with enforcing some deference"). A reviewing court must also presume that the Legislature intended the statute to be executed; it may not conclude that the statute presented an impossible hurdle for any permit applicant to clear. Tex. Gov't Code Ann. § 311.021 (West 2013) (requiring that statutes be construed under the presumption that "a result feasible of execution is intended."). The Commission interpreted Section 11.085(*l*)(2) to require a fact-based, case-by-case determination of whether the applicant's water conservation plan met the standard required for an interbasin transfer. That interpretation is reasonable and consistent with the plain language of the statute.

## III. Substantial evidence supports the Commission's decision to grant the permit.

### A. A substantial evidence review standard is a high hurdle for NWF to cross.

The Court must presume that the Commission's decisions are valid and that each finding, inference, conclusion, and decision the Commission made is supported by substantial evidence. *See Charter Medical*, 665 S.W.2d at 453 (holding that "the findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise"). Substantial evidence is a high

13

bar for NWF to clear. If the record includes any reasonable basis whatsoever for the agency's decision, the Court must affirm the agency's decision. *City of El Paso*, 883 S.W.2d at 185. The Commission granted the permit and issued findings of fact and conclusions of law, all of which must be presumed valid. Regardless of this presumption, each of the Commission's findings of fact are supported by substantial evidence. NWF cannot prove otherwise, which is its burden in this appeal.

## B. NWF does not overcome its burden of proof.

A party mounting a judicial challenge to an agency decision must ***prove*** the absence of even a minute piece of evidence supporting the issue it challenges; in other words, it must prove that not even a scintilla of evidence exists to support the agency. *City of El Paso*, 883 S.W.2d at 185 (citing *City of San Antonio v. Tex. Water Comm'n*, 407 S.W.2d 752, 758 (Tex. 1966)) (recognizing the fundamental principle that "when . . . an appeal is governed by the substantial evidence rule, the orders of the [Commission] are presumed to be legal and valid, and the burden is on the party appealing from the Commission's order to show that the orders are *not* reasonably supported by substantial evidence" (emphasis added)). Because the review is *de novo*, NWF maintains that burden of proof in this Court. *Heritage on San Gabriel Homeowners Ass'n v. Tex. Comm'n on Envtl. Quality*, 393 S.W.3d 417, 424 (Tex. App.—Austin 2012, pet. denied) (holding that the district court's

14

judgment regarding substantial evidence "is not entitled to deference on appeal" and the "focus of the appellate court's review, as in the district court, is on the agency's decision.").

NWF challenges the Commission's findings that the District met the standards under Section 11.085(*l*)(2) of the Texas Water Code. NWF also argues that the District did not meet the standards found in Section 288.5 of the Texas Administrative Code. In its motion for rehearing at the Commission and in its appeal to the district court, NWF argued that: (1) no adequate conservation plan exists; (2) the District has chosen the incorrect conservation standards; and (3) the District is not implementing the plan with appropriate vigor. Contrary to NWF's contentions and arguments, substantial evidence in the record supports the Commission's finding that the District fulfilled the prerequisites for an interbasin transfer under Texas Water Code Section 11.085 and Title 30, Texas Administrative Code Section 288.5.

Substantial evidence does not require that the Commission make its decision based on a plan desirable to all parties. Here, substantial evidence does exist in the record to support the Commission's decision because the District presented evidence that included detailed water conservation plans,[38] new contract

---

[38] 12 AR 163.

language,[39] contracts designed to encourage water conservation,[40] implementation of the 2012 Water Conservation Plan,[41] and more.[42] In granting the permit, the Commission considered this probative evidence and assigned weight to it accordingly. Therefore, NWF fails to meet its burden under a substantial evidence standard.

## C. Substantial evidence exists that the 2012 Water Conservation Plan will result in the "highest practicable levels" of conservation and efficiency.

### 1. The District reasonably relied on various sources of expert guidance to determine practicability.

The Legislature made a deliberate decision not to define "highest practicable levels" in statute, or direct the TCEQ to define the term. The Administrative Code and Section 11.085 of the Water Code do not define "practicable." Where terms are not defined, courts must rely on the common usage and the plain meaning of the words chosen. *See* Tex. Gov't Code § 311.011 (providing "words and phrases shall be read in context and construed according to the rules of grammar and common usage"); *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006) ("our primary objective is to determine the Legislature's intent which, when possible, we discern from the plain meaning of the words chosen"). Section 11.085(*l*)(2) must

---

[39] 12 AR 154 at 16:15-21.

[40] *Id.*

[41] 12 AR 154 at 15:22-16:3.

[42] 12 AR 154 at 14:11-17:20.

16

be interpreted with reasonableness, just as courts consistently interpret plain-language statutes with reasonableness.

The plain meaning of the words demonstrate that the Legislature wanted to create a standard that could be assessed by the Commission according to its own merits and considering the individual circumstances. The Commission did so in this case by considering evidence from those who know the most about conservation, including experts in the water resources industry and water plans developed by experts. The Commission correctly used a reasonable standard, making a fact-based inquiry to determine that the District satisfied the applicable level of conservation.

NWF wants the Court to impose a formulaic definition of "highest practicable" where even the Legislature refrained from doing so. Tex. Water Code Ann. § 11.085(*l*)(2) (West Supp. 2014). Tellingly, NWF has yet to disclose what formula it believes the Commission should have used in determining compliance with Section 11.085(*l*)(2). The District drew upon practical and technical expertise from sources that included its own customers, board members, the District Board's Water Conservation Committee, District staff, engineering consultants, legal counsel, and Texas A&M AgriLife Extension Service agents.[43] The result was the development of a comprehensive water conservation plan that was tailored for the

---

[43] 23 AR 374 at 46:13-47:14.

17

District and that took into consideration the District's unique geography, circumstances, and position as a wholesale provider.[44] At the contested case hearing, Tom Taylor, professional engineer and executive director of the District, testified on cross examination that ". . . we think the best experts are the . . . municipalities and utilities who have to make [conservation] work, and we think they are very much an expert in regard to these matters."[45] NWF did not rebut Mr. Taylor's testimony. The Commission correctly rejected the call by NWF to create an objective test where one is not created under the law, finding that "highest practicable" is not a one-size-fits-all standard.

**2.    The District reasonably relied on Report 362 as an additional guidance in development of its water conservation plans.**

In following the clear direction from the Texas Legislature to develop and implement the "highest practicable levels" of conservation within the District's jurisdiction, the District reasonably relied on Report 362 in selecting the water conservation measures that would lead to the highest practicable levels of water conservation achievable within its jurisdiction.[46] Report 362, or the "Water Conservation Best Management Practices Guide," is a guide published in 2004 by

---

[44]   23 AR 374 at 46:13-47:14.

[45]   23 AR 374 at 47:5-14.

[46]   24 AR 377 at 914:12-918:5.

18

the Texas Water Development Board.[47]   Its publication came the year after the Legislature instructed TCEQ and TWDB to collaboratively develop target goals for water conservation in Texas and model programs that "suggest best management practices for achieving the highest practicable levels of water conservation and efficiency achievable for each specific type of water supplier."[48] Act of May 28, 2003, 78th Leg., R.S. ch. 688, § 1, 2003 Tex. Gen. Laws 2116 (codified at Tex. Water Code § 11.1271); *cf.* Tex. Water Code § 11.085(*l*)(2). NWF argues that the direction from the Legislature and the subsequent development of Report 362 are coincidental.  On the contrary, the two are closely related.[49]

At district court, NWF argued that if the District relied on Report 362, it must have either used all of it or, if the District did not use a certain element, explain why the District chose to exclude it.[50]  A reasonable interpretation of the statute requires nothing of the sort.  Section 11.085(*l*)(2) does not require that the District's 2012 Water Conservation Plan be consistent with Report 362, in whole or in part.  The Legislature left it to the Commission to determine whether each

---

[47]   19 AR 260.

[48]   24 AR 377 at 913:14-25.

[49]   24 AR 377 at 911:24-914:5;999:13-1000:15, 1002:4-16.

[50]   CR 66-266 (Plaintiff's Initial Brief, Oct. 16, 2014) at 17.

applicant could meet the standard based on each applicant's circumstances, and the District did.

Even if the Court were to determine that Report 362 was not developed in response to a legislative mandate, the District reasonably relied on the report in developing its 2012 Water Conservation Plan to satisfy Section 11.085(*l*)(2).[51] NWF has not established that it was unreasonable for the District to rely on the guidelines found in Report 362 in developing a water conservation plan. The District's witness, Mr. Gooch, testified that the District determined that it could best meet the "highest practicable" standard by embracing the applicable best-management practices articulated in Report 362.[52]

### 3. Other authorities turned to Report 362 for water conservation standards.

The Region C Regional Water Planning Group ("Region C") has studied closely the viability of water conservation plans in the region that includes the Lake Ralph Hall reservoir project, with the goal of achieving the highest practicable levels of water conservation and efficiency for water providers within the region.[53] Region C is one of 16 water-planning regions in Texas, and it carries the distinction of incorporating more municipal water conservation and reuse than

---

[51]   24 AR 377 at 907:5-11; 914:12-915:2.

[52]   18 AR 218 at 82; 24 AR 377 at 914:12-915:1.

[53]   19 AR 261; 25 AR 380 at 1816:13-1817:5.

20

any other regional water plan in Texas, by far.[54]  Therefore, it is telling that Region C also turned to Report 362 in determining appropriate conservation practices, strategies, and goals for its region.[55]

The 2011 Region C Water Plan concluded that implementation of the best management practices in Report 362 "will provide for the highest practicable levels of water conservation and efficiency."[56]  Mr. Gooch explained further that Region C relied on Report 362 for purposes of understanding the scope of Section 11.085(*l*)(2):

> . . . Region C feels that a water supplier should look at the best management practices laid out in Report 362, consider them carefully in light of its particular situation, and implement those that fit its situation.  And if the supplier does so, they will achieve the highest practicable levels of water conservation and efficiency achievable.[57]

The District followed the direction of the Region C Regional Water Planning Group and looked to Report 362 for guidance in the development of its water conservation plan.

Report 362 itself emphasizes the critical role that planning groups such as Region C play in determining best practices in water conservation.  The report

---

[54]  18 AR 218 at 75:11-16, 76:18-77:15; 18 AR 238.  (Tom Gooch testifying that "Region C has significantly more municipal water conservation and reuse planned than any other region of the state.").

[55]  18 AR 218 at 83.

[56]  18 AR 218 at 83; 19 AR 261; 25 AR 380 at 1816:13-1817:5.

[57]  25 AR 380 at 1817:6-16.

explains that regional decisions in water conservation are the only effective way to plan:[58]

> . . . the [Water Conservation Implementation] Task Force *unanimously agreed* that the BMP Guide must be in accordance with the state's philosophy of region-based water planning. The Task Force firmly believes that applying a mandatory set of BMPs throughout Texas would not be appropriate. *One size does not fit all* in a state characterized by wide variations in climate, geography, municipal demographics, water utility and service profiles, and agricultural and industrial needs. State policies adopted to guide the implementation of water conservation in *Texas must acknowledge the fundamental decision-making primacy and prerogative of regional planning groups, municipalities, industrial and agricultural water users, and water providers*.[59]

Report 362 was reasonably relied upon by Region C, and it was reasonable for the District to rely upon it to help determine the best available methods of water conservation in the District's jurisdiction.

### 4. NWF failed to offer credible evidence discounting the District's development of its water conservation plans.

NWF relies exclusively on the testimony of its witness, Chris Brown to support its position on water conservation. At the time of his testimony, Mr. Brown was the lead staff member in a California water conservation think tank that "support[s] and integrat[es] innovative technologies and practices; encourag[es] effective public policies; advanc[es] research, training, and public education; and

---

[58] 25 AR 380 at 1817:6-16.

[59] 19 AR 260 at 4 (emphasis added); 25 AR 380 at 1819:15-1820:4.

build[s] on collaborative approaches and partnerships."[60] Although the think tank may have valuable ideas for California, Mr. Brown admitted that he has no experience operating a water utility in California, Texas, or anywhere.[61] He holds no technical licenses of any sort.[62] He is not trained as an economist, an attorney, or an engineer.[63] Nothing in the record demonstrates how Mr. Brown's work is relevant to water conservation planning for a wholesale treated water supplier in the North Texas region. He offered no reliable testimony regarding the satisfaction of Section 11.085(*l*)(2) as related to the District—the only relevant entity in the application. The TCEQ was correct in assigning little weight to his opinion testimony, and NWF cannot use the judicial review procedures to compel reassignment of the weight. *See Tex. Dep't of Pub. Safety v. Varme*, 262 S.W.3d 34, 38 (Tex. App.—Houston [1st Dist.], no pet.) (citing Tex. Gov't Code Ann. § 2001.174 (". . . a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion . . .")). Even if Mr. Brown provided testimony that was probative of a material fact at issue in the contested case, his testimony would not erase the existence of contrary evidence found throughout the record supporting the

---

[60] 22 AR 357.
[61] 22 AR 358.
[62] 24 AR 379 at 1492:2-8.
[63] 24 AR 379 at 1491:18-1492:1.

23

Commission's decision regarding Section 11.085(*l*)(2). *Charter Medical*, 665 S.W.2d at 452 (holding that "the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence").

**D. Substantial evidence in the record demonstrates that the 2012 Water Conservation Plan is the most efficient "achievable within the jurisdiction" of the District.**

**1. "Achievable within the jurisdiction of the applicant" is a subjective standard.**

Arguably the most important language of Section 11.085(*l*)(2) is the modifying language that requires agency evaluation of water conservation plans that are "achievable within the jurisdiction of the applicant." This requires taking into account the unique circumstances surrounding the application, in contrast to an objective test that NWF wants created. An applicant satisfies Section 11.085 if it meets standards that are "achievable within the jurisdiction of the applicant." The Commission correctly interpreted Section 11.085(*l*)(2) as requiring the District to do what was reasonably possible under the District's unique circumstances by analyzing the application under a localized, subjective standard.[64]

**2. The District's jurisdiction is that of a wholesaler.**

The District's substantive jurisdiction is limited to that of a wholesaler, not a retailer. Unlike a retailer, the District does not possess regulatory control of the

---

[64] 24 AR 377 at 915:18-916:1.

end-user of its treated water supplies. This is an important distinction in the context of determining the level to which a water provider can be expected to affect water conservation.[65] Appropriate conservation efforts for a wholesale supplier like the District differ from conservation efforts considered appropriate for a retail supplier like, for example, the City of San Antonio.[66] Importantly, NWF never challenged this point. The Commission correctly analyzed the District's efforts according to a wholesaler standard, within the bounds of the District Enabling Act. This Court should use the same analysis.

### 3. The District developed multiple water-saving procedures.

The Texas Legislature has not given the District the authority to penalize water consumers for their water consumption practices.[67] As a wholesale water supplier that deals with its wholesale customers through voluntary, arms-length contracts, the District is accordingly limited in its legal ability to affect water consumption behaviors by end-users.[68] Working within these statutory limitations, the District has leveraged the limited conservation tools it does possess with the goal of maximizing water conservation.[69]

---

[65] 18 AR 218 at 67.

[66] 11 AR 151 (FOF 325, 326); 18 AR 218 at 67.

[67] 12 AR 154 at 47:22-23; 12 AR 163 at 10; District Enabling Act, attached as Appx. G.

[68] 12 AR 154 at 47:15-19.

[69] 12 AR 154 at 47:15-48:7.

For example, the District has deliberately avoided the use of "take-or-pay" contracts with its members and customers, which have a tendency to discourage water conservation.[70] Take-or-pay contracts require the buyer to pay for certain amount of water each year, regardless of whether the full amount is actually needed. By requiring its members and customers to pay only for the volumes of water they actually use, the District has embedded a water conservation catalyst into its rate policy.[71] In addition, the District has conscientiously employed a system capacity rate structure that was designed to force each of its members and customers to make "deliberate, sober-minded" choices on their projected water needs, discouraging over-subscription and, ultimately, the waste of water.[72]

Additionally, the District enters into contracts based on a "water year"—i.e., June 1 to May 31—rather than a calendar year.[73] If a customer exceeds its contracted water use at any time during the water year, the customer's water rate is increased and is applied to the entire water year.[74] This method was designed to promote conservation of water by creating a financial disincentive for wholesale customers to use more water than their contracts allow during the peak water-use

---

[70] 12 AR 154 at 15:22-16:3.

[71] 12 AR 154 at 15:22-23.

[72] 12 AR 154 at 16:15-21.

[73] 12 AR 154 at 16:22-17:2.

[74] 12 AR 154 at 16:22-17:9.

times of the year.[75]   Additionally, the District invested its efforts and financial resources into the creation of the Upper Trinity Conservation Trust in 2010.[76]   The role of the trust is to support watershed protection initiatives with the goal of conserving existing water supply through watershed and water quality protection initiatives.[77]

Moreover, the District has worked toward maximizing its reuse of treated wastewater effluent.[78]   The District's efforts to reuse this increasingly important source of water have saved it almost 10,000 acre-feet of water supply each year.[79] That volume does not include the amounts of additional water reuse that the District plans to leverage from the Lake Ralph Hall project.[80]   The District anticipates, and the record reflects, that the same water-reuse trend will continue into the foreseeable future.[81]

These water-saving protocols, and others, are memorialized in the District's water conservation plans.[82]   A water conservation plan must be developed and filed with the TCEQ at least every five years.   30 Tex. Admin. Code §§ 288.30(1),

---

[75]   12 AR 154 at 17:2-9.

[76]   12 AR 154 at 17:15-20.

[77]   12 AR 154 at 17:15-20.

[78]   12 AR 154 at 27:6-7, 44:17-20, 45:5-8, 50:21-51:13.

[79]   12 AR 154 at 43:16-17.

[80]   12 AR 154 at 45:5-8, 51:14-18.

[81]   12 AR 154 at 44:17-20.

[82]   12 AR 154 at 47:3-9.

(10)(B). The District incorporated revisions to its 2009 Water Conservation Plan when it adopted its 2012 Water Conservation Plan in September 2012, ahead of this five-year cycle.[83] It is unreasonable for NWF to suggest that the full five-year plan should have been completed in the short time frame between September 2012 and the contested case hearing in January 2013. Importantly, NWF cannot point the Court to any law that justifies its criticism. Since the District implemented its 2012 Water Conservation Plan in September 2012, it has been executing the plan in the orderly way prescribed by the plan, right on time.[84]

Because of the lack of statutory authority to regulate the behaviors of retail water consumers through punitive action, the District Board's Water Conservation Committee has worked through the years to develop what the District refers to as "mutually acceptable strategies" to achieve water conservation.[85] The District's water conservation plans, including its 2009 Water Conservation Plan and its 2012 Water Conservation Plan, have been appropriately structured based on the fact that its customers and members are the entities that can legally enforce conservation practices on retail water consumers within the District.[86]

---

[83] 12 AR 163 at 38.

[84] 12 AR 162; 23 AR 374 at 47:15-18.

[85] 12 AR 154 at 48:1-3.

[86] 12 AR 154 at 46:8-14, 48:3-5.

### 4. The law recognizes the distinction between wholesale and retail suppliers for purposes of conservation, but NWF does not.

The law recognizes this practical distinction by creating different water conservation planning standards for wholesale suppliers and retail suppliers.[87] *E.g.*, 30 Tex. Admin. Code §§ 288.2, 288.5 (requiring different types of water conservation plans for different types of water suppliers). NWF conceded this point at the contested case hearing.[88] Yet on appeal, NWF argues as though no distinction exists. The record demonstrates that wholesale suppliers have substantially different and fewer tools to impact water conservation than do retail water suppliers.[89]

NWF's own witness was not able to identify a single wholesale water supplier in the entire state of Texas that could satisfy his and NWF's interpretation of Section 11.085(*l*)(2) of the Texas Water Code.[90] The Commission rightfully understood that Section 11.085(*l*)(2) was not designed to render the provision nonfunctional nor impossible to meet. The Commission was right to reject NWF's arguments regarding the meaning of Section 11.085(*l*)(2) in the context of the application and to assign little weight to Mr. Brown's opinion testimony. *CenterPoint Energy Houston Elec., LLC v. Pub. Util. Comm'n*, 212 S.W.3d 389,

---

[87] 18 AR 218 at 67; 22 AR 351 at 4.

[88] 24 AR 379 at 1486:7-21.

[89] 12 AR 154 at 9:21-23, 47:15-48:7; 18 AR 218 at 67.

[90] 24 AR 379 at 1488:16-1490:6.

399 (Tex. App.—Austin 2006, judgm't vacated w.r.m.) (recognizing that a court affords an agency's expertise substantial deference in interpreting the facts); *Ramirez v. Tex. State Bd. of Med. Exam'rs*, 995 S.W.2d 915, 919 (Tex. App.—Austin 1999, pet. denied) (citing *Pub. Util. Comm'n v. Gulf States Util. Co.*, 809 S.W.2d 201 (Tex. 1991)) (noting that a court may not substitute its judgment for that of the agency as to the weight of the evidence).

An agency's reasonable interpretation of a statute is entitled to "serious consideration" by a reviewing court. *Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d at 624. Governmental agencies have a "unique understanding" of the statutes they administer. *Id.* at 629. The Commission's interpretation of Section 11.085(*l*)(2) in the context of the application is reasonable, can practically be implemented, and, unlike the NWF interpretation, does not contradict the language of the statute. Therefore, this Court should reverse the district court decision and uphold the Commission's interpretation.

## IV. The District has satisfied all applicable Commission rules in 30 Texas Administrative Code Chapter 288.

In addition to its complaints regarding Section 11.085(*l*)(2) of the Texas Water Code, NWF contends that the Commission should not have approved the application or issued the permit because the District did not satisfy the Commission's water conservation plan rules. NWF's argument on this point is flawed for multiple reasons, each of which is discussed below.

**A.    NWF did not preserve error regarding Chapter 288 of the Commission's rules.**

The Commission has an assortment of rules that govern its consideration and approval of applications seeking new appropriations of State water, including the application at issue in this appeal.  30 Tex. Admin. Code Chs. 295, 297.  The Commission also has a mutually exclusive assortment of rules that guide its approval of water conservation plans.  30 Tex. Admin. Code Ch. 288.  Without a bridge connecting these two discrete regulatory reviews, one does not affect the other.

The Commission's rules contain just two bridge points that link the guidelines for approving water conservation plans to the application requirements for new appropriations of State water—Section 288.7 and Section 295.9 of the Commission rules.  30 Tex. Admin. Code §§ 288.7, 295.9.  NWF has chosen only one of these two bridges—Section 295.9 of the Commission rules—as the route for its complaints about the application's compliance with Chapter 288.[91]

Each application for a new water right must include a water conservation plan that complies with the Commission's water conservation plan rules—that is, the applicable regulations found at 30 Texas Administrative Code, Chapter 288.  In the initial paragraph of Section 295.9, the Commission requires the following:

---

[91]    CR 66-266 (Plaintiff's Initial Brief, Oct. 16, 2014, at notes 75, 89).

31

> An application relating to the appropriation or use of state water must include water conservation and drought contingency plans meeting applicable requirements contained in this section. ***An application not accompanied by such plans is not administratively complete and shall not be considered by the commission, unless expressly exempted by this section.***

30 Tex. Admin. Code §295.9 (emphasis added). Additionally, Commission rules require that "[a] water conservation plan submitted with an application to appropriate or to use state water by a wholesale water supplier must be submitted in accordance with the guidelines set forth in Chapter 288 of [the Commission rules]." *Id.* § 295.9(2).

NWF's reliance in this appeal on Section 295.9 of the Commission's rules is flawed, however, because the review required by Section 295.9 applies only to the District's water conservation plan that was being implemented at the time the application was filed in 2003, not the 2012 Water Conservation Plan, as NWF suggests. In clear terms, Section 295.9 of the Commission's rules states that the District's application could not have been administratively complete if the application was not accompanied by a water conservation plan that satisfied Chapter 288 of the Commission's rules. 30 Tex. Admin. Code § 295.9. In fact, Section 295.9 prohibits the Commission from considering an application if it was not accompanied by a compliant water conservation plan before it was administratively complete. *Id.*

The Commission declared the application to be administratively complete on August 13, 2004.[92] NWF has not, at any time, challenged the validity of the Commission's determination that the application was administratively complete, nor has NWF alleged that the water conservation plan that accompanied the application in 2003 did not comply with Chapter 288 of the Commission's rules.[93] But the Commission rules are clear on this point: the application could not have been administratively complete if the water conservation plan that accompanied the application in 2003 did not meet the requirements of Chapter 288 of the Commission's rules. 30 Tex. Admin. Code §§ 295.9, 295.9(2).

In fact, if NWF were to have perfected any error for appeal regarding compliance with Section 295.9 of the Commission rules—and by NWF's own extension, its complaints regarding Chapter 288 compliance[94]—NWF must have alleged error regarding: (1) the water conservation plan that accompanied the application in 2003; (2) the Commission's determination that the application was administratively complete in 2004; and (3) the Commission's grounds for considering the application. NWF has not alleged any of these errors. NWF has therefore waived any complaint regarding the application's compliance with

---

[92] 12 AR 168.

[93] *See* 11 AR 151 at Finding of Fact No. 51, and Conclusion of Law No. 4 (recognizing that the application was administratively complete); *cf.* 11 AR 148 (NWF Motion for Rehearing raising no challenge to the validity of the Commission's declaration that the application was administratively complete).

[94] CR 66-266 (Plaintiff's Initial Brief, Oct. 16, 2014, at notes 75, 89).

33

Chapter 288 of the Commission rules by virtue of Section 295.9 of the rules. *Hamamcy v. Texas State Bd. of Med. Examiners*, 900 S.W.2d 423, 425 (Tex. App.—Austin 1995, writ denied) (holding that the failure of a party to properly identify an issue in a motion for rehearing deprives the trial court of jurisdiction over an appeal involving the issue).

Once the application was administratively complete, the Section 295.9 bridge between water conservation plan requirements and water right application requirements was crossed. Section 295.9 of the Commission rules no longer governed the Commission's consideration of any District water conservation plan that was submitted during the application process after that time. 30 Tex. Admin. Code § 295.9. NWF's complaints regarding compliance with Chapter 288 of the Commission's rules should be denied on this ground alone.

**B.    The record nonetheless demonstrates that the 2012 Water Conservation Plan complies with Chapter 288 of the Commission's rules.**

Even if NWF had preserved the error it alleges on this point, its argument is nevertheless flawed because the 2012 Water Conservation Plan does satisfy the Commission's rules regarding water conservation plans. NWF argued on appeal to the district court that TCEQ should not have approved the application because the 2012 Water Conservation Plan did not include: (1) "the means for implementation and enforcement required by TCEQ's rules" or (2) "the required basis for the

development of its five-year and ten-year targets for water savings in accordance with TCEQ's rules."[95]  Substantively, NWF is wrong on both counts.

### 1. The 2012 Water Conservation Plan includes enforcement provisions.

The evidence demonstrates that the District's 2012 Water Conservation Plan complied with Section 288.5.  In the 2012 Water Conservation Plan, the District explains that as a wholesale supplier it has no direct relationship with retail water consumers.[96]  In the same document, the District explains that the Texas Legislature has given it no ordinance powers or other legal ability to penalize retail water consumers relating to their use of water.[97]  The District further explains in the document that because enforcement authority over retail water consumption has been delegated to the local water utilities that make up its membership and customer base, the 2012 Water Conservation Plan is designed to leverage their enforcement capabilities.[98]

The District's primary relationship with its members and customers is by contract.[99]  The 2012 Water Conservation Plan contains revised contract language that is inserted into all new contracts with the District and revisions to existing

---

[95]  CR 66-266 (Plaintiff's Initial Brief, Oct. 16, 2014) at 25-30.

[96]  18 AR 239 at 6.

[97]  18 AR 239 at 6.

[98]  18 AR 239 at 9.

[99]  12 AR 163:10-11.

35

contracts,[100] and it explains that the District's new and existing wholesale water supply contracts provide the District with a reasonable means of enforcing the plan.[101]

The record contains substantial evidence that the District has appropriately described all components of enforceability in the 2012 Water Conservation Plan.

### 2. The 2012 Water Conservation Plan details the five-year and ten-year targets.

The 2012 Water Conservation Plan provides a lengthy discussion of the basis for its conservation approach and the underlying premise for each of the strategies and goals in the plan.[102] Specifically, the District explains the bases of its per capita water use goals—referenced as the 5-Year GPCD (gallons per capita per day) Goal and the 10-Year GPCD Goal—in Section 3.[103] The document explains that the District's service area is in a state of transition from largely rural land use to predominantly urban land use.[104] It further explains that the transition brings with it a traditional increase in per capita water use.[105] Coupled with a rapid population increase among its members and customers, the per capita use can be a

---

[100] 18 AR 239 at 9.

[101] 18 AR 239 at 9.

[102] See generally 18 AR 239.

[103] 12 AR 163 at 10-11.

[104] 18 AR 239 at 6.

[105] 18 AR 239 at 6.

36

difficult measure to identify.[106]    The 2012 Water Conservation Plan clearly explains these components of its bases.

The 2012 Water Conservation Plan also describes the limited tools available to the District in affecting individual daily water consumption.[107]   The document explains that the District currently does, and will continue to, keep unaccounted-for water losses in its distribution system below five percent, maintain a universal metering program among all of its customers, regularly calibrate the measuring devices, maintain its system-wide leak detection and repair program, leverage wastewater reuse, maintain its enhanced public awareness campaign for water conservation, encourage the embrace of water-conserving landscaping, enhance public awareness of the benefits of watershed protection, and use other tools as available.[108]

Notably, many customers of the District rely on additional sources of water, for example, privately owned groundwater wells.[109]   These sources fall outside of the District's legal jurisdiction, and the uses of that water is beyond the District's water conservation plan influences.  Nevertheless, the District's conservation effort focuses on the total usage from all sources, not just the amount of water being

---

[106]   18 AR 239 at 6.

[107]   18 AR 239 at 6-7.

[108]   18 AR 239 at 6-7.

[109]   12 AR 154 at 46:22-47:2.

37

purchased from the District.[110]  District customers used an average of 184 gallons per person per day, from all sources, between 2005 and 2011.[111]  The District explains in the 2012 Water Conservation Plan that it established its five-year goal of 175 gallons of total water use per person each day, and its ten-year goal of 170 gallons of total water use per person each day, based on consideration of the factors it can control, as well as those it cannot.[112]  The record contains substantial evidence that the District explained the bases of its five-year and ten-year water conservation targets in the 2012 Water Conservation Plan.

## V.     The substantial rights of NWF have not been prejudiced.

The substantial evidence standard of review set out in Section 2001.174(2) of the Texas Government Code contains a two-part requirement, which NWF was required to satisfy to receive the relief it sought at the district court.  First, NWF was required to prove that the TCEQ's administrative findings, inferences, conclusions, or decisions in approving the application or issuing the Lake Ralph Hall permit violated any certain criteria listed in Section 2001.174(2)(A)-(F).  Second, it must have demonstrated that any such conduct or omission *actually prejudiced* NWF's substantial rights.  That is, NWF must have shown how a particular right it possessed was harmed by the agency's decision.  Tex. Gov't

---

[110]  12 AR 163 at § 3.
[111]  12 AR 154 at 46:17-19.
[112]  18 AR 239 at 6-7.

Code § 2001.174(2); *Charter Medical*, 665 S.W.2d at 452 (a reviewing court may reverse because of the lack of substantial evidence only if such absence has prejudiced the substantial rights of the litigant); *United Sav. Ass'n of Tex. v. Vandygriff*, 594 S.W.2d 163, 171-72 (Tex. Civ. App.—Austin 1980, writ ref. n.r.e.) (finding statutory language similar to Section 2001.174 (2), Gov't Code, to create a condition precedent to relief in an appeal of an administrative decision, and finding that, in order to complain of an agency decision, the complaining party "must show some right that is subjected to harm because of the agency's action"); *Lone Star R.V. Sales, Inc. v. Motor Vehicle Bd. of Tex. Dep't of Transp.*, 49 S.W.3d 492, 500 (Tex. App.—Austin 2001, no pet.) (noting that "[e]ven if we were to find, however, that the Board engaged in an unlawful procedure, the task at hand is to determine whether [the complaining party's] substantial rights were prejudiced by the Board's consideration of the exceptions."). Stated differently, even if NWF were able to show that the Commission failed to satisfy each element of Section 2001.174(2)(A)-(F) of the Texas Government Code in its decision on the Lake Ralph Hall permit, the Court cannot disturb the agency's action in this case unless NWF demonstrates that the agency's alleged failures prejudiced at least one of NWF's substantial rights. *Charter Medical*, 665 S.W.2d at 452; *Vandygriff*, 594 S.W.2d at 171-72; *Lone Star R.V. Sales*, 49 S.W.3d at 500. The record is devoid of any evidence demonstrating that NWF has any substantial rights that were

39

prejudiced by the Commission's decision on the application, and none were earnestly described in the district court proceeding. Accordingly, the trial court's judgment should be reversed on this ground alone. *Id*.

## CONCLUSION AND PRAYER

NWF bears the burden of proof on this *de novo* review of the trial court's judgment. NWF must prove that not even a scintilla of evidence in the record supports the Commission's decision on the portion of the application requesting an interbasin transfer of State water. The burden is high, and NWF cannot meet it. The District relied on a wide variety of sources, including its board members, water experts, District staff, customers, and engineering consultants, to develop a water conservation plan that met the "highest practicable levels achievable within the jurisdiction" standard required under Section 11.085(*l*)(2) of the Water Code. The Commission has a unique understanding of the subject matter at issue in this appeal. Through the lens of that unique understanding, the Commission granted the permit using the authority provided to it by the Legislature. NWF failed to preserve error to make its argument that the District did not comply with Section 288.5 of Title 30, Texas Administrative Code, and it failed to demonstrate that its substantial rights have been prejudiced by any alleged error. The District respectfully prays that this Court reverse the judgment of the trial court and affirm the Commission's decision to grant the permit for the Lake Ralph Hall project.

Respectfully submitted,

**LLOYD GOSSELINK
  ROCHELLE & TOWNSEND, P.C.**
816 Congress Avenue, Suite 1900
Austin, Texas 78701
Telephone:  (512) 322-5800
Facsimile:   (512) 472-0532

/s/ Lambeth Townsend
**LAMBETH TOWNSEND**
State Bar No. 20167500
ltownsend@lglawfirm.com

**JASON T. HILL**
State Bar No. 24046075
jhill@lglawfirm.com

**ELIZABETH P. HERNANDEZ**
State Bar No. 24080942
ehernandez@lglawfirm.com

**ATTORNEYS FOR APPELLANT
THE UPPER TRINITY REGIONAL
WATER DISTRICT**

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this Brief of Appellant, Upper Trinity Regional Water District, not counting the portions properly excepted as shown in Texas Rule of Appellate Procedure 9.4(i)(1), contains **8,344** words according to the word count of the computer program used to prepare the document.  It therefore complies with the word limit found in Tex. R. App. P. 9.4(i)(2)(B).

/s/ Lambeth Townsend
LAMBETH TOWNSEND

41

# CERTIFICATE OF SERVICE

I certify that on this, the 26th day of June, 2015, a true and correct copy of the foregoing submission has been served on the persons listed below by electronic transmission.

Myron J. Hess
hess@nwf.org
Annie E. Kellough
kellough@nwf.org
National Wildlife Federation
44 East Avenue, Suite 200
Austin, Texas  78701


**ATTORNEYS FOR APPELLEE**
**NATIONAL WILDLIFE FEDERATION**

Cynthia Woelk
cynthia.woelk@texasattorneygeneral.gov
Assistant Attorney General
Environmental. Protection Division
Office of Texas Attorney General
P. O. Box 12548-MC015
Austin, Texas  787l11-2548

**ATTORNEYS FOR APPELLANT**
**TEXAS COMMISSION ON ENVIRONMENTAL QUALITY**


/s/ Lambeth Townsend
LAMBETH TOWNSEND

**INDEX OF APPENDICES**

Appx. A     UTRWD Exh. 24 (Photographs of North Sulphur River) [19 AR 246]

Appx. B     UTRWD Exh. 11U (2012 Water Conservation Plan) [18 AR 239]

Appx. C     UTRWD Exh. 38 (24-page excerpt of Report 362) [19 AR 260]

Appx. D     Texas Water Code
              Section 11.022
              Section 11.085
              Section 11.121
              Section 11.1271
              Section 11.134

Appx. E     Texas Government Code
              Section 311.011
              Section 311.021
              Section 2001.171
              Section 2001.174

Appx. F     Title 30 Texas Administrative Code
              Section 288.2
              Section 288.5
              Section 288.6
              Section 288.30(1)
              Section 288.30(10)(B)
              Section 295.9
              Section 297.11
              Section 297.18

Appx. G     District Enabling Act
              Act of May 20, 1989, 71st R.S., ch. 1053, 1989 Tex. Gen. Laws 4269 (1989 Act)
              Act of May 24, 1995, 74th R.S., ch. 494, 1995 Tex. Gen. Laws 3233 (1995 Act)
              Act of April 20, 2001, 77th R.S., ch. 46, 2001 Tex. Gen. Laws 76 (2001 Act)

Appx. H     Act of May 28, 2003, 78th Leg., R.S. ch. 688, § 1, 2003 Tex. Gen. Laws 2116

# APPENDIX A



Record Copy

JAN 17 2013

EC

UTRWD
Exh.
24

# APPENDIX B

# Upper Trinity Regional Water District

# WATER CONSERVATION PLAN
## *Updated*



**September 2012**

**Prepared By:**

Upper Trinity Regional Water District
PO Drawer 305
Lewisville, TX  75067
972-219-1228

UTRWD
EXHIBIT
11U

# TABLE OF CONTENTS

**Section 1.    Introduction and Objectives** ........................................................................ 1

    1.1    Texas Commission on Environmental Quality Rules ................................. 2

**Section 2.    Water Utility Profile** .................................................................................... 4

**Section 3.    Water Conservation Planning Goals** ........................................................ 6

**Section 4.    Basic Water Conservation Strategies** ...................................................... 7

    4.1    Accurate Supply Source Metering ........................................................... 7
    4.2    Monitoring and Record Management of Water Deliveries, Sales & Losses ........... 7
    4.3    Program for Leak Detection & Repair, and Water Loss Accounting ......... 8
    4.4    Requirement for Water Conservation Plans by Wholesale Customers ...... 9
    4.5    Reservoir System Operation Plan ............................................................ 9
    4.6    Coordination with Regional Water Planning Groups ............................... 10

**Section 5.    Enhanced Water Conservation Strategies** ............................................. 10

    5.1    Reuse and Recycling of Reclaimed Water ............................................. 10
    5.2    Public Education .................................................................................... 10
    5.3    Water Conserving Landscaping ............................................................. 11
    5.4    Landscape Water Management Measures .............................................. 12
    5.5    Pressure Control .................................................................................... 12
    5.6    Watershed Protection ............................................................................ 12
    5.7    Enhanced Contract Provisions ............................................................... 13
    5.8    Irrigation System Evaluations / Technical Assistance ............................. 13
    5.9    Industrial, Commercial and Institutional (ICI) Audits .............................. 13
    5.10   Annual Reports ...................................................................................... 13
    5.11   Means for Measuring Success ............................................................... 13
    5.12   Water Rate Surcharge ........................................................................... 13
    5.13   Recycle Water from Water Treatment Plants .......................................... 14
    5.14   In-House Water Conservation Efforts ..................................................... 14
    5.15   Model Water Conservation Plans for Upper Trinity Customers ............... 14
    5.16   Conservation Support for Customers ...................................................... 16

**Section 6.    Implementation and Enforcement of the Plan** ........................................ 16

# APPENDICES

Appendix A      Texas Commission on Environmental Quality Minimum Requirements for a Water Conservation Plan

Appendix B      Upper Trinity Regional Water District's Water Utility Profile

Appendix C      Letter to Chairman of Region C Water Planning Group

Appendix D      Ordinance or Resolution from Governing Body Adopting the Water Conservation Plan

# LIST OF TABLES

Table 3.1      Per Capita Water Use Goals

# LIST OF FIGURES

Figure 2.1      Map of Upper Trinity's Planning and Service Area
Figure 2.2      Upper Trinity Wholesale Water Customers

# UPPER TRINITY REGIONAL WATER DISTRICT
## Water Conservation Plan
### Updated September 2012

## SECTION 1

### Introduction

Water supply has always been a key issue in the growth and development of communities in Texas. In recent years, the growing population and economic development of North Central Texas has led to increasing demands for water. Additional supplies to meet these demands will be both expensive and difficult to develop. Therefore, it is important that we make the most efficient use of existing supplies - - to minimize the need for new resources.

Effective water conservation can postpone or reduce the need for development of new water supplies, minimize the associated environmental impacts, and reduce the high cost of water supply development. Even with robust conservation measures, new sources of water will be needed; conservation alone is not enough. Therefore, to respond to the growing population of this region, the planning for new water resources must continue. Upper Trinity Regional Water District ("Upper Trinity") considers water conservation (including reuse of reclaimed wastewater) an integral part of this planning and water supply development process.

Upper Trinity was created in 1989 by the Texas Legislature to provide treated water service on a wholesale basis to towns, cities, and other water utility providers. Currently, Upper Trinity provides wholesale treated water service to twenty members and customers (serving more than twenty-five communities) in Denton and Collin Counties (herein "Customers").

Recognizing the need for efficient use of existing water supplies, the Texas Commission on Environmental Quality ("TCEQ") has promulgated guidelines and requirements governing the development of water conservation plans for Wholesale Public Water Suppliers. Upper Trinity developed its original plans for Water Conservation and for Drought Contingency in May 1993, later amended in March 2005 and April 2009. This update of the Water Conservation Plan (the "Plan") has been coordinated with the suggested model water conservation plan prepared by Upper Trinity for Customers offering retail service; and, is consistent with the latest TCEQ requirements outlined below. This Plan also incorporates water conservation practices and strategies recommended by the Water Conservation and Implementation Task Force ("Task Force") and the Water Conservation Advisory Council ("Advisory Council"). Both the Task Force and the Advisory Council were created by the Texas Legislature to foster basic and enhanced water conservation measures and practices for Wholesale Public Water Suppliers like Upper Trinity.

### Objectives

Water is a basic tenant in all aspects of sustainability. Water conservation is one critical element of a utility's effort to meet future water supply needs, in an economical manner and without sacrificing quality of life standards. The following are the central objectives of this Plan:

- Provide support and incentives to communities to maintain and continue sound conservation practices;

- Reduce water consumption from levels that would otherwise prevail without conservation efforts;

- Reduce the loss and waste of water, as evidenced by per capita water use;

- Continue to improve efficiency in the use of water;

- Achieve greater reuse of reclaimed wastewater in helping to sustain an adequate supply; and

- Extend the adequacy of current water supplies by reducing the pace of growth in the demand for water.

In an effort to meet each of the above central objectives, Upper Trinity will provide leadership and technical assistance to its Customers in order to maximize water savings and water efficiency within its service area. Upper Trinity has dedicated staff to lead its regional water conservation program and to assist its Customers with implementation of their respective conservation strategies. Similarly, to coordinate and communicate consistent conservation strategies, Upper Trinity is creating a work group within the Customer Advisory Council for the Regional Treated Water System to focus on water conservation matters and will encourage each Customer to designate a staff member with responsibility for implementing and reporting on its water conservation program.

## 1.1 Texas Commission on Environmental Quality Rules

TCEQ rules governing the development of water conservation plans for Wholesale Public Water Suppliers are contained in Title 30, Part 1, Chapter 288, Subchapter A, and Rule 288.5 of the Texas Administrative Code. Copies of these rules are included in Appendix A. The rules define a water conservation plan as:

> "A strategy or combination of strategies for reducing the volume of water withdrawn from a water supply source, for reducing the loss or waste of water, for maintaining or improving the efficiency in the use of water, for increasing the recycling and reuse of water, and for preventing the pollution of water."

A.     Basic Water Conservation Plan Requirements
TCEQ requires that water conservation plans for Wholesale Public Water Suppliers, like Upper Trinity, include the following components:

- *Utility Profile:* Information regarding population and customer data, water use data, water supply system data, and wastewater system data. (Section 2)

- *Goals:* Specific quantified five-year and ten-year targets for water savings to include goals for water loss programs, in gallons per capita per day (GPCD). (Section 3)

- *Accurate Metering Devices:* TCEQ requires that metering devices have an accuracy of plus or minus five percent (5%) for measuring water diverted from the supply source. (Section 4.1)

- *Record Management System:* A system to record water delivered, water sold, and water lost. (Section 4.2)

- *Program for Leak Detection & Repair, and Water Loss Accounting:* A program to detect and repair leaks, and water loss accounting for the water storage, delivery, and distribution system. (Section 4.3)

- *Wholesale Customer Requirements:* A requirement that every water supply contract entered into or renewed after official adoption of the water conservation plan, including any contract extension, include a provision that each successive wholesale customer develop and implement a water conservation plan with similar water conservation strategies to this Plan, including applicable elements of Title 30 TAC Chapter 288. (Section 4.4)

- *Reservoir Systems Operational Plan:* A requirement to provide a coordinated operational structure for operation of reservoirs owned by the water supply entity within a common watershed or river basin in order to optimize available water supplies. (Section 4.5)

- *Coordination with Regional Water Planning Group:* Document that the Plan has been coordinated with the Regional Water Planning Group to insure consistency with the appropriate approved regional water plan. (Section 4.6)

- *Means of Implementation and Enforcement:* A strategy for implementing and enforcing the provisions of this Plan, as evidenced by an ordinance, resolution, or tariff, and a description of the authority by which the Plan is enforced. (Section 6)

B.  Enhanced Water Conservation Strategies

Upper Trinity will also incorporate the following additional conservation strategies, as needed, to achieve the conservation goals stated in this Plan:

- *Program for Reuse and/or Recycling:* Upper Trinity has implemented a program of reclaiming and recycling treated wastewater effluent in order to further the efficient use of water. (Section 5.1)

- *Public Education Program:* Upper Trinity has implemented public education and outreach programs that include an informative school program, a literature program, special events and promotions program, a website dedicated to water conservation, a public awareness program, and it provides speakers to various groups on conservation while coordinating with other North Texas water suppliers and Customers to promote water conservation. (Section 5.2)

- *Water Conserving Landscaping:* As part of its public education activities, Upper Trinity has implemented and fostered programs to support the conservative use of water in landscape by its Customers and their retail customers. (Section 5.3)

- *Landscape Water Management:* A strategy for implementing and achieving the efficient use and stewardship of water in landscape irrigation, including watering a maximum of two times per week and time-of-day watering provisions. (Section 5.4)

- *Enhanced Contract Language:* Upper Trinity will implement additional language in future contracts to continue to improve conservation and the efficient use of water. (Section 5.7)

- *Irrigation System Evaluations / Technical Assistance:* A program to provide technical assistance and training to Customers and their retail customers (residential, industrial, commercial, and institutional), if requested, regarding efficient and effective landscape

watering practices. (Section 5.8)

- *ICI Program:* A facilities and processes audit program that will assist Customers and their retail industrial, commercial, and institutional ("ICI") customers with audits of their facilities to explore the development of economical and practical water efficiency measures that will contribute to increased water conservation in their processes. (Section 5.9)

*Other Strategies:* Upper Trinity has developed model water conservation and drought contingency plans for use by its Customers (Section 5.15). In addition, Upper Trinity has a dedicated staff to lead its regional water conservation program and to assist Customers with implementation of their respective conservation strategies; and, has created a work group within Upper Trinity's Customer Advisory Council to focus on water conservation matters in order to better coordinate and communicate consistent conservation strategies (Section 5.16). Other strategies also include pressure controls to maintain System integrity to avoid the loss of water (Section 5.5), watershed protection measures (Section 5.6), and establishing a means for measuring success in water conservation (Section 5.11).

Upper Trinity will continue to evaluate and implement water conservation strategies and practices that will further the conservation of its water supplies. This Plan sets forth a program of long-term strategies under which Upper Trinity can maintain and continue existing conservation results, plus improve the overall efficiency of water use and conserve its water resources. Shorter-term strategies that address specific water management conditions (i.e., periods of drought, unusually high water demands, unforeseen equipment or system failure, or contamination of water supply sources) are provided in Upper Trinity's Drought Contingency Plan.

## SECTION 2

### Water Utility Profile

Upper Trinity's Regional Treated Water System ("System") provides services to its wholesale Customers through two water treatment plants (Thomas E. Taylor Water Treatment Plant and the Tom Harpool Water Treatment Plant), and a system of pipelines and pump stations that deliver water to each Customer at specified points of delivery. The System does not include facilities "downstream" of such points of delivery (i.e., internal, retail distribution system). Upper Trinity currently obtains its raw water from Lewisville Lake, Ray Roberts Lake, Jim Chapman Lake and from the reuse of water imported from Jim Chapman Lake. A dependable supply of water from these sources is confirmed and enabled by various contractual agreements between Upper Trinity and the respective water rights holders.

Upper Trinity's planning area, as established by the Region C Water Planning Group, includes all communities currently served plus additional portions of Denton, Grayson, Wise and Cooke counties. See Figure 2.1 for a map of Upper Trinity's planning (service) area.



Figure 2.1
Map of Planning & Service Area

---



**Figure 2.2**
**Upper Trinity Wholesale Water Customers**

Using surface water supplies, Upper Trinity currently provides treated water service to twenty Customers serving more than twenty-five communities in Denton and Collin Counties. Figure 2.2 lists both direct Customers of Upper Trinity and the other communities served indirectly.

Projections of water needs are based on dry-year demands anticipated by Customers, and reviewed and considered by Upper Trinity. Actual water usage will vary from year to year depending on climatic conditions, and on growth and development within the service area and on various factors affecting retail customers within a Customer's residential, commercial, industrial and institutional customer categories. Upper Trinity's population projections and raw water demand projections for its planning area are included in the 2011 Region C Water Plan, and the 2012 State Water Plan.

Some Upper Trinity Customers also use groundwater for a portion of their water supply. In Denton County, groundwater resources are very limited; the County has been included in a "Priority Groundwater Management Area" by the TCEQ, and a groundwater conservation district has been created to manage and conserve groundwater resources within the County. One of the key purposes of Upper Trinity's regional water program is to avoid further draw-down of these limited ground water resources, and to make surface water available as a more reliable and sustainable source for further growth in Upper Trinity's service area. To this end, conservation, reuse, and the development of additional water supply resources that will allow for additional reuse supplies, will contribute greatly to the conservation program's success.

Appendix B of this Plan includes an updated water utility profile for Upper Trinity, based on the format recommended by TCEQ. The water utility profile includes additional information regarding population and Customer data, water use data, water supply system data, and

wastewater system data.

# SECTION 3

## Water Conservation Planning Goals

As a wholesale water supplier, Upper Trinity does not have a direct relationship with retail customers who are the ultimate consumers of the treated water it provides to its Customers. Further, Upper Trinity doesn't have ordinance or policy power over such retail customers or their use of treated water supplied in wholesale transactions with Customers. As a result, and as noted in Section 4.4 below and Section 5.7, Upper Trinity has limited control or influence over the use of water being purchased by its Customers. Some Upper Trinity Customers are projected to require increased supplies for their future growth and development, which may result in increases to historical municipal per capita use, during and following periods of population growth. Reasons for such potential increases include:

- Upper Trinity's service area continues to transform from a historically rural to a primarily urban land use, causing some communities to experience an increase in per capita water use.

- Some Upper Trinity Customers will experience substantial population growth in future years, generating changes in commercial and economic activity. With a growing infrastructure of retail industrial, commercial, and institutional customers using water supplied by Upper Trinity to its wholesale Customers, increases in municipal per capita water use can be expected for these communities.

- The municipal per capita use for Upper Trinity's System can be affected by changes in per capita use for its Customers. It can also be affected by how much water Upper Trinity is asked to supply to different communities with widely varying growth factors and water usage characteristics. Nonetheless, Upper Trinity's water conservation efforts are expected to significantly influence per capita water use that could otherwise result from continued growth in its service area. Upper Trinity will make every effort to measure and quantify savings achieved through the programs it implements, and will encourage its Customers to measure savings from the programs they implement, as well.

Upper Trinity does, however, control the operation of its own water treatment and transmission system and it can take direct action to maximize the water use efficiency of System operation. Upper Trinity adopts the following water conservation and efficiency goals within the System:

- Maintain the level of unaccounted-for water in the System below five percent (5%) annually;

- Maintain a program of universal metering of Customers and regular meter calibration; and, meter replacement and repair;

- Maintain a program of leak detection and repair;

- Continue to utilize wastewater reuse as a major source of future water supply, to the maximum extent feasible;

- Continue to recycle wash-water from Upper Trinity water treatment plants, to the

maximum extent feasible;

- Continue to implement other in-house water conservation efforts;

- Continue to raise public awareness of water conservation and encourage responsible public behavior through a coordinated public education program;

- Encourage landscape water management strategies on a routine basis to help instill good habits and responsible stewardship for water conservation;

- Maintain and promote a first-class demonstration program for water-smart practices in landscape and gardening;

- Expand public education about the need to protect water quality through a continuing program for watershed protection.

Upper Trinity has developed 5-year and 10-year water conservation goals as part of the Plan. Table 3.1 below shows the projected municipal per capita water use for Upper Trinity, as recommended by Region C Water Planning Group and approved by the Texas Water Development Board ("TWDB"). This table also shows Upper Trinity's goals for municipal per capita water use with a reduction for results in implementing this Plan; and, as supported by plans to be implemented by Upper Trinity Customers.

**Table 3.1**
**Per Capita Water Use Goals**

|  | 5-Year GPCD Goal (Gallons) | 10-Year GPCD Goal (Gallons) |
|---|---|---|
| Average Per Capita Use Per Day | 204 | 208 |
| Less Projected Reduction Due to Strategies of this Plan | 29 | 38 |
| **Water Conservation Goal** | **175** | **170** |

# SECTION 4

## Basic Water Conservation Strategies

This section outlines Upper Trinity's basic water conservation program strategies that will be implemented to achieve and exceed the stated water conservation goals above.

### 4.1 Accurate Supply Source Metering

Upper Trinity measures all raw water diversions using meters with an accuracy of plus or minus two percent (2%) in accordance with AWWA standards. Said meters are calibrated annually in accordance AWWA standards. When necessary, Upper Trinity will repair or replace meters not conforming to an accuracy of plus or minus two percent (2%).

### 4.2 Monitoring and Record Management of Water Deliveries, Sales and Losses

Upper Trinity regularly monitors all water deliveries and sales to all Customers. All critical data, such as raw water conveyance to water treatment plants or to Customers, treated water pumped, and unaccounted-for water, are available on a regular basis as needed. All water sources and water delivered to Customers is metered and recorded, as follows:

- Water delivered to all Customers is measured by individual meters with an accuracy of plus or minus two percent (2%) in accordance with AWWA standards, and in most cases with rate-of-flow controllers. Said meters are read monthly by Upper Trinity personnel, with the meter readings being used to invoice Customers. Meters are calibrated and tested annually, and as needed, in accordance with AWWA standards. Customers may witness the calibrations of these meters.

- Treated drinking water leaving the District's water treatment plants and pumping facilities is also measured by meters with a minimum accuracy of plus or minus two percent (2%).

- Upper Trinity monitors unaccounted-for water in its treatment and transmission system to its Customers. (For Upper Trinity, unaccounted-for water is defined as the amount of raw water diverted to or received at the treatment plants, less metered sales to Customers, less water used during the treatment process, and water used for line flushing and construction purposes.)

A goal of Upper Trinity's water conservation program is to maintain unaccounted water below five percent (5%).

## 4.3    Program for Leak Detection & Repair, and Water Loss Accounting
Upper Trinity's metering program for raw and treated water is described in Sections 4.1 and 4.2 above. As evidenced by a historically low level of unaccounted-for water, Upper Trinity has an effective program to control, detect and repair leaks:

- In most projects, Upper Trinity's water pipelines consist of ductile iron pipe, reinforced concrete cylinder pipe, or steel cylinder pipe with an internal protective liner and an external protective coating and/or polywrap. Because of the multi layers of material, these pipelines have very long service lives and are not subject to excessive leaks.

- Most joints in Upper Trinity pipelines are designed with bell and spigot joint construction, including a rubber gasket. Some joints are welded. For larger lines other than ductile iron, each joint is also coated with grout for corrosion protection.

- All Upper Trinity pipelines are constructed in legally defined and identified rights-of-way, properly registered with authorities in each county. Most are in exclusive rights of way on private property, protecting the pipelines from possible damage by a third party.

- Upper Trinity routinely inspects its facilities and pipelines for leaks or mechanical problems. Repairs are undertaken as soon as practicable in order to minimize waste.

- Upper Trinity operates a program for identification of construction projects adjacent to Upper Trinity facilities and pipelines in order to minimize leaks caused by pipeline damage during construction.

- Upper Trinity's metering program allows comparison of metered flows in the System with metered deliveries to Customers, which can be used to identify leaks.

- Upper Trinity's regular monitoring of unaccounted-for water provides a further check for problems in the transmission system.

## 4.4 Requirement for Water Conservation Plans by Wholesale Customers

Contracts for the wholesale purchase of water by Upper Trinity Customers provide that the wholesale Customer will develop water conservation and an emergency water demand management plan appropriate and adequate for local conditions and circumstances. These plans are subject to review and approval by Upper Trinity. Any new contract for wholesale water service entered and any renewed or extended contract with a Customer after the adoption of this Plan will require the Customer to adopt similar water conservation strategies as outlined in this Plan, and providing enforcement thereof. In addition, each Customer has agreed to coordinate with Upper Trinity the implementation of any action to limit or curtail water supplies to minimize adverse impact on Upper Trinity's water system operations, and on adequacy of service, and to promote public understanding of the need for and terms of such limitation or curtailment.

Current wholesale contracts utilized by Upper Trinity include some version of the following provisions:

*It is the policy of the District to prepare, adopt, and maintain a regional water conservation plan which incorporates loss reduction measures and demand management practices which insure that the available supply of the System is used in an economically efficient and environmentally sensitive manner. Similarly, it is the policy of the District to prepare, adopt and maintain a drought and emergency conditions plan for water supply to Customers. Each Customer agrees to cooperate in the implementation of both plans and to adopt and enforce such or similar plans for use within its respective jurisdiction. Customer may be required by State or Federal agencies to implement a water conservation plan; also, the District reserves the right to require Customer to implement a water conservation plan. The Customer's water conservation plan is subject to approval by District.*

Towns and cities have ordinance powers and greater capability to manage and enforce their own water conservation programs, as compared to a wholesale water supplier. Thus, in order to encourage local initiative and to respond to the diversity of powers, needs, and circumstances, Upper Trinity allows each Customer to develop its own conservation program, but Upper Trinity's contracts allow for its approval of such programs. To assist its Customers, Upper Trinity provides a model water conservation plan for all wholesale customers for use in developing their own water conservation plans.

## 4.5 Reservoir System Operation Plan

Upper Trinity currently purchases raw water from the City of Dallas and City of Denton out of Lewisville Lake and Ray Roberts Lake. In addition, Upper Trinity has a contract for up to 14.4 million gallons of raw water per day from Jim Chapman Lake in the Sulphur River Basin. Further, Upper Trinity has received a permit from TCEQ for the reuse of raw water being imported to the Trinity River Basin, treated to potable water standards, utilized by its Customers, returned to state streams via effluent discharges, and then diverted by Upper Trinity for a second treatment, delivery, and use by its Customers.

Water from Jim Chapman Lake is pumped by pipeline to Lewisville Lake. Treated wastewater effluent from Upper Trinity's three (3) water reclamation facilities and from treatment plants operated by certain Customers is returned to the Lewisville Lake watershed. Upper Trinity relies on the Cities of Dallas and Denton (and the U. S. Army Corps of Engineers) for the operation of Lewisville Lake and Ray Roberts Lake. In addition, the water rights holders of Jim Chapman Lake have developed a water supply operating plan which allows for overdrafting of the reservoir when it is relatively full and also protects the firm annual yield of the reservoir should the drought of record occur. Upper Trinity manages its use of water from these four sources

(Lewisville Lake, Ray Roberts Lake, Jim Chapman Lake and from Reuse) on a system-wide basis to make maximum use of the most efficient or most available source.

## 4.6 Coordination with Regional Water Planning Groups

Appendix C includes a copy of a letter sent to the Chair of Region C Water Planning group to coordinate Upper Trinity's Plan with Region C. In addition, copies of the adopted Plan have been provided to the Executive Director of TCEQ and the Executive Administrator of the TWDB.

# SECTION 5

## Enhanced Water Conservation Strategies

This section outlines enhanced water conservation strategies that Upper Trinity will include as part of its water conservation program.

## 5.1 Reuse and Recycling of Reclaimed Wastewater

Upper Trinity has completed construction of three (3) regional water reclamation facilities with a total treatment capacity of approximately eight (8) million gallons per day. These regional facilities provide wastewater treatment services to twelve (12) municipalities, six (6) special districts and one (1) utility. Reuse is practiced on the plant site for service water and irrigation of landscape.

Upper Trinity has constructed facilities and sells treated wastewater effluent to one of its Customers for golf course irrigation. Upper Trinity continues to promote additional opportunities to expand recycle and reuse markets.

Upper Trinity reuses up to 60% of the water it diverts from Jim Chapman Lake pursuant to a TCEQ reuse permit. The reuse permit is for a single reuse and pass-through cycle of the water imported from Jim Chapman Lake in the Sulphur River Basin. An extensive daily accounting system provides for management of this reuse project.

## 5.2 Public Education Program

As a regional wholesale water supplier, Upper Trinity does not interact directly with retail water customers at whom typical water conservation public education efforts are aimed. However, Upper Trinity's public education program is intended to assist and supplement the public education efforts of its Customers.

The ultimate success of any water conservation program is dependent on an informed public. The individual retail customers must have an awareness of the benefits and needs for water conservation. They must also have knowledge of how to contribute to the success of the Plan. Upper Trinity's public education and information program, including dedicated staff for this program, is designed in cooperation with Customers to provide information to as many of the Customers' retail customers as possible. The elements of Upper Trinity's education program are described below.

- *Informative School Program.* This program currently provides area schools with textbook covers containing water conservation messages. Upper Trinity is working with local school districts to integrate the *Waters to the Sea: Trinity River* into middle school science classrooms. This engaging, multimedia interactive program connects the students to environmental history, hydrology, ecology and water quality and conservation. Also, water conservation is demonstrated to students using a watershed model. The EnviroScape model provides hands-on interaction to show at least twenty

different ways of protecting and conserving water. Educational tours of Upper Trinity's water treatment plants and demonstration garden are also available, promoting water conservation and water quality protection. Educational opportunities include poster contests, classroom presentations, curriculum aids and materials, and teacher workshops.

- *Literature Program.* As part of its water conservation literature program, brochures are designed to educate the public on various water conservation methods. Upper Trinity will make available water conservation brochures covering the following topics:

  o Saving water outdoors,

  o Saving water indoors,

  o Use of native plants and wildflowers in low water-use landscaping,

  o Retrofitting existing structures with high efficiency showerheads and high efficiency toilets.

- *Special Events and Promotions.* For special events sponsored by Customers, Upper Trinity makes available water conservation promotional items such as Texas Smartscape CD's, toilet-leak test kits, Upper Trinity water bottles, water conservation booklets, etc. Upper Trinity also hosts special events focused on conserving water in the landscape and on protecting water quality.

- *Website.* Upper Trinity has included a section on its website dedicated to water conservation. Conservation publications are also available online.

- *Speaking Engagements.* Speakers and presentations are available from Upper Trinity, which promote water conservation ideas to environmental groups, garden clubs, senior citizen centers, youth groups, civic groups, and other citizen and professional groups.

- *Public Awareness Campaign.* Upper Trinity will promote the importance of conservation by placing public service announcements on radio or television or by promoting newspaper articles in newspapers with general circulation in the service area. In accomplishing this strategy, Upper Trinity will partner with other entities to promote a regional conservation message on radio, television and other media.

- *Regional Cooperation.* Upper Trinity will coordinate with other North Texas water suppliers and Customers to benefit all entities in promoting water conservation.

## 5.3    Water Conserving Landscaping
As part of its public education program, Upper Trinity has a Water Wise Demonstration Garden employing **Texas SmartScape®** principles. **Texas Smartscape** was developed in cooperation with cities, utilities and other agencies, including Upper Trinity, to educate citizens on the ecological, economic and aesthetic benefit of using landscape plants, shrubs, grasses and trees that are native or adapted to the regional climate and local conditions.

The goal of the Water Wise Garden is to demonstrate that outdoor landscapes can be both practical and beautiful, using earth-friendly techniques that conserve water resources and protect water quality. Upper Trinity encourages each Customer to use the Water Wise Garden

to demonstrate how to conserve water in landscape practice. Further, the Water Wise Garden is available to garden clubs, developers, and customers throughout the North Texas region to advance public knowledge of water conservation in home and business landscapes. Throughout the year, the Water Wise Garden is used to help train Master Gardeners in Denton County, and as the venue for various public education programs - - all promoting water conservation.

## 5.4    Landscape Water Management

To promote the efficient use and stewardship of water and to provide a consistent message throughout Upper Trinity's service area, Upper Trinity urges each Customer to include the following landscape water management strategy into their respective water conservation plans:

- *Watering Maximum of Two Times per Week.* Limit outdoor watering (automatic systems or hose-end sprinklers) to no more than two (2) times per week. Watering with hand-held hoses, soaker hoses or drip irrigation is allowed any time.

- *Time of Day Watering.* No outdoor watering with automatic irrigation systems or hose-end sprinklers from 10:00 am to 6:00 pm each day beginning June 1 and ending September 30 of each year. Watering with hand-held hoses, soaker hoses, or drip irrigation systems is allowed anytime.

Each Customer will be responsible for implementing, communicating and enforcing these landscape water management strategies within its respective jurisdictions

Recognizing that the goal of these strategies is to help instill good habits for conservation of water - - not to be punitive - - each Customer shall have maximum flexibility in administering same. Unless a drought contingency stage is in effect, Customers will be encouraged to allow each retail customer to select the two most convenient days of each week for outdoor watering.

These strategies are intended to be actively promoted by the Customers through public information programs for voluntary or mandatory compliance by their respective retail customers. Upper Trinity will include these strategies as part of its regional public information program and within its model water conservation plan for use by Customers.

During any period that a drought contingency stage is in effect, these strategies would become mandatory and are required to be enforced by all Customers.

## 5.5    Pressure Control to Maintain System Integrity

Upper Trinity installs all necessary pressure control stations to deliver water into each Customer's storage tank. Whenever feasible, Upper Trinity conserves energy by minimizing surplus pressure (head) available at the delivery point to the Customer. Upper Trinity encourages each Customer to determine a reasonable system pressure for each pressure zone in its retail distribution system, install internal pressure control stations where necessary, or install customer service pressure regulators where needed.

## 5.6    Watershed Protection

Protecting our watershed is a priority need for every citizen and every community. As a double benefit, strategies that promote water conservation also tend to protect the quality of water resources. Using earth-friendly techniques, such as native and adaptive plant materials and organic techniques for landscaped areas, requires less water and less use of fertilizers, pesticides and other chemicals. Overuse or improper use of fertilizer, pesticides and other chemicals from landscape activities is also a major source of pollutants that find their way into water resources. Upper Trinity has developed a coordinated program for watershed protection

aimed at educating the public about protecting local watersheds and water quality. To help communicate the important role that watersheds have in the water supply for this region, Upper Trinity has created a watershed logo and sign. These signs are being placed along roadways in Upper Trinity's service area as a constant reminder that we need to keep the watersheds clean.

### 5.7 Enhanced Contract Provisions

All basic contract provisions identified in Section 4.4 will be incorporated into future wholesale water supply contracts. Amendments to wholesale water supply contracts entered into after the adoption of this Plan, including any contract extension or renewal, will require Customers to include strategies included within this Plan into their own water conservation plans. These provisions, coupled with Upper Trinity's prohibition on the subsequent resale of water on a wholesale basis without prior written approval of Upper Trinity, will enable Upper Trinity to achieve the objectives of this Plan.

### 5.8 Irrigation System Evaluations / Technical Assistance

To improve water conservation and efficiency in landscape watering practices, Upper Trinity will, if requested, provide technical assistance and training to Customers and their retail customers (residential, industrial, commercial and institutional). The assistance provided to the Customers could include actual evaluation of the retail customers irrigation system; or, as an alternative, Upper Trinity could offer a training program to its Customers to enable them to perform said irrigation system evaluations. A typical evaluation would include identification of potential system leaks, diagnosis of equipment malfunctions, and recommendations for equipment upgrades to enhance water efficiency. During the evaluation, education about good landscape watering practices and the use of earth-friendly materials could be shared with the retail customer.

### 5.9 Industrial, Commercial and Institutional (ICI) Audits

Upper Trinity, in coordination with its Customers, will offer an outreach program to assist large water users in finding ways to operate more efficiently, save water and energy, and lower their costs. Water savings are realized as the ICI customers implement audit recommendations. In addition to these audits, Upper Trinity would publicly recognize those ICI customers who have implemented said recommendations and have taken proactive steps in using water more wisely and efficiently.

### 5.10 Annual Reports

An important element of Upper Trinity's model water conservation plan is for Customers to provide a copy of its annual conservation report to Upper Trinity at the same time it submits the report to TCEQ. Upper Trinity will compile these reports and use the information to help generate its own annual water conservation report. Upper Trinity's report will be used to review the effectiveness of its water conservation program and will be shared with Upper Trinity's Board and the Water Conservation Committee.

### 5.11 Means for Measuring Success

Upper Trinity will make every effort to measure and quantify water savings achieved through its programs and will encourage Customers to measure and quantify savings from their respective programs. The water saving results from Upper Trinity and its Customers will be regularly reported to the Region C Water Planning Group to incorporate in the State Water Plan.

### 5.12 Water Rate Surcharge

Upper Trinity has a conservation-oriented water rate surcharge as part of its rate structure for Customers. The rate structure for wholesale treated water service is two-part, based on demand and volume. The conservation-oriented surcharge takes effect when the actual volume of water sold during the months of June through September exceed the volume of water

budgeted for the same time period by more than 5%. The surcharge rate is established annually by Upper Trinity's Board of Directors.

## 5.13 Recycle Water from Water Treatment Plants

The wash water from filter washing and sludge from Upper Trinity's water treatment process are pumped into lagoons for recycling. After settling of solids, suitable water is decanted from the lagoons and recycled to the head of the water treatment plant for treatment. This saves water and contributes to Upper Trinity's control of unaccounted water in treatment and transmission.

## 5.14 In-House Water Conservation Efforts

Upper Trinity has implemented an in-house water conservation program, including the following elements:

- Upper Trinity uses native or adapted drought tolerant plants, trees, and shrubs in the majority of its landscapes;
- Irrigation at Upper Trinity facilities occurs during off-peak times at night and early morning to avoid evaporation losses;
- Irrigation will be limited to the amount needed to promote survival and health of plants and lawns, including limitation on frequency and time-of-day watering (see Section 5.4);
- Irrigation will be avoided on Saturday and Sunday if possible, since these are periods of high water use by the public;
- Irrigation will be accomplished with treated wastewater effluent wherever feasible and practicable.

## 5.15 Model Water Conservation Plan for Upper Trinity Customers

Upper Trinity has developed two key documents as part of its water conservation strategies: (1) a *Model Water Conservation Plan;* and, (2) a *Model Drought Contingency Plan.* These model plans are valuable aids to Customers in developing their own water conservation and drought contingency plans, providing for consistency and clarity throughout Upper Trinity's service area.

A.      The *Model Water Conservation Plan* addresses TCEQ Ch. 288 requirements for water conservation for municipal use by Public Water Suppliers. Upper Trinity will work with its Customers in developing or updating their individual water conservation plans using the following requirements:

- *Utility Profile:* Information regarding population and customer data, water use data, water supply system data, and wastewater system data.

- *Goals:* Specific quantified five-year and ten-year targets for water savings to include goals for water loss programs and goals for municipal use, in gallons per capita per day (GPCD). The goals established by a Public Water Supplier are not enforceable under this subparagraph.

- *Accurate Metering Devices:* TCEQ requires that metering devices have an accuracy of plus or minus five percent (5%) for measuring water diverted from the source of supply.

- *Universal Metering, Testing, Repair and Replacement:* A program for universal metering of both customer and public uses of water, for meter testing and repair, and for periodic meter replacement.

- *Determination and Control of Unaccounted-for Water:* Specific measures to determine and control unaccounted-for water. The measures may include periodic visual

inspections along distribution pipelines, periodic audits of the water system for illegal connections or abandoned services.

- *Public Education Program:* A public education and information program regarding water conservation is required as part of the water conservation plan.

- *Non-Promotional Water Rate Structure:* Chapter 288 requires a water rate structure that is not "promotional"; that is, rates that discourage waste and excessive use of water, such as increasing block rate instead of volume discounts.

- *Landscape Water Management Strategy:* A strategy for implementing and enforcing the efficient use and stewardship of water in landscape irrigation, including watering a maximum of two times per week; and, including a time-of-day watering provision.

- *Reservoir Systems Operational Plan:* If applicable, this requirement is to provide a coordinated operational structure for operation of reservoirs owned by the water supply entity within a common watershed or river basin in order to optimize available water supplies.

- *Coordination with Regional Water Planning Group:* To document that the water conservation plan has been coordinated with the Regional Water Planning Group to insure consistency with the appropriate approved regional water plan.

- *Means of Implementation and Enforcement:* A strategy for implementing and enforcing the provisions of a water conservation plan, as evidenced by an ordinance, resolution, or tariff, and a description of the authority by which the plan is enforced.

B.     The *Model Water Conservation Plan* covering municipal uses by Public Water Suppliers that: (1) currently serve a population of 5,000 or more; or (2) a projected population of 5,000 or more within ten (10) years from the effective date of the plan; or (3) provide potable water service to 3,300 or more connections, are required to include the following additional strategies.

- *Program for Leak Detection & Repair, and Water Loss Accounting:* A program of leak detection and repair, and water loss accounting for the water transmission, delivery, and distribution system.

- *Record Management System:* A system to record water pumped, water deliveries, water sales and water losses which allows for the desegregation of water sales and uses into user classes (residential, commercial, public and institutional, and industrial).

- *Wholesale Customer Requirements:* If applicable, include a requirement in every water supply contract entered into or renewed after official adoption of the water conservation plan, and including any contract extension, that each successive wholesale customer develop and implement water conservation strategies similar to this Plan, including applicable elements of Title 30 TAC Chapter 288.

C.     Upper Trinity will work with each Customer to evaluate and incorporate, as appropriate, enhanced conservation strategies identified throughout Section 5 herein to achieve Upper Trinity's conservation goals.

## 5.16 Conservation Support for Customers

Upper Trinity has an appointed staff conservation coordinator to lead its regional water conservation program and to assist Customers with implementation of their respective conservation plans and strategies. Upper Trinity will create a work group within the Customer Advisory Council for the Regional Treated Water System to coordinate and communicate consistent conservation strategies to Customers, to better focus on water conservation matters and to encourage Customers to designate staff with responsibility for implementing and reporting on their water conservation programs.


# SECTION 6


## Implementation and Enforcement of the Plan

Appendix D contains a copy of the resolution of Upper Trinity's Board of Directors adopting this updated Plan (and Upper Trinity's drought contingency plan). The Executive Director of Upper Trinity is authorized to implement and enforce the Plan and the drought contingency plan. Upper Trinity will prepare a water conservation report every year, incorporating the reports required from Customers as appropriate. This report will be used to review the effectiveness of Upper Trinity's water conservation program, and results will be reported to the Water Conservation Committee and to the Board of Directors.

The Plan is also referenced in Upper Trinity's wholesale water supply contracts, as noted in Sections 4.4 and 5.7 herein, and there is a prohibition on the resale of water on a wholesale basis without prior written approval by Upper Trinity. As such, Upper Trinity's contractual relationships with its Customers provide for a reasonable means for enforcing the Plan.

# APPENDIX A

TCEQ Minimum Requirements for a Water Conservation Plan
(Title 30, Part 1, Chapter 288, Subchapter A, and Rule 228.5 of TAC)

# Texas Administrative Code

**TITLE 30**     ENVIRONMENTAL QUALITY

**PART 1**     TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

**CHAPTER 288**     WATER CONSERVATION PLANS, DROUGHT CONTINGENCY PLANS, GUIDELINES AND REQUIREMENTS

**SUBCHAPTER A**     WATER CONSERVATION PLANS

**RULE §288.5**     **Water Conservation Plans for Wholesale Water Suppliers**

---

A water conservation plan for a wholesale water supplier must provide information in response to each of the following paragraphs. If the plan does not provide information for each requirement, the wholesale water supplier shall include in the plan an explanation of why the requirement is not applicable.

(1) Minimum requirements. All water conservation plans for wholesale water suppliers must include the following elements:

(A) a description of the wholesaler's service area, including population and customer data, water use data, water supply system data, and wastewater data;

(B) until May 1, 2005, specification of conservation goals including, where appropriate, target per capita water use goals for the wholesaler's service area, maximum acceptable unaccounted-for water, the basis for the development of these goals, and a time frame for achieving these goals;

(C) beginning May 1, 2005, specific, quantified five-year and ten-year targets for water savings including, where appropriate, target goals for municipal use in gallons per capita per day for the wholesaler's service area, maximum acceptable unaccounted-for water, and the basis for the development of these goals. The goals established by wholesale water suppliers under this subparagraph are not enforceable;

(D) a description as to which practice(s) and/or device(s) will be utilized to measure and account for the amount of water diverted from the source(s) of supply;

(E) a monitoring and record management program for determining water deliveries, sales, and losses;

(F) a program of metering and leak detection and repair for the wholesaler's water storage, delivery, and distribution system;

(G) a requirement in every water supply contract entered into or renewed after official adoption of the water conservation plan, and including any contract extension, that each successive wholesale customer develop and implement a water conservation plan or water conservation measures using the applicable elements of this chapter. If the customer intends to resell the water, then the contract between the initial supplier and customer must provide that the contract for the resale of the water must have water conservation requirements so that each successive customer in the resale of the water will be required to implement water conservation measures in accordance with applicable provisions of this chapter;

(H) a reservoir systems operations plan, if applicable, providing for the coordinated operation of reservoirs owned by the applicant within a common watershed or river basin. The reservoir systems operations plans shall include optimization of water supplies as one of the significant goals of the plan;

(I) a means for implementation and enforcement, which shall be evidenced by a copy of the ordinance, rule, resolution, or tariff, indicating official adoption of the water conservation plan by the water supplier; and a description of the authority by which the water supplier will implement and enforce the conservation plan; and

(J) documentation of coordination with the regional water planning groups for the service area of the wholesale water supplier in order to ensure consistency with the appropriate approved regional water plans.

(2) Additional conservation strategies. Any combination of the following strategies shall be selected by the water wholesaler, in addition to the minimum requirements of paragraph (1) of this section, if they are necessary in order to achieve the stated water conservation goals of the plan. The commission may require by commission order that any of the following strategies be implemented by the water supplier if the commission determines that the strategies are necessary in order for the conservation plan to be achieved:

(A) conservation-oriented water rates and water rate structures such as uniform or increasing block rate schedules, and/or seasonal rates, but not flat rate or decreasing block rates;

(B) a program to assist agricultural customers in the development of conservation pollution prevention and abatement plans;

(C) a program for reuse and/or recycling of wastewater and/or graywater; and

(D) any other water conservation practice, method, or technique which the wholesaler shows to be appropriate for achieving the stated goal or goals of the water conservation plan.

(3) Review and update requirements. Beginning May 1, 2005, the wholesale water supplier shall review and update its water conservation plan, as appropriate, based on an assessment of previous five-year and ten-year targets and any other new or updated information. A wholesale water supplier shall review and update the next revision of its water conservation plan not later than May 1, 2009, and every five years after that date to coincide with the regional water planning group.

**Source Note:** The provisions of this §288.5 adopted to be effective May 3, 1993, 18 TexReg 2558; amended to be effective February 21, 1999, 24 TexReg 949; amended to be effective April 27, 2000, 25 TexReg 3544; amended to be effective October 7, 2004, 29 TexReg 9384

Next Page          Previous Page

List of Titles                    Back to List

# APPENDIX B

## Upper Trinity Regional Water District's Water Utility Profile



# PROFILE & WATER CONSERVATION PLAN REQUIREMENTS FOR WHOLESALE PUBLIC WATER SUPPLIERS

This form is provided to assist wholesale public water suppliers in water conservation plan development. Information from this form should be included within a wholesale public water supplier water conservation plan. If you need assistance in completing this form or in developing your plan, please contact the conservation staff of the Resource Protection Team in the Water Supply Division at (512) 239-4691.

| | |
|---|---|
| **Name of Entity:** | **Upper Trinity Regional Water District** |
| **Address & Zip:** | **PO Box 305 Lewisville, TX 75067** |
| **Telephone Number:** | **(972) 219-1228**  Fax: **(972) 219-7521** |
| **Form Completed by:** | **Larry N. Patterson, P.E.** |
| **Title:** | **Director of Operations & Water Resources** |
| **Signature:** | *Larry N. Patterson*  Date: **9/18/12** |

**Name and Phone Number of Person/Department responsible for implementing a water conservation program:**    Jason Pierce    972-219-1228

## PROFILE

## I.    WHOLESALE SERVICE AREA POPULATION AND CUSTOMER DATA

### A.    Population and Service Area Data

1.    Service area size in square miles:  (attach a copy of service-area map)

Upper Trinity Regional Water District ("Upper Trinity") is a wholesale water utility created by the Legislature of the State of Texas. Upper Trinity's service area (see Figure 1 below) is defined in its enabling legislation as the service area of its retail customers:

> *"The boundaries of Upper Trinity are coterminous with the boundaries of the county (Denton) plus the entire area in the boundaries of any contract member or participating member, a portion of whose incorporated limits is partially in the boundaries of the county (Denton) as those boundaries existed on the effective date of the Act."* (H.B. 3112, 1989)

In addition, there is no limitation on other customers being service by Upper Trinity outside such boundaries; for example, a portion of Wise County and Cooke County are shown in the

Region C Plan to be served by Upper Trinity.

**Figure 1.** Service and Planning Area Map



2.  Current population of service area (2012):  244,613   (excludes cities of Lewisville, Denton and Irving)

3.  Current population served for (2012):
    a. water                    195,319
    b. wastewater               74,301

4.  Population (water) served for previous five years:

| Year | Population |
|------|-----------|
| 2007 | 165,739 |
| 2008 | 172,726 |
| 2009 | 179,483 |
| 2010 | 186,891 |
| 2011 | 191,126 |

5.  Projected population for service area in following decades:

| Year | Population |
|------|-----------|
| 2020 | 337,283 |
| 2030 | 450,401 |
| 2040 | 576,490 |
| 2050 | 702,370 |
| 2060 | 793,974 |

6.  List source(s) or method(s) for the calculation of current and projected population:

a.  Texas Water Development Board - - 2011 Region C Water Plan

b.  North Central Texas Council of Governments

c.  Texas State Data Center

d.  United States Census Bureau – 2010 Census

e.  Information from existing Upper Trinity Customers, including CCN service area limits

[REMAINING INTENTIONALLY LEFT BLANK]

## B. Customers Data

List (or attach) the names of all wholesale customers, amount of annual contract, and amount of the annual use for each for the previous year:

| Wholesale Customer | Contracted Amount (acre-feet) | Previous Year Amount of Water Delivered (acre-feet) |
|---|---|---|
| Argyle Water Supply Corp. | 2,240 | 728 |
| Bartonville Water Supply Corp. | 2,800 | 749 |
| City of Celina | 2,800 | 953 |
| City of Corinth | 8,401 | 3,694 |
| Denton County FWSD No. 1A | 3,360 | 1,850 |
| Denton County FWSD No. 7 | 3,360 | 1,749 |
| Denton County FWSD No. 8A | 2,431 | 402 |
| Denton County FWSD No. 10 | 2,688 | 756 |
| Denton County FWSD No. 11A | 3,360 | 489 |
| Town of Flower Mound | 33,604 | 9,198 |
| City of Highland Village | 3,360 | 2,607 |
| City of Justin | 840 | 370 |
| City of Krum | 448 | 110 |
| Lake Cities MUA | 4,256 | 1,841 |
| Town of Lincoln Park | 112 | 43 |
| Mustang SUD | 3,136 | 1,096 |
| Town of Northlake | 560 | 0 |
| Providence Village WCID | 2,688 | 706 |
| City of Sanger | 560 | 241 |

[REMAINING INTENTIONALLY LEFT BLANK]

## II.   WATER USE DATA FOR SERVICE AREA

### A.   Water Delivery

Indicate if the water provided under wholesale contracts is treated or raw water and the annual amount for each for previous year:

Total amount sold for previous year (acre-feet) (2011)

Treated:      27,583
Raw:          0

### B.   Water Accounting Data

1.   Total amount of water diverted at point of diversion(s) for previous five years (in acre-feet) for all water uses:

| Year | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| January | 1,046 | 1,263 | 1,302 | 1,209 | 1,210 |
| February | 965 | 1,241 | 1,217 | 991 | 1,203 |
| March | 1,402 | 1,196 | 1,441 | 1,171 | 1,744 |
| April | 1,390 | 1,401 | 1,626 | 1,585 | 1,951 |
| May | 1,358 | 1,887 | 1,534 | 2,213 | 1,880 |
| June | 1,352 | 2,905 | 2,608 | 3,228 | 3,356 |
| July | 1,766 | 3,818 | 3,389 | 2,687 | 4,457 |
| August | 2,765 | 3,097 | 3,265 | 3,979 | 4,637 |
| September | 2,222 | 2,360 | 2,097 | 2,190 | 3,589 |
| October | 1,978 | 1,980 | 1,405 | 2,199 | 2,386 |
| November | 1,641 | 1,596 | 1,452 | 1,557 | 1,698 |
| December | 1,146 | 1,331 | 1,369 | 1,445 | 1,158 |
| TOTAL | 19,033 | 24,076 | 22,705 | 24,453 | 29,270 |

2.   Wholesale population served and total amount of water diverted for **municipal use** for previous five years:

| Year | Total Population Served | Total Annual Water Diverted for Municipal Use (acre feet) |
|---|---|---|
| 2007 | 165,739 | 19,033 |
| 2008 | 172,726 | 24,076 |
| 2009 | 179,483 | 22,705 |
| 2010 | 186,891 | 24,453 |
| 2011 | 191,126 | 29,270 |

## C.  Projected Water Demands

If applicable, project and attach water supply demands for the next ten years using information such as population trends, historical water use, and economic growth in the service area over the next ten years and any additional water supply requirement from such growth.





### Water Demand – Area Served

[REMAINING INTENTIONALLY LEFT BLANK]

## III. WATER SUPPLY SYSTEM DATA

### A. Water Supply Sources

List all current water supply sources and the amounts authorized (acre-feet) with each:

|  | Source | Amount Available |
|---|---|---|
| Surface Water | Jim Chapman Lake[1] | 16,106[2] |
| Contract | City of Dallas[3] | 31,121 |
| Contract | City of Denton[4] | 7,400 |
| Reuse | Jim Chapman Lake[5] | 9,664 |

[1] Certificate of Adjudication No. 03-4797 and a contract with the City of Commerce allows the District to divert water from Jim Chapman Lake.

[2] Amount shown is the maximum diversion amount.

[3] A contract with the City of Dallas allows the District to divert water from Lewisville Lake and Ray Roberts Lake. The amount of supply will increase over time as population of certain "named" cities increases.

[4] A contract with the City of Denton allows the District to divert water from Lewisville Lake and Ray Roberts Lake on an interim basis. The amount of supply available is determined annually by Denton and will decline over time as Denton's own needs increase.

[5] TCEQ Water Use Permit No. 5778, and supporting contracts with the cities of Dallas and Denton, allows the District to reuse an amount equal to 60% of the water it imports from Jim Chapman Lake.

### B. Treatment and Distribution System (if provide treated water)

1. Design daily capacity of system:  90.0 MGD

2. Storage Capacity:  Elevated  0.5 MGD
   Ground  18.0 MGD

3. Please describe the water system. Include the number of treatment plants, wells, and storage tanks. If possible, attach a sketch of the system layout.

See Attachment 1.

## IV. WASTEWATER SYSTEM DATA

### A. Wastewater System Data (if applicable)

1. Design capacity of wastewater treatment plant(s):

|  | Permitted Capacity |
|---|---|
| Lakeview Regional Water Reclamation System | 7.5 MGD |
| Riverbend Water Reclamation Plant | 5.7 MGD |
| Peninsula Water Reclamation Plant | 2.0 MGD |
| Doe Branch Water Reclamation Plant | 5.225 MGD |

2. Briefly describe the wastewater system(s) of the area serviced by the wholesale public water supplier. Describe how treated wastewater is disposed of. Where applicable, identify treatment plant(s) with the TCEQ name and number, the operator, owner, and, if wastewater is discharged, the receiving stream. If possible, attach a sketch or map which locates the plant(s) and discharge points or disposal sites.

a. Lakeview Regional Water Reclamation System

| | |
|---|---|
| Irrigation On-site | Yes |
| Irrigation Off-site | No |
| Chlorination / dechlorination | N/A |
| Approximate usage per month | 0.010 MGD |
| TCEQ number | TX0020354, TPDES 10698-001 |
| Operator / Owner | Upper Trinity |
| Disposal Type | Activated Sludge Discharge 4.12 MGD (avg. daily flow) |
| Discharge receiving stream | Lewisville Lake Segment #0.0823 Trinity River Basin |

See Attachment 1 for location of Lakeview Water Reclamation Plant.

b. Riverbend Water Reclamation Plant

| | |
|---|---|
| Irrigation On-site | No |
| Irrigation Off-site | No |
| Chlorination / dechlorination | N/A |
| Approximate usage per month | 0 MGD |
| TCEQ number | TX0123781, TPDES 10698-002 |
| Operator / Owner | Upper Trinity |
| Disposal Type | Sequential / Batch Reactor Discharge 0.965 MGD (avg. daily flow) |
| Discharge receiving stream | Lewisville Lake Segment #0.0823 Little Elm Creek, Trinity River Basin |

See Attachment 1 for location of Riverbend Water Reclamation Plant.

c. Peninsula Water Reclamation Plant

| | |
|---|---|
| Irrigation On-site | No |
| Irrigation Off-site | No |
| Chlorination / dechlorination | N/A |
| Approximate usage per month | 0 MGD |
| TCEQ number | TX0124745, TPDES 14323-001 |
| Operator / Owner | Upper Trinity |

Disposal Type                          Activated Sludge Extended Aeration
                                       Discharge 0.196 MGD (avg. daily flow)
Discharge receiving stream             Lewisville Lake Segment #0.0823
                                       Cantrell Slough, Trinity River Basin
See Attachment 1 for location of Peninsula Water Reclamation Plant.


    d.    Doe Branch Water Reclamation Plant

Irrigation On-site                     No
Irrigation Off-site                    No
Chlorination / dechlorination          N/A
Approximate usage per month            0 MGD
TCEQ number                            TX0125172, TPDES 10698-003
Operator / Owner                       Upper Trinity
Disposal Type                          Activated Sludge Extended Aeration
                                       Plant permitted, but not constructed
Discharge receiving stream             Lewisville Lake Segment #0.0823
                                       Unnamed Tributary, Trinity River Basin
See Attachment 1 for the location of proposed Doe Branch Water
Reclamation Plant.


## B.    Wastewater Data for Service Area (if applicable)

1.    Percent of water service area served by wastewater system: 30%

2.    Monthly volume treated for previous three years (in 1,000 gallons):

| Year | 2009 | 2010 | 2011 |
|---|---|---|---|
| January | 137,043 | 168,503 | 150,887 |
| February | 118,498 | 176,007 | 136,867 |
| March | 136,811 | 190,364 | 139,967 |
| April | 136,501 | 167,289 | 138,047 |
| May | 164,081 | 162,744 | 160,803 |
| June | 139,766 | 144,809 | 143,076 |
| July | 136,578 | 158,038 | 139,762 |
| August | 139,781 | 145,125 | 139,872 |
| September | 147,687 | 155,131 | 131,864 |
| October | 194,628 | 155,131 | 131,864 |
| November | 160,473 | 142,549 | 145,353 |
| December | 162,595 | 145,656 | 158,514 |
| TOTAL | 1,774,442 | 1,902,931 | 1,729,623 |

# Upper Trinity Regional Water District

Service Area

COOKE

GRAYSON

Tom Harpool
Regional Water
Treatment Plant

Peninsula Water
Reclamation Plant

Riverbend Water
Reclamation Plant

DENTON

WISE

Lakeview Water
Reclamation Plant

Proposed Doe Branch
Water Reclamation Plant

COLLIN

Thomas E. Taylor
Regional Water
Treatment Plant

TARRANT

DALLAS



UPPER TRINITY
REGIONAL WATER DISTRICT

# APPENDIX C

## Letter to Chairman of Region C Water Planning Group



**UPPER TRINITY**

**REGIONAL WATER DISTRICT**

P.O. Drawer 305 • Lewisville, TX 75067

(972) 219-1228 • Fax (972) 221-9896

September 17, 2012

Mr. Jim Parks, Chairman
Region C Water Planning Group
c/o North Texas Municipal Water District
P. O. Box 2408
Wylie, TX 75098

**RE:    Water Conservation and Drought Contingency Plans**

Dear Mr. Parks:

Water conservation is an important strategy in making sure this region has sufficient water to meet the growing demand. Recognizing the importance of this strategy, Upper Trinity Regional Water District recently updated its Water Conservation and Drought Contingency Plans to include new conservation strategies. In coordination with other utilities and cities in the Dallas/Fort Worth area, we have included a new strategy to limit outdoor landscape watering to no more than two times per week.

In addition, we wanted to update the Plans after the great drought of 2011. Accordingly, other strategies were added to enhance the Water Conservation Plan, following the recommendations of the Water Conservation Advisory Council and the Water Conservation and Implementation Task Force. Enclosed are copies of Upper Trinity's updated plans.

We are submitting copies of the plans to you, to Texas Water Development Board and to the Texas Commission on Environmental Quality in accordance with state requirements. Upper Trinity's Board of Directors approved the amended plans at its September 6 Board Meeting.

Thank you for your assistance in this matter. Should you have any questions or need further information, please feel free to contact me or Larry N. Patterson, Director of Operations and Water Resources, at 972-219-1228.

Sincerely,

Thomas E. Taylor
Executive Director

TET/JP/nka

Encl:    Updated Water Conservation and Drought Contingency Plans

C:    Jody Puckett, Director of Dallas Water Utilities
Larry N. Patterson, Director of Operations and Water Resources, UTRWD
Jason Pierce, Manager of Watershed and Contract Services

\\Utrwd01\Admin1\WAllis Docs\Water Conservation\UTRWD Conserv & Drought Cont Plan trans ltr Reg C 091712.doc

A conservation and reclamation district of the State of Texas.

*With vision and courage, we plan. . . . . With cooperation and commitment, we serve.*

32

# APPENDIX D

Resolution from Upper Trinity Regional Water District's Board of Directors
Adopting the Water Conservation Plan



**REGIONAL WATER DISTRICT**

# RESOLUTION

## RESOLUTION # 2012- 07

A RESOLUTION OF THE BOARD OF DIRECTORS OF THE UPPER TRINITY REGIONAL WATER DISTRICT ("DISTRICT") ADOPTING UPDATED WATER CONSERVATION AND DROUGHT CONTINGENCY PLANS FOR THE DISTRICT.

WHEREAS, the District's Board of Directors adopted Water Conservation and Drought Contingency Plans in May 1993, later amended in March 2005 and in April 2009; and,

WHEREAS, the Texas Administrative Code Title 30, Part 12, Chapter 288, Subchapter A, Rule 288.5 and Subchapter B, Rule 288.22 governs the development of water conservation and drought contingency plans for wholesale water suppliers and requires wholesale public water suppliers, like the District, to include certain basic provisions in said plans; and,

WHEREAS, the Board of Directors recently expressed its support for a regional initiative that is intended to achieve uniform application of a new water conservation strategy limiting outdoor landscape irrigation to no more than two times per week; and,

WHEREAS, the Board directed staff to work with the Water Conservation Committee and the Customer Advisory Council to develop a flexible approach for implementing the twice weekly strategy for District Customers; and,

WHEREAS, Texas endured a record-breaking drought just last year, generating new experiences in water management and further evidence of the need for water conservation - - providing a sense of urgency to review and update the District's Water Conservation Plan; and,

WHEREAS, the District desires to update the 2009 Water Conservation Plan and Drought Contingency Plan based on current knowledge and practices, to add the new twice weekly strategy for outdoor landscape irrigation, as well as to enhance the District's Plan by incorporating recommendations from the Texas Water Conservation Advisory Council and the Texas Water Conservation Implementation Task Force; and,

WHEREAS, the updated Water Conservation Plan and Drought Contingency Plan shall hereinafter be referred to as the "2012 Plans"; and,

WHEREAS, the 2012 Plans must be approved by the governing body prior to submission to the Texas Commission on Environmental Quality ("TCEQ"); and,

34

**WHEREAS**, the Water Conservation Committee of the District has reviewed and hereby recommends the 2012 Plans, which plans include the new and updated conservation strategies; and,

**WHEREAS**, the Customer Advisory Council for the Water System has provided input on said strategies.

**NOW THEREFORE, BE IT RESOLVED BY THE BOARD OF DIRECTORS OF THE UPPER TRINITY REGIONAL WATER DISTRICT:**

**SECTION 1.** That the 2012 Water Conservation Plan and Drought Contingency Plan as recommended by the Water Conservation Committee and reviewed by the Customer Advisory Council are hereby adopted.

**SECTION 2.** That the Executive Director is hereby directed to administer and enforce the 2012 Plans as adopted.

**SECTION 3.** That the Executive Director is hereby directed to include provisions in any new contract for wholesale water services and any renewed or extended contract with a Customer after the adoption hereof requiring said Customer to adopt similar water conservation and drought contingency strategies as outlined in the 2012 Plans and providing for enforcement thereof.

**SECTION 4.** That the Executive Director is authorized to submit the 2012 Plans to TCEQ for review and approval and to make reasonable changes thereto if requested by TCEQ.

**SECTION 5.** That this Resolution shall become effective immediately upon its passage.

**DULY PASSED AND APPROVED THIS 6th DAY OF SEPTEMBER 2012.**

Recommended: _____
Thomas E. Taylor, Executive Director

Executed: _____
Todd Madison, Vice President

Attest: _____
Chris Boyd, Secretary

35

# APPENDIX C



**Texas Water Development Board**
**Report 362**

**Water Conservation Implementation**
**Task Force**

**Water Conservation**
**Best Management Practices Guide**

November 2004



UTRWD
38

*This page intentionally blank.*

# Texas Water Development Board

E. G. Rod Pittman, Chairman, Lufkin

Jack Hunt, Vice Chairman, Houston

Dario Vidal Guerra, Jr., Member, Edinburg

Thomas Weir Labatt, III, Member, San Antonio

James E. Herring, Member, Amarillo

William W. Meadows, Member, Fort Worth

J. Kevin Ward, Executive Administrator

*Authorization for use or reproduction of any original material contained in this publication, i.e., not obtained from other sources, is freely granted. The use of brand names in this publication does not indicate an endorsement by the Texas Water Development Board or the State of Texas.*

*Views expressed in this report are of the authors and do not necessarily reflect the views of the Texas Water Development Board.*

Published and distributed
by the
Texas Water Development Board
P.O. Box 13231, Capitol Station
Austin, Texas 78711-3231

*This document was developed by GDS Associates, Inc., Chris Brown Consulting, Axiom-Blair Engineering, Inc. and Tony Gregg, P.E. through funding from the Texas Water Development Board*

November 2004
Report 362
*(Printed on recycled paper)*

*This page intentionally blank.*

# Table of Contents

1.0      Introduction..................................................................................................................1

   1.1      Background........................................................................................................ 2

   1.2      Best Management Practices (BMPs) ................................................................. 3

   1.3      Development and Purpose of Best Management Practices Guide ...................... 4

   1.4      Cost-Effectiveness Considerations ................................................................... 7

   1.5      Getting the Most Out of the Guide ................................................................... 8

2.0      BMPs for Municipal Water Users....................................................................11

   2.1      System Water Audit and Water Loss ............................................................. 13

   2.2      Water Conservation Pricing............................................................................ 19

   2.3      Prohibition on Wasting Water ........................................................................ 25

   2.4      Showerhead, Aerator, and Toilet Flapper Retrofit ......................................... 28

   2.5      Residential Toilet Replacement Programs ...................................................... 34

   2.6      Residential Clothes Washer Incentive Program ............................................. 39

   2.7      School Education ............................................................................................ 43

   2.8      Water Survey for Single-Family and Multi-Family Customers ..................... 48

   2.9      Landscape Irrigation Conservation and Incentives ........................................ 54

   2.10     Water Wise Landscape Design and Conversion Programs ............................. 61

   2.11     Athletic Field Conservation............................................................................ 66

   2.12     Golf Course Conservation .............................................................................. 71

   2.13     Metering of All New Connections and Retrofit of Existing Connections....... 75

   2.14     Wholesale Agency Assistance Programs ....................................................... 78

   2.15     Conservation Coordinator............................................................................... 82

   2.16     Water Reuse.................................................................................................... 85

   2.17     Public Information........................................................................................... 90

   2.18     Rainwater Harvesting and Condensate Reuse................................................. 96

   2.19     New Construction Graywater .........................................................................102

2.20   Park Conservation................................................................................................ 106

2.21   Conservation Programs for Industrial, Commercial, and Institutional Accounts...... 112

2.22   Cost-Effectiveness Analysis for Municipal Water Users ........................................ 118

3.0   BMPs for Industrial Water Users.................................................................................131

3.1   Industrial Water Audit.......................................................................................... 133

3.2   Industrial Water Waste Reduction.......................................................................... 138

3.3   Industrial Submetering .......................................................................................... 142

3.4   Cooling Towers ..................................................................................................... 145

3.5   Cooling Systems (other than Cooling Towers) ...................................................... 150

3.6   Industrial Alternative Sources and Reuse of Process Water .................................. 154

3.7   Rinsing/Cleaning .................................................................................................. 158

3.8   Water Treatment................................................................................................... 162

3.9   Boiler and Steam Systems ..................................................................................... 167

3.10   Refrigeration (including Chilled Water)................................................................. 172

3.11   Once-Through Cooling.......................................................................................... 175

3.12   Management and Employee Programs.................................................................... 179

3.13   Industrial Landscape.............................................................................................. 184

3.14   Industrial Site Specific Conservation .................................................................... 190

3.15   Cost Effectiveness for Industrial Water Users ...................................................... 195

4.0   BMPs for Agricultural Water Users .............................................................................199

4.1   Agricultural Irrigation Water Use Management...................................................... 201

4.1.1   Irrigation Scheduling.................................................................................. 201

4.1.2   Volumetric Measurement of Irrigation Water Use ...................................... 204

4.1.3   Crop Residue Management and Conservation Tillage.................................. 208

4.1.4   On-Farm Irrigation Audit ........................................................................... 210

4.2   Land Management Systems..................................................................................... 214

4.2.1   Furrow Dikes.............................................................................................. 214

4.2.2   Land Leveling ............................................................................................. 216

4.2.3    Contour Farming ................................................................................ 218

4.2.4    Conversion of Supplemental Irrigated Farmland to Dry-Land Farmland ............. 220

4.2.5    Brush Control/Management ................................................................ 222

4.3     On-Farm Water Delivery Systems .......................................................... 226

4.3.1    Lining of On-Farm Irrigation Ditches .................................................. 226

4.3.2    Replacement of On-Farm Irrigation Ditches with Pipelines ...................... 229

4.3.3    Low Pressure Center Pivot Sprinkler Irrigation Systems .......................... 231

4.3.4    Drip/Micro-Irrigation System ............................................................ 234

4.3.5    Gated and Flexible Pipe for Field Water Distribution Systems ................... 237

4.3.6    Surge Flow Irrigation for Field Water Distribution Systems ..................... 239

4.3.7    Linear Move Sprinkler Irrigation Systems ........................................... 241

4.4     Water District Delivery Systems ........................................................... 244

4.4.1    Lining of District Irrigation Canals ..................................................... 244

4.4.2    Replacement of Irrigation District Canals and Lateral Canals with Pipelines ...... 247

4.5     Miscellaneous Systems ...................................................................... 250

4.5.1    Tailwater Recovery and Reuse System ............................................... 250

4.5.2    Nursery Production Systems .............................................................. 252

4.6     Cost Effectiveness for Agricultural Water Users ..................................... 255

*This page intentionally blank.*

## 1.0    Introduction

This document is the result of the work of the Texas Water Conservation Implementation Task Force, a volunteer group of Texas citizens with experience in and commitment to using Texas water more efficiently. The Task Force was created by the 78th Texas Legislature under Senate Bill 1094. The Legislature directed the Texas Water Development Board ("TWDB") to select members of the Water Conservation Implementation Task Force from applicants representing the following entities and interest groups:

- Texas Commission on Environmental Quality
- Department of Agriculture
- Parks and Wildlife Department
- State Soil and Water Conservation Board
- Texas Water Development Board
- Regional Water Planning Groups
- Federal Agencies
- Municipalities
- Groundwater Conservation Districts
- River Authorities
- Environmental Groups
- Irrigation Districts
- Industries
- Institutional Water Users
- Professional Organizations Focused on Water Conservation
- Higher Education

The legislature charged the Task Force with reviewing, evaluating, and recommending optimum levels of water use efficiency and conservation for the state. These Best Management Practices were prepared in partial fulfillment of this charge. This document was developed by GDS Associates, Inc., Chris Brown Consulting, Axiom-Blair Engineering, Inc. and Tony Gregg, P.E. through funding from the Texas Water Development Board's Research and Planning Fund.

## 1.1  Background

Municipal water conservation efforts in Texas have been motivated by diverse goals such as preventing land subsidence, addressing short-term or long-term water shortages, providing environmental protection, and avoiding or postponing the high costs of new water system improvements. Through implementation of water conservation programs across the state, experience has been gained in the effective delivery of programs and lessons learned in approaches which are not as effective.

Industrial water users have also made advances in water use efficiency over the past several decades. Inspired by increasing costs of resources, such as the water itself, energy needed to pump, treat, and heat water in industrial processes, and the challenges of drought, many Texas businesses have developed or adopted techniques to lower water use. One indication of the success of industrial efforts is actual water use recorded for the manufacturing sector in the year 2000.  Actual use was 70 percent of water demand projections developed in the late 1990s.

Agricultural growers using groundwater from the Ogallala Aquifer have pioneered water efficiency in agricultural irrigation in the Texas panhandle region. As early as the 1970s, low-pressure center pivot irrigation systems were reducing water use by 30 percent to 50 percent from existing irrigation methods at the time. Since then, irrigation efficiency has increased both in the sophistication of low pressure irrigation methods as well as increased efficiency in other irrigation and water management methods in agricultural production.

While there are a number of successful conservation efforts in Texas, there is an opportunity for a more comprehensive effort by all sectors of the State.  The legislation that created the Water Conservation Task Force was passed in order to further conservation efforts in the State.  One of the objectives of the Task Force was to gather information about the elements of successful conservation programs, good cost estimates and reliable water savings estimates for use in water resource planning.  In this guide, the Task Force uses the following working definition of conservation:  Those practices, techniques, programs, and technologies that will protect water resources, reduce the consumption of water, reduce the loss or waste of water, improve the efficiency in the use of water, or increase the recycling and reuse of water so that a water supply is made available for future or alternative uses.  As part of its work, the Task Force hopes to move the process of water conservation planning a significant step forward in Texas by the publication of Best Management Practice Guidelines based upon this current analysis.

## 1.2    Best Management Practices (BMPs)

Experience in water conservation program implementation over the decades has resulted in a body of knowledge in Texas, across the United States and around the world. Practitioners have shared these experiences and adopted the approach of the BMP. A BMP is structured for delivering a conservation measure or series of measures that is useful, proven, cost-effective, and generally accepted among conservation experts.

In Texas, conservation BMPs are designed to fit into the State's water resource planning process as one alternative to meet future water needs. As a result, each BMP should be clearly defined in its schedule of implementation, expected water savings, and costs of implementation (based on Exhibit B Guidelines for Regional Water Plan Development). Each BMP structure has several elements that describe the efficiency measures, implementation techniques, schedule of implementation, scope, water savings estimating procedures, cost effectiveness considerations, and references to assist end-users in implementation.

## 1.3     Development and Purpose of Best Management Practices Guide

The BMPs and the cost effectiveness tools in this Guide are offered to the state's regional water planning groups, water providers, and water users as a tool for planning and designing effective conservation programs. The Guide is organized into three sections, for municipal, industrial and agricultural water user groups ("WUG") with a total of fifty-five BMPs. At the end of each section is a chapter giving guidance on cost effectiveness evaluation for the specific BMPs in the section. Each BMP is organized to be of assistance in conservation planning, program development, implementation, and evaluation.

The BMPs can be evaluated for potential water savings and the cost effectiveness for consideration in the regional water planning process. Within each planning region, sufficient variation exists at the local water user level that more specific analysis should be done by a prospective end-user prior to adopting the BMP. Best-management practices contained in the BMP Guide are voluntary efficiency measures that save a quantifiable amount of water, either directly or indirectly, and can be implemented within a specified timeframe. The BMPs are not exclusive of other meaningful conservation techniques that an entity might use in formulating a state-required water conservation plan. At the discretion of each user, BMPs may be implemented individually, in whole or in part, or be combined with other BMPs or other water conservation techniques to form a comprehensive water conservation program. The adoption of any BMP is entirely voluntary, although it is recognized that once adopted, certain BMPs may have some regulatory aspects to them (e.g. implementation of a local city ordinance).

The Task Force unanimously agreed that the BMP Guide must be in accordance with the state's philosophy of region-based water planning. The Task Force firmly believes that applying a mandatory set of BMPs throughout Texas would **not** be appropriate. One size does not fit all in a state characterized by wide variations in climate, geography, municipal demographics, water utility and service profiles, and agricultural and industrial needs. State policies adopted to guide the implementation of water conservation in Texas must acknowledge the fundamental decision-making primacy and prerogative of regional planning groups, municipalities, industrial and agricultural water users, and water providers. Each BMP is organized into nine standardized sections (A-I), which are described in general terms below.

### A.    *Applicability*

The specific type of water user group that could potentially benefit from the BMP is described, as are the general goals for water efficiency that the BMP addresses.

### B.    *Description*

This section provides an explanation of the specifics of the conservation measure(s) included in the BMP. The best available technology that is proven and cost effective is recommended. Often a best available technology may not yet be cost effective to be implemented by all water users. Highly efficient water conservation measures that will produce cost-effective results are mentioned.

**Example:** The current standard for water efficient toilets is 1.6 gallon per flush ("gpf") models. Lower flush volume toilets exist such as dual flush toilets which flush 1.6 gpf for solid waste and 0.8 gpf for liquid waste, but their availability is not yet widespread in the United States. Since this technology is new and few models are available, costs are currently high but are expected to fall as additional models become available. As prices fall, this technology will become more cost effective.

## C.  *Implementation*

The basic steps to accomplish the BMP are described. If the description section includes more than one measure to complete the BMP, the implementation section will suggest necessary steps for achieving the water savings.

## D.  *Schedule*

In BMPs which have multiple implementation steps, a recommended schedule for implementation is included. In general, planning, data gathering and evaluation steps should be accomplished within 12 months of adoption of a specific BMP.

## E.  *Scope*

For simpler BMPs, the scope is complete when the steps described in the implementation section have been achieved. For more complicated BMPs, the scope indicates the level of implementation necessary to consider the BMP complete. Where different levels of implementation or constraints are present, these are described.

## F.  *Documentation*

To track the progress of a BMP, the water user should collect certain data to document progress implementing the BMP and evaluating actual water savings. This section identifies the recommended data.

## G.  *Determination of Water Savings*

This section specifies information necessary to calculate water savings from implementation of the BMP and may include statistical or mathematical formulas when appropriate.

## H.  *Cost-Effectiveness Considerations*

Basic costs of implementing the specific BMP are explained. Due to the wide variety in actual costs based upon size of program and location, ranges of costs are given where appropriate. In many cases, costs and expenses can be reduced or spread out when multiple BMPs are implemented by an entity. This section primarily serves to remind the users of costs to consider when performing a cost effectiveness analysis.

*I.*      *References for Additional Information*

The BMP concludes with a listing of resources that can assist a water user in implementing the BMP.

## 1.4    Cost-Effectiveness Considerations

Each of the three sections of the BMP Guide, Municipal, Industrial, and Agricultural, has a dedicated chapter on cost-effectiveness analyses. Methods for determining the relationship between the value of water saved and the cost of BMP implementation are described and explained through examples. Users of the guide are encouraged to read and utilize any of the analytical tools found in these sections, if they find them to be appropriate.

## 1.5    Getting the Most Out of the Guide

The BMP Guide is designed for several uses and for a diverse audience of water resource planners and managers throughout the state. It has sufficient detail to be useful in the state water planning process, which is implemented at the regional level. The Regional Water Planning Groups are encouraged to review the BMPs and to consult with WUGs in their region that have an identified future need for water to determine which BMPs are appropriate and which BMPs the WUGs intend to utilize or are already using for conservation program planning and implementation. For planning purposes water conservation best management practices are not limited to those listed in this guide.

The Task Force acknowledges that the efficient use of water as a natural resource is an important planning objective and an economical means of operation and recommends that water user groups of all types evaluate the BMPs for use in their area. The first step for a municipal, agricultural or industrial water user is to review the Applicability section in a BMP to determine if the BMP is appropriate for their use. For those water users with stakeholders, a stakeholder involvement process is a valuable means of getting feedback on priority BMPs and on specific elements within a BMP which have broad support. In municipalities, stakeholders include customers and representative interest groups which have shown an interest in water issues in the community. Such groups may include representatives from neighborhood and business associations, technical groups, academics, environmentalists, and city departments. A number of the municipal BMPs recommend developing such stakeholder groups as a part of implementing the specific BMP. The Task Force also recognizes that stakeholder groups can be helpful in the initial selection of best management practices to be included in a Conservation Plan.

Industrial WUGs should consider employees from all affected departments, customers, suppliers, and regulators and impacted water users, including agricultural or municipal interests, as potential stakeholders. Depending upon the size of the business and the proposed BMPs, the process can be either formal or informal. The industrial WUG can also use the guidance included in the Employee Programs BMP as part of the process of selecting the appropriate BMPs. For those industrial WUGs that are already implementing an Environmental Management System the stakeholder process may be defined and can be used to help pick the appropriate BMPs. In the industrial setting, executive management support is essential for success and should be sought early in the planning process.

Agricultural WUGs at the farm level may include employees, suppliers and regulators among potential stakeholders. A valid input process may be an informal survey of individuals to solicit input for choosing the best BMPs. For political subdivisions of the State of Texas that deliver irrigation water to agricultural users, the stakeholder group may include representatives from agricultural and water conservation organizations, municipal, and rural water supply entities, and local, state, or federal governmental agencies.

In writing a Conservation Plan it is important for the WUG to follow state, local and, in some cases, federal guidelines which may include requirements for certain plan elements such as a utility profile and seasonal demand. Such requirements are often specific to the WUG, the type

of water demand, and the political boundaries in which a WUG operates. Texas has numerous groundwater districts, river authorities, and irrigation districts all of which have specific authority and the potential for unique requirements within their area or operation. The BMPs are designed to be used as a resource in developing that part of a water conservation plan where specific measures, the schedule and scope of implementation, and the anticipated savings and costs are addressed.

Each BMP was prepared through research of literature and with the insight and experience of Task Force members, Board staff, and technical consultants to provide information based upon real world results of conservation program implementation. Because of the information accumulated in the development of the Guide, each BMP can serve as a program guide as well as a planning tool. Conservation program managers wishing to use the BMPs in program delivery should pay close attention to the Implementation, Schedule, Scope, and Documentation sections. Each of these sections contains information which can assist existing conservation programs as well as new conservation efforts to increase their effectiveness. Each BMP also includes a reference section with additional resources to assist conservation practitioners in delivering high quality programs with real water savings.

The BMP also has information that can assist managers, auditors and policy makers in evaluating the impact of conservation programs. The Documentation, Determination of Water Savings, and Cost Effectiveness Considerations sections are provided to assist in program evaluation. Each section of BMPs, municipal, industrial and agricultural, has a Cost-Effectiveness Chapter, which provides tools for doing cost-benefit analysis by each of the major types of WUGs.

The Task Force presents this Guide as a tool for advancing the practice and effectiveness of water conservation in Texas. The insights distilled in the enclosed BMPs come from years of conservation practice by the Task Force members. That same experience leads the Task Force to view this as a living document, with the recognition that further implementation of conservation practices will bring new insight, more study will provide new information, and new technology will improve savings. The Task Force members encourage conservation managers, planners, practitioners and policy makers to give feedback to the Texas Water Development Board about the BMP Guide in the hopes that it will be updated regularly over the years ahead.

*This page intentionally blank.*

## 2.0    BMPs for Municipal Water Users

Water consumption by water utilities serving municipal water customers is driven by a wide variety of domestic, commercial, industrial and institutional needs. BMPs have been developed for utilities to both improve water use efficiency of their own operations and for programs to improve the efficiency of their customers.

It is important that water utilities focus on the efficiency of their supply operations while promoting water efficiency to their customers. A utility can reduce water loss through careful and regular monitoring of its water delivery systems through the System Water Audit and Water Loss BMP. In addition, the Water Conservation Pricing BMP can provide an effective method of encouraging water efficiency by the customer through feedback from the cost of the water to the user. The Prohibition on Water Wasting BMP can help send a message to users about the value of water as well as educate the general populace about simple steps to save water.

Despite the variety of water uses and numbers of water users, many patterns of water use, especially in domestic water use are common. As a result a number of conservation measures have been developed in municipal settings over the past several decades to reduce the total gallons consumed for daily activities without reducing the benefit of the water used. The Showerheads, Faucet Aerators and Toilet Flapper Retrofit BMP and the Residential Toilet Replacement Programs BMP focus on indoor water use. The Residential Clothes Washer Incentive Program BMP encourages the installation of water efficient clothes washers.

The School Education BMP affects water consumption through changes in behavior as students learn about water resources and the wise use of water. The Water Survey for Single-Family and Multi-Family Customers BMP educates customers about specific water saving opportunities as well as water wasting practices which may be present in their home or business.

Outdoor water uses driven by climatic differences, and water needs of different plants, and used for diverse purposes result in BMPs which are focused on good landscape management principles. The Landscape Irrigation Conservation and Incentives BMP focuses on water savings that can be obtained through efficient operation of automatic irrigation systems, while the Water Wise Landscape Design and Conversion Programs BMP focuses on landscape materials.

A utility can reduce water loss through careful and regular metering of water delivered to billed as well as unbilled water uses and through proper maintenance of meters as through the Metering of All New Connections and Retrofit of Existing Connections BMP. For agencies or utilities offering water to wholesale customers who in turn serve retail customers, the Wholesale Agency Assistance Programs BMP offers methods for promoting water conservation among the retail water utilities. In addition, the Conservation Coordinator BMP can provide an effective method of ensuring that the utility's conservation programs are well administered and effective. The Reuse BMP outlines how utilities can make more efficient reuse of their existing supplies.

The Public Information BMP can affect water consumption through changes in behavior as customers learn about water resources, the wise use of water and the utility's conservation program. The Rainwater Harvesting/Condensate Reuse BMP focuses on water savings that can be obtained through capturing rainwater or the condensate from large cooling systems while the New Construction Graywater BMP focuses on reuse of water which has been used in washing clothes.

Commercial water uses also have a variety of practices and equipment that can benefit from efficiency measures. The Municipal BMPs also include those focused on good water use practices for Park Conservation and for Conservation Programs for Industrial, Commercial, and Institutional Accounts.

Best-management practices contained in the BMP Guide are voluntary efficiency measures that save a quantifiable amount of water, either directly or indirectly, and can be implemented within a specified timeframe. The BMPs are not exclusive of other meaningful conservation techniques that an entity might use in formulating a state-required water conservation plan. At the discretion of each user, BMPs may be implemented individually, in whole or in part, or be combined with other BMPs or other water conservation techniques to form a comprehensive water conservation program. The adoption of any BMP is entirely voluntary, although it is recognized that once adopted, certain BMPs may have some regulatory aspects to them (e.g. implementation of a local city ordinance).

## 2.14   Wholesale Agency Assistance Programs

### A.   *Applicability*

This BMP is intended for Wholesale Municipal Water User Groups ("agency") supplying potable water. The specific measures listed as part of this BMP can be implemented individually or as a group. Upon review, an agency may find that it is already implementing one or more of these elements and may want to adopt additional elements outlined below.

Once an agency decides to adopt this BMP, the agency should follow the BMP closely in order to achieve the maximum benefit from this BMP.

### B.   *Description*

Wholesale agency assistance program measures are designed to deliver assistance to its wholesale utility customers who purchase water and provide retail water service to customers. Under this BMP, the wholesale agency will provide financial and/or technical support to wholesale purchasers to advance water conservation efforts both for the wholesale customer and its retail water customers. Financial support should consist of incentives or equivalent resources as appropriate and beneficial. All BMP programs that target retail water customers should be supported when they can be shown to be cost-effective in terms of avoided cost of water from the wholesaler's perspective.

Financing for water conservation programs can be built into the rate structure as a dedicated fund available to wholesale customers who are retail purveyors. The wholesale agency can offer its BMP programs either to the wholesale customer or directly to its retail customers and should provide technical assistance to implement them. When mutually agreeable and beneficial, the wholesale agency may operate all or any part of the conservation-related activities for one or more of its retail customers.

Wholesale agencies should work in cooperation with their wholesale customers to identify and remove potential disincentives to conservation that are created by water management policies including, to the extent possible, when considering the nature of wholesale water service, its water rate structure. Wholesale rate structures should be designed upon the basic principal of increased cost for increased usage. Incentives to conserve can be built into the base rate/volumetric rate ratio with greater emphasis on volumetric rates or with a seasonal increment.

### C.   *Implementation*

Agencies are encouraged to consider stakeholder group information meetings, especially for those affected by this BMP. Working with stakeholder groups will be important to achieving "buy in" from the stakeholders. Implementation of this BMP will exceed the requirements of §TAC 288.5, Water Conservation Plans for Wholesale Water Suppliers. To implement this BMP, the following elements and strategies should be included:

1)     Wholesale agency baseline profile: A description of the wholesaler's service area, including population and customer data, water use data, water supply system data, and wastewater data;

2)     Wholesale agency goals: Specification of quantified five- and ten-year targets for water savings including, where appropriate, target goals for municipal use in gallons per capita per day (Total "GPCD") for the wholesaler's service area, maximum acceptable water loss and the basis for the development of these goals;

3)     Wholesale water system accounting and measurement:

    a.     A description as to which practice(s) and/or device(s) will be utilized to measure and account for the amount of water diverted from the source(s) of supply;

    b.     A monitoring and record management program for determining water deliveries, sales, and losses;

    c.     A program of metering and leak detection and repair for the wholesaler's water storage, delivery, and distribution system;

4)     A requirement in every wholesale water supply contract that each successive wholesale customer develops and implements a water conservation plan that meets TAC 288 rule requirements for public water suppliers. Because no state mechanisms are in place to enforce implementation of these plans, the wholesale agency should consider developing and adopting penalties for non-compliance of this requirement.

5)     Conservation-oriented water rates. During the process of contracting for water service, either new or renewed, the wholesale agency should implement wholesale water rate structures that provide incentives to conserve.

6)     Wholesale customer assistance. A program to assist customers, which could include, but not be limited to, the following:

    a.     Technical assistance with the development of plans and program implementation;

    b.     Development of consistent methodologies for accounting and tracking water loss and gallons per capita per day;

    c.     Development of procedures for calculating program savings, costs and benefits;

    d.     Coordination of conservation incentive activities. Examples of pooling funds and providing grants; offering bulk purchase of equipment such as ULF toilets;

    e.     Implementation of wholesale service area-wide education and outreach programs, such as school education programs, public information programs, etc. (*See* BMP for school education and public information);

    f.     Cost-sharing, including joint management of retrofit and education programs and partial funding of rebates for specific conservation measures.

7)     A program for reuse and/or recycling of wastewater and/or gray water and

8)     Any other water conservation practice, method, or technique which the wholesaler shows to be appropriate for achieving the stated goal or goals of the water conservation plan.

9) A means for implementing this BMP, which will be evidenced by official adoption of the wholesale agency's BMP initiatives by the wholesale customers.

## D. *Schedule*

Program participants should begin implementing this BMP within twelve (12) months of official adoption.

## E. *Scope*

To accomplish this BMP, the agency should adopt wholesale agency assistance policies, programs or rates consistent with the provisions for this BMP as specified in Section C.

## F. *Documentation*

To track the progress of this BMP, the agency should gather the following documentation:

1) Copy of wholesale agency assistance BMP enacted in the service area;
2) Copy of Conservation Plan pursuant to §TAC 288.5;
3) Annual report of measures accomplished; and
4) Copies of progress reports of BMPs implemented by wholesale customers that are done in conjunction with the wholesaler or which are cost-shared through this BMP.

## G. *Determination of Water Savings*

Using historical records as appropriate, calculate water savings due to implemented BMPs, such as water loss programs or programs delivered to retail customers. Calculated savings should be based upon equipment changes, quantified efficiency measures, or alternative water sources as appropriate.

## H. *Cost-effectiveness Considerations*

The labor costs for technical services to retail customers are dependent upon the type of conservation BMPs which the wholesale agency decides to implement. Wholesale providers should evaluate each of the BMPs to determine the appropriate costs associated with technical assistance. Cost-share costs also depend upon the cost of the BMP and the percentage of BMP implementation the wholesaler determines is appropriate. It is recommended that the wholesaler determine the NPV of avoided costs for new supply projects to determine the appropriate level of financial support to offer retailers for cost-share programs.

## I. *References for Additional Information*

1) *A Water Conservation Guide for Public Utilities,* New Mexico Office of the State Engineer, March 2001.

2)      *Pulling Utilities Together: Water-Energy Partnerships*, Home Energy Magazine Online July/August 1993. http://hem.dis.anl.gov/eehem/93/930709.html

3)      *Memorandum of Understanding*, California Urban Water Conservation Council, 1999.

# APPENDIX D

| Vernon's Texas Statutes and Codes Annotated |
| --- |
|    Water Code (Refs & Annos) |
|       Title 2. Water Administration (Refs & Annos) |
|          Subtitle B. Water Rights |
|             Chapter 11. Water Rights (Refs & Annos) |
|                Subchapter B. Rights in State Water (Refs & Annos) |

V.T.C.A., Water Code § 11.022

§ 11.022. Acquisition of Right to Use State Water

Currentness

The right to the use of state water may be acquired by appropriation in the manner and for the purposes provided in this chapter. When the right to use state water is lawfully acquired, it may be taken or diverted from its natural channel.

**Credits**

Amended by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977.

Notes of Decisions (9)

V. T. C. A., Water Code § 11.022, TX WATER § 11.022
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle B. Water Rights
        Chapter 11. Water Rights (Refs & Annos)
          Subchapter C. Unlawful Use, Diversion, Waste, Etc.

V.T.C.A., Water Code § 11.085

§ 11.085. Interbasin Transfers

Effective: September 1, 2013
Currentness

(a) No person may take or divert any state water from a river basin in this state and transfer such water to any other river basin without first applying for and receiving a water right or an amendment to a permit, certified filing, or certificate of adjudication from the commission authorizing the transfer.

(b) The application must include:

(1) the contract price of the water to be transferred;

(2) a statement of each general category of proposed use of the water to be transferred and a detailed description of the proposed uses and users under each category; and

(3) the cost of diverting, conveying, distributing, and supplying the water to, and treating the water for, the proposed users.

(c) The applicant shall provide the information described by Subsection (b) of this section to any person on request and without cost.

(d) Prior to taking action on an application for an interbasin transfer, the commission shall conduct at least one public meeting to receive comments in both the basin of origin of the water proposed for transfer and the basin receiving water from the proposed transfer. Notice shall be provided pursuant to Subsection (g) of this section. Any person may present relevant information and data at the meeting on the criteria which the commission is to consider related to the interbasin transfer.

(e) In addition to the public meetings required by Subsection (d), if the application is contested in a manner requiring an evidentiary hearing under the rules of the commission, the commission shall give notice and hold an evidentiary hearing, in accordance with commission rules and applicable state law. An evidentiary hearing on an application to transfer water authorized under an existing water right is limited to considering issues related to the requirements of this section.

(f) Notice of an application for an interbasin transfer shall be mailed to the following:

(1) all holders of permits, certified filings, or certificates of adjudication located in whole or in part in the basin of origin;

(2) each county judge of a county located in whole or in part in the basin of origin;

(3) each mayor of a city with a population of 1,000 or more located in whole or in part in the basin of origin; and

(4) all groundwater conservation districts located in whole or in part in the basin of origin; and

(5) each state legislator in both basins.

(g) The applicant shall cause the notice of application for an interbasin transfer to be published in two different weeks within a 30-day period in one or more newspapers having general circulation in each county located in whole or in part in the basin of origin or the receiving basin. The published notice may not be smaller than 96.8 square centimeters or 15 square inches with the shortest dimension at least 7.6 centimeters or three inches. The notice of application and public meetings shall be combined in the mailed and published notices.

(h) The notice of application must state how a person may obtain the information described by Subsection (b) of this section.

(i) The applicant shall pay the cost of notice required to be provided under this section. The commission by rule may establish procedures for payment of those costs.

(j) In addition to other requirements of this code relating to the review of and action on an application for a new water right or amended permit, certified filing, or certificate of adjudication, the commission shall:

(1) request review and comment on an application for an interbasin transfer from each county judge of a county located in whole or in part in the basin of origin. A county judge should make comment only after seeking advice from the county commissioners court; and

(2) give consideration to the comments of each county judge of a county located in whole or in part in the basin of origin prior to taking action on an application for an interbasin transfer.

(k) In addition to other requirements of this code relating to the review of and action on an application for a new water right or amended permit, certified filing, or certificate of adjudication, the commission shall weigh the effects of the proposed transfer by considering:

(1) the need for the water in the basin of origin and in the proposed receiving basin based on the period for which the water supply is requested, but not to exceed 50 years;

(2) factors identified in the applicable approved regional water plans which address the following:

(A) the availability of feasible and practicable alternative supplies in the receiving basin to the water proposed for transfer;

(B) the amount and purposes of use in the receiving basin for which water is needed;

(C) proposed methods and efforts by the receiving basin to avoid waste and implement water conservation and drought contingency measures;

(D) proposed methods and efforts by the receiving basin to put the water proposed for transfer to beneficial use;

(E) the projected economic impact that is reasonably expected to occur in each basin as a result of the transfer; and

(F) the projected impacts of the proposed transfer that are reasonably expected to occur on existing water rights, instream uses, water quality, aquatic and riparian habitat, and bays and estuaries that must be assessed under Sections 11.147, 11.150, and 11.152 of this code in each basin. If the water sought to be transferred is currently authorized to be used under an existing permit, certified filing, or certificate of adjudication, such impacts shall only be considered in relation to that portion of the permit, certified filing, or certificate of adjudication proposed for transfer and shall be based on historical uses of the permit, certified filing, or certificate of adjudication for which amendment is sought;

(3) proposed mitigation or compensation, if any, to the basin of origin by the applicant;

(4) the continued need to use the water for the purposes authorized under the existing permit, certified filing, or certificate of adjudication, if an amendment to an existing water right is sought; and

(5) the information required to be submitted by the applicant.

(l) The commission may grant, in whole or in part, an application for an interbasin transfer only to the extent that:

(1) the detriments to the basin of origin during the proposed transfer period are less than the benefits to the receiving basin during the proposed transfer period, as determined by the commission based on consideration of the factors described by Subsection (k); and

(2) the applicant for the interbasin transfer has prepared a drought contingency plan and has developed and implemented a water conservation plan that will result in the highest practicable levels of water conservation and efficiency achievable within the jurisdiction of the applicant.

(m) The commission may grant new or amended water rights under this section with or without specific terms or periods of use and with specific conditions under which a transfer of water may occur.

(n) If the transfer of water is based on a contractual sale of water, the new water right or amended permit, certified filing, or certificate of adjudication authorizing the transfer shall contain a condition for a term or period not greater than the term of the contract, including any extension or renewal of the contract.

(o) The parties to a contract for an interbasin transfer may include provisions for compensation and mitigation. If the party from the basin of origin is a government entity, each county judge of a county located in whole or in part in the basin of origin may provide input on the appropriate compensation and mitigation for the interbasin transfer.

(p) A river basin may not be redesignated in order to allow a transfer or diversion of water otherwise in violation of this section.

(q) A person who takes or diverts water in violation of this section is guilty of a misdemeanor and upon conviction is punishable by a fine of not more than $1,000 or by confinement in the county jail for not more than six months.

(r) A person commits a separate offense each day he continues to take or divert water in violation of this section.

(s) Any proposed transfer of all or a portion of a water right under this section is junior in priority to water rights granted before the time application for transfer is accepted for filing.

(t) Any proposed transfer of all or a portion of a water right under this section from a river basin in which two or more river authorities or water districts created under Section 59, Article XVI, Texas Constitution, have written agreements or permits that provide for the coordinated operation of their respective reservoirs to maximize the amount of water for beneficial use within their respective water services areas shall be junior in priority to water rights granted before the time application for transfer is accepted for filing.

(u) An appropriator of water for municipal purposes in the basin of origin may, at the appropriator's option, be a party in any hearings under this section.

(v) The provisions of this section, except Subsection (a), do not apply to:

(1) a proposed transfer which in combination with any existing transfers totals less than 3,000 acre-feet of water per annum from the same permit, certified filing, or certificate of adjudication;

(2) a request for an emergency transfer of water;

(3) a proposed transfer from a basin to its adjoining coastal basin;

(4) a proposed transfer from the part of the geographic area of a county or municipality, or the part of the retail service area of a retail public utility as defined by Section 13.002, that is within the basin of origin for use in that part of the geographic area of the county or municipality, or that contiguous part of the retail service area of the utility, not within the basin of origin; or

(5) a proposed transfer of water that is:

(A) imported from a source located wholly outside the boundaries of this state, except water that is imported from a source located in the United Mexican States;

(B) for use in this state; and

(C) transported by using the bed and banks of any flowing natural stream located in this state.

**Credits**

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1997, 75th Leg., ch. 1010, § 2.08, eff. Sept. 1, 1997; Acts 2001, 77th Leg., ch. 966, § 2.05, eff. Sept. 1, 2001; Acts 2001, 77th Leg., ch. 1234, § 12, eff. Sept. 1, 2001; Acts 2009, 81st Leg., ch. 1016, § 3, eff. June 19, 2009; Acts 2013, 83rd Leg., ch. 1065 (H.B. 3233), § 1, eff. Sept. 1, 2013.

Notes of Decisions (56)

V. T. C. A., Water Code § 11.085, TX WATER § 11.085
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle B. Water Rights
        Chapter 11. Water Rights (Refs & Annos)
          Subchapter D. Permits to Use State Water (Refs & Annos)

V.T.C.A., Water Code § 11.121

§ 11.121. Permit Required

Currentness

Except as provided in Sections 11.142, 11.1421, and 11.1422 of this code, no person may appropriate any state water or begin construction of any work designed for the storage, taking, or diversion of water without first obtaining a permit from the commission to make the appropriation.

**Credits**
Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1987, 70th Leg., ch. 544, § 1, eff. Aug. 31, 1987; Acts 1995, 74th Leg., ch. 183, § 1, eff. May 23, 1995.

Notes of Decisions (20)

V. T. C. A., Water Code § 11.121, TX WATER § 11.121
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

> Vernon's Texas Statutes and Codes Annotated
>   Water Code (Refs & Annos)
>     Title 2. Water Administration (Refs & Annos)
>       Subtitle B. Water Rights
>         Chapter 11. Water Rights (Refs & Annos)
>           Subchapter D. Permits to Use State Water (Refs & Annos)

V.T.C.A., Water Code § 11.1271

§ 11.1271. Additional Requirements: Water Conservation Plans

Effective: September 1, 2011
Currentness

(a) The commission shall require from an applicant for a new or amended water right the formulation and submission of a water conservation plan and the adoption of reasonable water conservation measures, as defined by Subdivision (8)(B), Section 11.002, of this code.

(b) The commission shall require the holder of an existing permit, certified filing, or certificate of adjudication for the appropriation of surface water in the amount of 1,000 acre-feet a year or more for municipal, industrial, and other uses, and 10,000 acre-feet a year or more for irrigation uses, to develop, submit, and implement a water conservation plan, consistent with the appropriate approved regional water plan, that adopts reasonable water conservation measures as defined by Subdivision (8)(B), Section 11.002, of this code. The requirement for a water conservation plan under this section shall not result in the need for an amendment to an existing permit, certified filing, or certificate of adjudication.

(c) Beginning May 1, 2005, all water conservation plans required under this section must include specific, quantified 5-year and 10-year targets for water savings. The entity preparing the plan shall establish the targets. Targets must include goals for water loss programs and goals for municipal use in gallons per capita per day.

(d) The commission and the board jointly shall identify quantified target goals for water conservation that water suppliers and other entities may use as guidelines in preparing water conservation plans. Goals established under this subsection are not enforceable requirements.

(e) The commission and board jointly shall develop model water conservation programs for different types of water suppliers that suggest best management practices for achieving the highest practicable levels of water conservation and efficiency achievable for each specific type of water supplier.

(f) The commission shall adopt rules:

(1) establishing criteria and deadlines for submission of water conservation plans, including any required amendments, and for submission of implementation reports; and

(2) requiring the methodology and guidance for calculating water use and conservation developed under Section 16.403 to be used in the water conservation plans required by this section.

(g) At a minimum, rules adopted under Subsection (f)(2) must require an entity to report the most detailed level of municipal water use data currently available to the entity. The commission may not adopt a rule that requires an entity to report municipal water use data that is more detailed than the entity's billing system is capable of producing.

**Credits**
Added by Acts 1985, 69th Leg., ch. 133, § 1.08. Amended by Acts 1997, 75th Leg., ch. 1010, § 1.03, eff. Sept. 1, 1997; Acts 2003, 78th Leg., ch. 688, § 1, eff. June 20, 2003; Acts 2011, 82nd Leg., ch. 1233 (S.B. 660), § 5, eff. Sept. 1, 2011.

V. T. C. A., Water Code § 11.1271, TX WATER § 11.1271
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle B. Water Rights
        Chapter 11. Water Rights (Refs & Annos)
          Subchapter D. Permits to Use State Water (Refs & Annos)

V.T.C.A., Water Code § 11.134

§ 11.134. Action on Application

Effective: September 1, 2007
Currentness

(a) After the hearing, the commission shall make a written decision granting or denying the application. The application may be granted or denied in whole or in part.

(b) The commission shall grant the application only if:

  (1) the application conforms to the requirements prescribed by this chapter and is accompanied by the prescribed fee;

  (2) unappropriated water is available in the source of supply;

  (3) the proposed appropriation:

    (A) is intended for a beneficial use;

    (B) does not impair existing water rights or vested riparian rights;

    (C) is not detrimental to the public welfare;

    (D) considers any applicable environmental flow standards established under Section 11.1471 and, if applicable, the assessments performed under Sections 11.147(d) and (e) and Sections 11.150, 11.151, and 11.152; and

    (E) addresses a water supply need in a manner that is consistent with the state water plan and the relevant approved regional water plan for any area in which the proposed appropriation is located, unless the commission determines that conditions warrant waiver of this requirement; and

  (4) the applicant has provided evidence that reasonable diligence will be used to avoid waste and achieve water conservation as defined by Section 11.002(8)(B).

(c) Beginning January 5, 2002, the commission may not issue a water right for municipal purposes in a region that does not have an approved regional water plan in accordance with Section 16.053(i) unless the commission determines that conditions warrant waiver of this requirement.

**Credits**

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 133, § 1.09; Acts 1997, 75th Leg., ch. 1010, § 4.01, eff. Sept. 1, 1997; Acts 1999, 76th Leg., ch. 1223, § 1, eff. June 18, 1999; Acts 2001, 77th Leg., ch. 966, § 2.08, eff. Sept. 1, 2001; Acts 2007, 80th Leg., ch. 1351, § 1.12, eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 1430, § 1.12, eff. Sept. 1, 2007.

Notes of Decisions (26)

V. T. C. A., Water Code § 11.134, TX WATER § 11.134
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX E

Vernon's Texas Statutes and Codes Annotated
    Government Code (Refs & Annos)
        Title 3. Legislative Branch (Refs & Annos)
            Subtitle B. Legislation
                Chapter 311. Code Construction Act (Refs & Annos)
                    Subchapter B. Construction of Words and Phrases (Refs & Annos)

V.T.C.A., Government Code § 311.011

§ 311.011. Common and Technical Usage of Words

Currentness

(a) Words and phrases shall be read in context and construed according to the rules of grammar and common usage.

(b) Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.

**Credits**
Acts 1985, 69th Leg., ch. 479, § 1, eff. Sept. 1, 1985.

Notes of Decisions (49)

V. T. C. A., Government Code § 311.011, TX GOVT § 311.011
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

| Vernon's Texas Statutes and Codes Annotated<br>    Government Code (Refs & Annos)<br>        Title 3. Legislative Branch (Refs & Annos)<br>            Subtitle B. Legislation<br>                Chapter 311. Code Construction Act (Refs & Annos)<br>                    Subchapter C. Construction of Statutes (Refs & Annos) |
| :--- |

V.T.C.A., Government Code § 311.021

§ 311.021. Intention in Enactment of Statutes

Currentness

In enacting a statute, it is presumed that:

(1) compliance with the constitutions of this state and the United States is intended;

(2) the entire statute is intended to be effective;

(3) a just and reasonable result is intended;

(4) a result feasible of execution is intended; and

(5) public interest is favored over any private interest.

**Credits**
Acts 1985, 69th Leg., ch. 479, § 1, eff. Sept. 1, 1985.

Notes of Decisions (43)

V. T. C. A., Government Code § 311.021, TX GOVT § 311.021
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle A. Administrative Procedure and Practice
        Chapter 2001. Administrative Procedure (Refs & Annos)
          Subchapter G. Contested Cases: Judicial Review

V.T.C.A., Government Code § 2001.171

§ 2001.171. Judicial Review

Currentness

A person who has exhausted all administrative remedies available within a state agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993.

Notes of Decisions (356)

V. T. C. A., Government Code § 2001.171, TX GOVT § 2001.171
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle A. Administrative Procedure and Practice
        Chapter 2001. Administrative Procedure (Refs & Annos)
          Subchapter G. Contested Cases: Judicial Review

V.T.C.A., Government Code § 2001.174

§ 2001.174. Review Under Substantial Evidence Rule or Undefined Scope of Review

Currentness

If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

(1) may affirm the agency decision in whole or in part; and

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(A) in violation of a constitutional or statutory provision;

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993.

Notes of Decisions (420)

V. T. C. A., Government Code § 2001.174, TX GOVT § 2001.174

Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX F

Texas Administrative Code
   Title 30. Environmental Quality
      Part 1. Texas Commission on Environmental Quality
         Chapter 288. Water Conservation Plans, Drought Contingency Plans, Guidelines and Requirements
            Subchapter A. Water Conservation Plans

30 TAC § 288.2

Tex. Admin. Code tit. 30, § 288.2

§ 288.2. Water Conservation Plans for Municipal Uses by Public Water Suppliers

Currentness

(a) A water conservation plan for municipal water use by public water suppliers must provide information in response to the following. If the plan does not provide information for each requirement, the public water supplier shall include in the plan an explanation of why the requirement is not applicable.

(1) Minimum requirements. All water conservation plans for municipal uses by public water suppliers must include the following elements:

(A) a utility profile in accordance with the Texas Water Use Methodology, including, but not limited to, information regarding population and customer data, water use data (including total gallons per capita per day (GPCD) and residential GPCD), water supply system data, and wastewater system data;

(B) a record management system which allows for the classification of water sales and uses into the most detailed level of water use data currently available to it, including, if possible, the sectors listed in clauses (i)-(vi) of this subparagraph. Any new billing system purchased by a public water supplier must be capable of reporting detailed water use data as described in clauses (i)-(vi) of this subparagraph:

(i) residential;

(I) single family;

(II) multi-family;

(ii) commercial;

(iii) institutional;

(iv) industrial;

(v) agricultural; and,

(vi) wholesale.

(C) specific, quantified five-year and ten-year targets for water savings to include goals for water loss programs and goals for municipal use in total GPCD and residential GPCD. The goals established by a public water supplier under this subparagraph are not enforceable;

(D) metering device(s), within an accuracy of plus or minus 5.0% in order to measure and account for the amount of water diverted from the source of supply;

(E) a program for universal metering of both customer and public uses of water, for meter testing and repair, and for periodic meter replacement;

(F) measures to determine and control water loss (for example, periodic visual inspections along distribution lines; annual or monthly audit of the water system to determine illegal connections; abandoned services; etc.);

(G) a program of continuing public education and information regarding water conservation;

(H) a water rate structure which is not "promotional," i.e., a rate structure which is cost-based and which does not encourage the excessive use of water;

(I) a reservoir systems operations plan, if applicable, providing for the coordinated operation of reservoirs owned by the applicant within a common watershed or river basin in order to optimize available water supplies; and

(J) a means of implementation and enforcement which shall be evidenced by:

(i) a copy of the ordinance, resolution, or tariff indicating official adoption of the water conservation plan by the water supplier; and

(ii) a description of the authority by which the water supplier will implement and enforce the conservation plan; and

(K) documentation of coordination with the regional water planning groups for the service area of the public water supplier in order to ensure consistency with the appropriate approved regional water plans.

(2) Additional content requirements. Water conservation plans for municipal uses by public drinking water suppliers serving a current population of 5,000 or more and/or a projected population of 5,000 or more within the next ten years subsequent to the effective date of the plan must include the following elements:

(A) a program of leak detection, repair, and water loss accounting for the water transmission, delivery, and distribution system;

(B) a requirement in every wholesale water supply contract entered into or renewed after official adoption of the plan (by either ordinance, resolution, or tariff), and including any contract extension, that each successive wholesale customer develop and implement a water conservation plan or water conservation measures using the applicable elements in this chapter. If the customer intends to resell the water, the contract between the initial supplier and customer must provide that the contract for the resale of the water must have water conservation requirements so that each successive customer in the resale of the water will be required to implement water conservation measures in accordance with the provisions of this chapter.

(3) Additional conservation strategies. Any combination of the following strategies shall be selected by the water supplier, in addition to the minimum requirements in paragraphs (1) and (2) of this subsection, if they are necessary to achieve the stated water conservation goals of the plan. The commission may require that any of the following strategies be implemented by the water supplier if the commission determines that the strategy is necessary to achieve the goals of the water conservation plan:

(A) conservation-oriented water rates and water rate structures such as uniform or increasing block rate schedules, and/or seasonal rates, but not flat rate or decreasing block rates;

(B) adoption of ordinances, plumbing codes, and/or rules requiring water-conserving plumbing fixtures to be installed in new structures and existing structures undergoing substantial modification or addition;

(C) a program for the replacement or retrofit of water-conserving plumbing fixtures in existing structures;

(D) reuse and/or recycling of wastewater and/or graywater;

(E) a program for pressure control and/or reduction in the distribution system and/or for customer connections;

(F) a program and/or ordinance(s) for landscape water management;

(G) a method for monitoring the effectiveness and efficiency of the water conservation plan; and

(H) any other water conservation practice, method, or technique which the water supplier shows to be appropriate for achieving the stated goal or goals of the water conservation plan.

(b) A water conservation plan prepared in accordance with 31 TAC § 363.15 (relating to Required Water Conservation Plan) of the Texas Water Development Board and substantially meeting the requirements of this section and other applicable commission rules may be submitted to meet application requirements in accordance with a memorandum of understanding between the commission and the Texas Water Development Board.

(c) A public water supplier for municipal use shall review and update its water conservation plan, as appropriate, based on an assessment of previous five-year and ten-year targets and any other new or updated information. The public water supplier for municipal use shall review and update the next revision of its water conservation plan every five years to coincide with the regional water planning group.

**Credits**
**Source:** The provisions of this §288.2 adopted to be effective May 3, 1993, 18 TexReg 2558; amended to be effective February 21, 1999, 24 TexReg 949; amended to be effective April 27, 2000, 25 TexReg 3544; amended to be effective October 7, 2004, 29 TexReg 9384; amended to be effective December 6, 2012, 37 TexReg 9515.

Current through 40 Tex.Reg. No. 3730, dated June 12, 2015, as effective on or before June 12, 2015

30 TAC § 288.2, 30 TX ADC § 288.2

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

Texas Administrative Code
　　Title 30. Environmental Quality
　　　　Part 1. Texas Commission on Environmental Quality
　　　　　　Chapter 288. Water Conservation Plans, Drought Contingency Plans, Guidelines and Requirements
　　　　　　　　Subchapter A. Water Conservation Plans

30 TAC § 288.5

Tex. Admin. Code tit. 30, § 288.5

§ 288.5. Water Conservation Plans for Wholesale Water Suppliers

Currentness

A water conservation plan for a wholesale water supplier must provide information in response to each of the following paragraphs. If the plan does not provide information for each requirement, the wholesale water supplier shall include in the plan an explanation of why the requirement is not applicable.

(1) Minimum requirements. All water conservation plans for wholesale water suppliers must include the following elements:

(A) a description of the wholesaler's service area, including population and customer data, water use data, water supply system data, and wastewater data;

(B) specific, quantified five-year and ten-year targets for water savings including, where appropriate, target goals for municipal use in gallons per capita per day for the wholesaler's service area, maximum acceptable water loss, and the basis for the development of these goals. The goals established by wholesale water suppliers under this subparagraph are not enforceable;

(C) a description as to which practice(s) and/or device(s) will be utilized to measure and account for the amount of water diverted from the source(s) of supply;

(D) a monitoring and record management program for determining water deliveries, sales, and losses;

(E) a program of metering and leak detection and repair for the wholesaler's water storage, delivery, and distribution system;

(F) a requirement in every water supply contract entered into or renewed after official adoption of the water conservation plan, and including any contract extension, that each successive wholesale customer develop and implement a water conservation plan or water conservation measures using the applicable elements of this chapter. If the customer intends to resell the water, then the contract between the initial supplier and customer must provide that the contract for the resale of the water must have water conservation requirements so that each successive customer in the resale of the water will be required to implement water conservation measures in accordance with applicable provisions of this chapter;

---

(G) a reservoir systems operations plan, if applicable, providing for the coordinated operation of reservoirs owned by the applicant within a common watershed or river basin. The reservoir systems operations plans shall include optimization of water supplies as one of the significant goals of the plan;

(H) a means for implementation and enforcement, which shall be evidenced by a copy of the ordinance, rule, resolution, or tariff, indicating official adoption of the water conservation plan by the water supplier; and a description of the authority by which the water supplier will implement and enforce the conservation plan; and

(I) documentation of coordination with the regional water planning groups for the service area of the wholesale water supplier in order to ensure consistency with the appropriate approved regional water plans.

(2) Additional conservation strategies. Any combination of the following strategies shall be selected by the water wholesaler, in addition to the minimum requirements of paragraph (1) of this section, if they are necessary in order to achieve the stated water conservation goals of the plan. The commission may require by commission order that any of the following strategies be implemented by the water supplier if the commission determines that the strategies are necessary in order for the conservation plan to be achieved:

(A) conservation-oriented water rates and water rate structures such as uniform or increasing block rate schedules, and/or seasonal rates, but not flat rate or decreasing block rates;

(B) a program to assist agricultural customers in the development of conservation pollution prevention and abatement plans;

(C) a program for reuse and/or recycling of wastewater and/or graywater; and

(D) any other water conservation practice, method, or technique which the wholesaler shows to be appropriate for achieving the stated goal or goals of the water conservation plan.

(3) Review and update requirements. The wholesale water supplier shall review and update its water conservation plan, as appropriate, based on an assessment of previous five-year and ten-year targets and any other new or updated information. A wholesale water supplier shall review and update the next revision of its water conservation plan every five years to coincide with the regional water planning group.

**Credits**
**Source:** The provisions of this §288.5 adopted to be effective May 3, 1993, 18 TexReg 2558; amended to be effective February 21, 1999, 24 TexReg 949; amended to be effective April 27, 2000, 25 TexReg 3544; amended to be effective October 7, 2004, 29 TexReg 9384; amended to be effective December 6, 2012, 37 TexReg 9515.

Current through 40 Tex.Reg. No. 3730, dated June 12, 2015, as effective on or before June 12, 2015

30 TAC § 288.5, 30 TX ADC § 288.5

**End of Document**                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
  Title 30. Environmental Quality
    Part 1. Texas Commission on Environmental Quality
      Chapter 288. Water Conservation Plans, Drought Contingency Plans, Guidelines and Requirements
        Subchapter A. Water Conservation Plans

30 TAC § 288.7

Tex. Admin. Code tit. 30, § 288.7

§ 288.7. Plans Submitted with a Water Right Application for New or Additional State Water

Currentness

(a) A water conservation plan submitted with an application for a new or additional appropriation of water must include data and information which:

(1) supports the applicant's proposed use of water with consideration of the water conservation goals of the water conservation plan;

(2) evaluates conservation as an alternative to the proposed appropriation; and

(3) evaluates any other feasible alternative to new water development including, but not limited to, waste prevention, recycling and reuse, water transfer and marketing, regionalization, and optimum water management practices and procedures.

(b) It shall be the burden of proof of the applicant to demonstrate that no feasible alternative to the proposed appropriation exists and that the requested amount of appropriation is necessary and reasonable for the proposed use.

**Credits**
**Source:** The provisions of this § 288.7 adopted to be effective May 3, 1993, 18 TexReg 2558.

Current through 40 Tex.Reg. No. 3730, dated June 12, 2015, as effective on or before June 12, 2015

30 TAC § 288.7, 30 TX ADC § 288.7

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
  Title 30. Environmental Quality
    Part 1. Texas Commission on Environmental Quality
      Chapter 288. Water Conservation Plans, Drought Contingency Plans, Guidelines and Requirements
        Subchapter C. Required Submittals

30 TAC § 288.30
Tex. Admin. Code tit. 30, § 288.30

§ 288.30. Required Submittals

Currentness

In addition to the water conservation and drought contingency plans required to be submitted with an application under § 295.9 of this title (relating to Water Conservation and Drought Contingency Plans), water conservation and drought contingency plans are required as follows.

(1) Water conservation plans for municipal, industrial, and other non-irrigation uses. The holder of an existing permit, certified filing, or certificate of adjudication for the appropriation of surface water in the amount of 1,000 acre-feet a year or more for municipal, industrial, and other non-irrigation uses shall develop, submit, and implement a water conservation plan meeting the requirements of Subchapter A of this chapter (relating to Water Conservation Plans). The water conservation plan must be submitted to the executive director not later than May 1, 2005. Thereafter, the next revision of the water conservation plan for municipal, industrial, and other non-irrigation uses must be submitted not later than May 1, 2009, and every five years after that date to coincide with the regional water planning group. Any revised plans must be submitted to the executive director within 90 days of adoption. The revised plans must include implementation reports. The requirement for a water conservation plan under this section must not result in the need for an amendment to an existing permit, certified filing, or certificate of adjudication.

(2) Implementation report for municipal, industrial, and other non-irrigation uses. The implementation report must include:

(A) the list of dates and descriptions of the conservation measures implemented;

(B) data about whether or not targets in the plans are being met;

(C) the actual amount of water saved; and

(D) if the targets are not being met, an explanation as to why any of the targets are not being met, including any progress on that particular target.

(3) Water conservation plans for irrigation uses. The holder of an existing permit, certified filing, or certificate of adjudication for the appropriation of surface water in the amount of 10,000 acre-feet a year or more for irrigation uses shall develop, submit, and implement a water conservation plan meeting the requirements of Subchapter A of this chapter. The water conservation plan must be submitted to the executive director not later than May 1, 2005. Thereafter, the next revision of the water conservation plan for irrigation uses must be submitted not later than May 1, 2009, and every five years after that date to coincide with the

regional water planning group. Any revised plans must be submitted to the executive director within 90 days of adoption. The revised plans must include implementation reports. The requirement for a water conservation plan under this section must not result in the need for an amendment to an existing permit, certified filing, or certificate of adjudication.

(4) Implementation report for irrigation uses. The implementation report must include:

(A) the list of dates and descriptions of the conservation measures implemented;

(B) data about whether or not targets in the plans are being met;

(C) the actual amount of water saved; and

(D) if the targets are not being met, an explanation as to why any of the targets are not being met, including any progress on that particular target.

(5) Drought contingency plans for retail public water suppliers. Retail public water suppliers shall submit a drought contingency plan meeting the requirements of Subchapter B of this chapter (relating to Drought Contingency Plans) to the executive director after adoption by its governing body. The retail public water system shall provide a copy of the plan to the regional water planning group for each region within which the water system operates. These drought contingency plans must be submitted as follows.

(A) For retail public water suppliers providing water service to 3,300 or more connections, the drought contingency plan must be submitted to the executive director not later than May 1, 2005. Thereafter, the retail public water suppliers providing water service to 3,300 or more connections shall submit the next revision of the plan not later than May 1, 2009, and every five years after that date to coincide with the regional water planning group. Any revised plans must be submitted to the executive director within 90 days of adoption by the community water system. Any new retail public water suppliers providing water service to 3,300 or more connections shall prepare and adopt a drought contingency plan within 180 days of commencement of operation, and submit the plan to the executive director within 90 days of adoption.

(B) For all the retail public water suppliers, the drought contingency plan must be prepared and adopted not later than May 1, 2005 and must be available for inspection by the executive director upon request. Thereafter, the retail public water suppliers shall prepare and adopt the next revision of the plan not later than May 1, 2009, and every five years after that date to coincide with the regional water planning group. Any new retail public water supplier providing water service to less than 3,300 connections shall prepare and adopt a drought contingency plan within 180 days of commencement of operation, and shall make the plan available for inspection by the executive director upon request.

(6) Drought contingency plans for wholesale public water suppliers. Wholesale public water suppliers shall submit a drought contingency plan meeting the requirements of Subchapter B of this chapter to the executive director not later than May 1, 2005, after adoption of the drought contingency plan by the governing body of the water supplier. Thereafter, the wholesale public water suppliers shall submit the next revision of the plan not later than May 1, 2009, and every five years after that date to coincide with the regional water planning group. Any new or revised plans must be submitted to the executive director within 90 days of adoption by the governing body of the wholesale public water supplier. Wholesale public water suppliers shall also

provide a copy of the drought contingency plan to the regional water planning group for each region within which the wholesale water supplier operates.

(7) Drought contingency plans for irrigation districts. Irrigation districts shall submit a drought contingency plan meeting the requirements of Subchapter B of this chapter to the executive director not later than May 1, 2005, after adoption by the governing body of the irrigation district. Thereafter, the irrigation districts shall submit the next revision of the plan not later than May 1, 2009, and every five years after that date to coincide with the regional water planning group. Any new or revised plans must be submitted to the executive director within 90 days of adoption by the governing body of the irrigation district. Irrigation districts shall also provide a copy of the plan to the regional water planning group for each region within which the irrigation district operates.

(8) Additional submissions with a water right application for state water. A water conservation plan or drought contingency plan required to be submitted with an application in accordance with § 295.9 of this title must also be subject to review and approval by the commission.

(9) Existing permits. The holder of an existing permit, certified filing, or certificate of adjudication shall not be subject to enforcement actions nor shall the permit, certified filing, or certificate of adjudication be subject to cancellation, either in part or in whole, based on the nonattainment of goals contained within a water conservation plan submitted with an application in accordance with § 295.9 of this title or by the holder of an existing permit, certified filing, or certificate of adjudication in accordance with the requirements of this section.

(10) Submissions to the executive administrator of the Texas Water Development Board.

(A) Water conservation plans for retail public water suppliers. For retail public water suppliers providing water service to 3,300 or more connections, a water conservation plan meeting the minimum requirements of Subchapter A of this chapter and using appropriate best management practices must be developed, implemented, and submitted to the executive administrator of the Texas Water Development Board not later than May 1, 2009, and every five years after that date to coincide with the regional water planning group. Any revised plans must be submitted to the executive administrator within 90 days of adoption by the community water system. Any new retail public water suppliers providing water service to 3,300 or more connections shall prepare and adopt a water conservation plan within 180 days of commencement of operation, and submit the plan to the executive administrator of the Texas Water Development Board within 90 days of adoption.

(B) Water conservation plans. Each entity that is required to submit a water conservation plan to the commission shall submit a copy of the plan to the executive administrator of the Texas Water Development Board not later than May 1, 2009, and every five years after that date to coincide with the regional water planning group.

(C) Annual reports. Each entity that is required to submit a water conservation plan to the Texas Water Development Board or the commission, shall file a report not later than May 1, 2010, and annually thereafter to the executive administrator of the Texas Water Development Board on the entity's progress in implementing the plan.

(D) Violations of the Texas Water Development Board's rules. The water conservation plans and annual reports shall comply with the minimum requirements established in the Texas Water Development Board's rules. The Texas Water Development Board shall notify the commission if the Texas Water Development Board determines that an entity has not

complied with the Texas Water Development Board rules relating to the minimum requirements for water conservation plans or submission of plans or annual reports. The commission shall take appropriate enforcement action upon receipt of notice from the Texas Water Development Board.

**Credits**

**Source:** The provisions of this § 288.30 adopted to be effective February 21, 1999, 24 TexReg 949; amended to be effective April 27, 2000, 25 TexReg 3544; amended to be effective October 7, 2004, 29 TexReg 9384; amended to be effective January 10, 2008, 33 TexReg 193.

Current through 40 Tex.Reg. No. 3730, dated June 12, 2015, as effective on or before June 12, 2015

30 TAC § 288.30, 30 TX ADC § 288.30

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
    Title 30. Environmental Quality
        Part 1. Texas Commission on Environmental Quality
            Chapter 295. Water Rights, Procedural
                Subchapter A. Requirements of Water Rights Applications General Provisions
                    Division 1. General Requirements

30 TAC § 295.9

Tex. Admin. Code tit. 30, § 295.9

§ 295.9. Water Conservation and Drought Contingency Plans

Currentness

An application relating to the appropriation or use of state water must include water conservation and drought contingency plans meeting applicable requirements contained in this section. An application not accompanied by such plans is not administratively complete and shall not be considered by the commission, unless expressly exempted by this section. The water conservation plan must demonstrate that reasonable diligence will be used to avoid waste and achieve water conservation in order that appropriated waters will be beneficially used for the authorized purposes. Conservation means those practices, techniques, and technologies that will reduce the consumption of water, prevent or reduce the loss or waste of water, maintain or improve the efficiency in the use of water, increase the recycling and reuse of water, or prevent the pollution of water so that a water supply is made available for future or alternative uses for the benefit of the public health, safety and welfare, and of the environment.

(1) Applications to appropriate or to use water for municipal use, industrial or mining use, or agricultural use, including irrigation use. The water conservation and drought contingency plans submitted with an application to appropriate or to use state water for municipal use, industrial or mining use, or agricultural use must be submitted in accordance with the guidelines set forth in Chapter 288 of this title (relating to Water Conservation Plans, Drought Contingency Plans, Guidelines and Requirements).

(2) Applications to appropriate or to use water by wholesale water suppliers. A water conservation plan submitted with an application to appropriate or to use state water by a wholesale water supplier must be submitted in accordance with the guidelines set forth in Chapter 288 of this title.

(3) Applications to appropriate or to use water for any other purpose or use. A water conservation plan submitted with an application to appropriate or to use state water for any other purpose or use shall include a water conservation plan providing information where applicable about those practices, techniques, and technologies that will be used to reduce the consumption of water, prevent or reduce the loss or waste of water, maintain or improve the efficiency in the use of water, increase the recycling and reuse of water, or prevent the pollution of water.

(4) Applications to amend existing water rights. An application to amend an existing water right for any of the following reasons must be accompanied by water conservation and drought contingency plans in accordance with the applicable provisions of this section:

    (A) to increase the amount of the appropriation;

(B) to extend the term of the appropriation;

(C) to change the place of use, unless the request is to expand the amount of acreage to be irrigated adjacent to the existing, authorized irrigated tract without an increase in the appropriation; or

(D) to change the purpose or use of the appropriation (a conservation plan to change the purpose or use of an appropriation need only address the proposed change in purpose or use; however, the executive director may require an applicant to submit a water conservation plan which addresses the applicant's entire water uses and/or appropriations).

(5) Exemptions to the requirement to submit water conservation plans. Applications to impound water for in-place use only, for emergency use in accordance with § 295.91 of this title (relating to Requirements for Application for Emergency Water Use Permit) and for temporary use of water in accordance with § 295.61 of this title (relating to Additional Requirements for Applications for Temporary Permits) are exempt from having to submit a water conservation plan pursuant to this section. However, all water right holders must exercise reasonable diligence to avoid waste and achieve water conservation so that the right to use state water is limited to the amount which is being or can be beneficially used for the authorized purposes but not to exceed the amount specifically appropriated.

**Credits**
**Source:** The provisions of this § 295.9 adopted to be effective May 28, 1986, 11 TexReg 2324; amended to be effective May 3, 1993, 18 TexReg 2558; amended to be effective February 21, 1999, 24 TexReg 969; amended to be effective August 15, 2002, 27 TexReg 7149.

Current through 40 Tex.Reg. No. 3730, dated June 12, 2015, as effective on or before June 12, 2015

30 TAC § 295.9, 30 TX ADC § 295.9

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

Texas Administrative Code
   Title 30. Environmental Quality
      Part 1. Texas Commission on Environmental Quality
         Chapter 297. Water Rights, Substantive
            Subchapter B. Classes of Water Rights

30 TAC § 297.11

Tex. Admin. Code tit. 30, § 297.11

§ 297.11. General Authorization to Divert, Store or Use State Water, Texas Water Code, § 11.121

Currentness

Except as provided under Texas Water Code §§ 11.142, 11.1421 and 11.1422, no person may divert, store, impound, take or use water or begin construction of any work designed for the storage, taking, or diversion of water without first obtaining a water right. Such authorization may be with or without a term, on an annual or seasonal basis, or on a temporary or emergency basis as provided by this chapter.

**Credits**

**Source:** The provisions of this § 297.11 adopted to be effective May 29, 1986, 11 TexReg 2330; amended to be effective February 24, 1999, 24 TexReg 1162.

Current through 40 Tex.Reg. No. 3730, dated June 12, 2015, as effective on or before June 12, 2015

30 TAC § 297.11, 30 TX ADC § 297.11

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
  Title 30. Environmental Quality
    Part 1. Texas Commission on Environmental Quality
      Chapter 297. Water Rights, Substantive
        Subchapter B. Classes of Water Rights

30 TAC § 297.18
Tex. Admin. Code tit. 30, § 297.18

§ 297.18. Interbasin Transfers, Texas Water Code, § 11.085

Currentness

(a) No person may take or divert any state water from a river basin and transfer such water to any other river basin without first applying for and receiving a water right or an amendment to a water right authorizing the transfer.

(b) An increase in the authorized amount of water being transferred to the receiving basin under an existing water right constitutes a new interbasin transfer for purposes of this section.

(c) In addition to the other requirements of this chapter relating to the review of and action on an application for a new or amended water right, the commission shall weigh the effects of the proposed transfer by considering:

(1) the need for the water in the basin of origin and in the proposed receiving basin based on the period for which the water supply is requested, but not to exceed 50 years;

(2) factors identified in the applicable approved regional water plans which address the following:

(A) the availability of feasible and practicable alternative supplies in the receiving basin to the water proposed for transfer;

(B) the amount and purposes of use in the receiving basin for which the water is needed;

(C) proposed methods and efforts by the receiving basin to avoid waste and implement water conservation and drought contingency measures;

(D) proposed methods and efforts by the receiving basin to put the water proposed for transfer to beneficial use;

(E) the projected economic impact that is reasonably expected to occur in each basin as a result of the transfer; and

(F) the projected impacts of the proposed transfer that are reasonably expected to occur on existing water rights, instream uses, water quality, aquatic and riparian habitat, and bays and estuaries in each basin. If the water sought

to be transferred is currently authorized to be used under an existing water right in the basin of origin, such impacts shall only be considered in relation to that portion of the water right proposed for transfer and shall be based on the historical uses of the water right for which amendment is sought.

(3) proposed mitigation or compensation, if any, to the basin of origin by the applicant;

(4) the continued need to use the water for the purposes authorized under the existing water right if an amendment to an existing water right is sought;

(5) comments received from county judges required to be provided notice of the application as provided by § 297.17 of this title (relating to Emergency Authorization (Texas Water Code, § 11.139)); and

(6) information required to be submitted by the applicant.

(d) The commission may grant, in whole or in part, an application for an interbasin transfer only to the extent that:

(1) the detriments to the basin of origin during the proposed transfer period are less than the benefits to the receiving basin during the proposed transfer period, as determined by the commission based on consideration of the factors described by subsection (c)(1)-(4) and (6) of this section; and

(2) the applicant for the interbasin transfer has prepared drought contingency and water conservation plans meeting the requirements of Chapter 288 of this title (relating to Water Conservation Plans, Drought Contingency Plans, Guidelines and Requirements) and has implemented a water conservation plan that will result in the highest practicable levels of water conservation and efficiency achievable within the jurisdiction of the applicant.

(e) The commission may grant new or amended water rights under this section with or without specific terms or periods of use and with specific conditions under which a transfer of water may occur.

(f) If an interbasin transfer of water is based on a contractual sale of water, the new or amended water right authorizing the transfer shall contain a condition for a term or period not greater than the term of the contract, including any extension or renewal of the contract.

(g) The parties to a contract for an interbasin transfer of water may include provisions for compensation and mitigation. If the party from the basin of origin is a governmental entity, each county judge located in whole or in part in the basin of origin may provide comment on the appropriate compensation and mitigation for the interbasin transfer.

(h) A new water right or amendment to an existing water right for a proposed interbasin transfer of water is junior in priority to water rights in the basin of origin granted before the time an administratively complete application for the transfer is filed with the chief clerk in accordance with § 281.17 of this title (relating to Notice of Receipt of Application and Declaration of Administrative Completeness). If an amendment is made to the water right to effectuate an interbasin transfer of water for a

term, the affected portion of the water right shall be junior to all existing water rights in the basin of origin only for the term of the amendment.

(i) A new water right or amendment to an existing water right for a transfer of water from a river basin in which two or more river authorities or water districts have written agreements or permits that provide for the coordinated operation of their respective reservoirs to maximize the amount of water for beneficial use within their respective water service areas shall be junior in priority to water rights granted in that basin before the time an administratively complete application for the interbasin transfer is filed with the chief clerk in accordance with § 281.17 of this title. If an amendment is made to the water right to effectuate an interbasin transfer of water for a term, the affected portion of the water right shall be junior to all existing water rights in the basin of origin only for the term of the amendment.

(j) An appropriator of water for municipal purposes in the basin of origin may, at the appropriator's option, be a party in any hearings under this section. Nothing in this provision shall be construed as adversely affecting the ability of any other potentially affected person to obtain party status.

(k) The provisions that are contained in subsections (b)-(j) of this section that are in addition to those generally required for an application for a new or amended water right do not apply to:

(1) a proposed transfer which in combination with any existing transfers totals less than 3,000 acre-feet of water per annum from the same water right;

(2) a request for an emergency transfer of water as provided by § 297.17 of this title;

(3) a proposed transfer from a basin to its adjoining coastal basin;

(4) a proposed transfer of water that is:

(A) imported from a source located wholly outside the boundaries of this state; except water that is imported from a source located in the United Mexican States;

(B) for use in this state; and

(C) transported by using the bed and banks of any flowing natural stream in this state; or

(5) a proposed transfer from the part of the geographic area of a county or municipality, or the part of the retail service area of a retail public utility as defined by Texas Water Code, § 13.002, that is within the basin of origin for use in the part of the geographic area of the county or municipality, or that contiguous part of the retail service area of the utility, not within the basin of origin. The further transfer and use of this water outside of such county, municipality, or the part of the retail service area of a retail public utility as defined by Texas Water Code, § 13.002 as existing at the time of the transfer or as may exist in the future other than back to the basin of origin shall not be exempt under this paragraph.

**Credits**

**Source:** The provisions of this §297.18 adopted to be effective May 29, 1986, 11 TexReg 2330; amended to be effective February 24, 1999, 24 TexReg 1162; amended to be effective August 15, 2002, 27 TexReg 7152; amended to be effective May 6, 2010, 35 TexReg 3504; amended to be effective August 28, 2014, 39 TexReg 6494.

Current through 40 Tex.Reg. No. 3730, dated June 12, 2015, as effective on or before June 12, 2015

30 TAC § 297.18, 30 TX ADC § 297.18

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix G

Approved June 16, 1989.
Effective Sept. 1, 1989.

---

## CHAPTER 1053

### H.B. No. 3112

#### AN ACT

relating to the creation, administration, and powers, including the power of eminent domain subject to limitations, and to the duties, operations, and financing of the Upper Trinity Regional Water District, and to the creation in that district of subdistricts with the power to levy and collect ad valorem taxes in the subdistricts; providing for the issuance of bonds; authorizing the power of eminent domain.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. PURPOSE. It is the purpose and intent of this Act to establish a mechanism that can provide on an orderly basis for the water, wastewater, solid waste, and liquid waste needs of Denton County and the entities that may be served by the entities created by this Act. To accomplish this purpose, a conservation district, without taxing power, is created, with the authority to create subdistricts that have the power of taxation, subject to limitations, all for the purpose of providing for services on a coordinated basis that is consistent with the regionalization objectives to be satisfied by the creation of the district.

SECTION 2. DEFINITIONS. In this Act:

(1) "District" means Upper Trinity Regional Water District.

(2) "Basic service area" means the geographic area in the corporate limits of. all participating members, all contract members, and all customers and the areas that are served by those members and customers.

(3) "Board" means the board of directors of the district.

(4) "Contract member" means a governmental entity that provides retail utility service in its boundaries, that contracts with the district not later than the end of the second year after the effective date of this Act to preserve the option to become a participant in the 10-year period following the effective date of this Act, and that agrees to pay an annual pro rata share of the administrative and planning costs of the district that are unrelated to capital projects to be financed by the district; provided, however, that the share of administrative and planning costs may not exceed for a contract member 50 cents per capita unless otherwise agreed by at least 75 percent of the contract members having, collectively, at least 75 percent of the population represented by all of the contract members.

(5) "County" means Denton County, Texas.

(6) "Customer" means a wholesale user of the water or wastewater services provided by the district that provides retail utility service in the boundaries of the user.

(7) "Participant" means a governmental entity that provides retail utility service in the entity's boundaries and that contracts with the district for the construction of and payment for the water or wastewater projects to be financed by the district.

(8) "Service area" means that geographic area in the boundaries of the district.

(9) "Subdistrict" means a subdistrict authorized to be created under this Act.

SECTION 3. LEGISLATIVE FINDINGS. (a) The legislature finds that the creation and establishment of the district and the creation and establishment of subdistricts in the district are essential to the accomplishment of the purposes of Article XVI, Section 59, of the Texas Constitution.

(b) The legislature finds that all of the land and other property included in the boundaries of the district and in the boundaries of a subdistrict will be benefited by the improvements, works, and projects that are to be provided by the district and by

subdistricts pursuant to the powers conferred on the district and subdistricts by this Act, and that the district is created to serve a public use and benefit and any subdistrict created will serve a public use and will be for a public purpose.

(c) The legislature specifically finds and declares that the requirements of Article XVI, Section 59(d), and Section 59(e), of the Texas Constitution, to the extent applicable, have been met and accomplished in due course, time, and order and that all notices required to be given relating to this Act have been given, that all approvals required to be obtained have been obtained, and that the legislature has the authority and power to enact this Act.

SECTION 4. CREATION. (a) A conservation and reclamation district is created pursuant to Article XVI, Section 59, of the Texas Constitution. The district shall be known as the Upper Trinity Regional Water District.

(b) The district is a governmental agency, a body corporate and politic, and a political subdivision of the state.

(c) The boundaries of the district are coterminous with the boundaries of the county plus the entire area in the boundaries of any contract member or participating member, a portion of whose incorporated limits is partially in the boundaries of the county as those boundaries existed on the effective date of this Act.

(d) An election confirming the creation of the district is not required.

SECTION 5. BOARD OF DIRECTORS. (a) The district is governed by a board of directors. A director may not be an elected official of any governmental entity that has the authority to appoint a member of the board.

(b) A director shall serve for a term of four years.

(c) Directors shall be appointed by the governing bodies of the participants and the contract members in the manner provided by this Act.

(d) A director is subject to removal with or without cause by action of the governing body of the entity that originally appointed that member.

(e) The board has exclusive authority to manage the district under this Act.

SECTION 6. COMPOSITION OF BOARD. (a) The initial board consists of the persons who served as the initial board of directors of the Upper Trinity Municipal Water Authority, Inc., a nonprofit corporation organized under the laws of this state and those persons who are appointed by those entities that become participant or contract members within two years of the effective date of this Act.

(b) Each participant or contract member shall appoint one member to the board, and the county shall appoint one member to the board.

(c) The county may appoint one additional member to the board if the board determines that such an appointment is in the best interests of the district and that the directors to be appointed by the county are selected from a list of nominees submitted to the county by the board.

(d) Those entities that contract with the district after two years from the effective date of this Act are entitled to representation on the board only pursuant to the rules established by the board for the admission of board members.

SECTION 7. VOTES OF DIRECTORS. (a) Directors who are appointed by the participants are entitled to vote on all matters before the board, including all projects to be considered by the board in all service areas of the district, regardless of whether the participant is participating in the project.

(b) A director who is appointed by a contract member that is not a participant is entitled to one vote on all matters before the board except those matters that require a weighted vote.

(c) Votes concerning authorization of and financial commitments for capital projects shall be determined as provided by this section.

(d) Each participant that is receiving or that has contracted to receive service or capacity, including that service or capacity to be received as a result of the capital project then under consideration, has one vote for each four million gallons per day, or portion of

that amount, of service or capacity for which the participant has contracted with the district. The amount for which the participant has contracted shall be determined by taking into account any water treatment plant capacity in which the member is participating, any wastewater treatment plant capacity of the district in which the member is participating, or any raw water supply for which the member has contracted with the district, or any combination of the foregoing.

(e) Each participant with a population of 50,000 or more as determined by the most recent federal decennial census is entitled to one extra vote that may be cast on those matters requiring a weighted vote.

(f) Participation in capital projects financed by the district through the issuance of special facility bonds entitles that entity to be classified as a participant, but does not entitle that entity to receive any credit toward the four million gallons per day of service or capacity standard established in Subsection (d) of this section.

SECTION 8.　TERMS OF OFFICE. (a) Except as otherwise provided by this Act, the initial directors shall serve staggered terms in accordance with the procedures to be adopted by the initial board, but an initial director may not be appointed for a term in excess of four years.

(b) Each director, other than an initial director, shall serve a four-year term.

(c) Members of the board may serve consecutive terms.

SECTION 9.　RIGHTS AND VOTING AUTHORITY OF CERTAIN DIRECTORS. (a) The directors that served on the board of directors of the Upper Trinity Municipal Water Authority, Inc., have the rights and privileges as members of the board appointed by participating members, but are not entitled to a weighted vote on any matter coming before the board. They are entitled to vote as participating members without the right to a weighted vote.

(b) The directors that served on the board of directors of the Upper Trinity Municipal Water Authority, Inc., shall serve an initial term of two years beginning on the effective date of this Act and are eligible to be appointed to the board by a contract member or a participant.

SECTION 10.　DIRECTOR QUALIFICATIONS AND COMPENSATION. (a) A director must be a qualified voter who resides in the district and must qualify to serve by taking the oath of office and furnishing evidence of the person's qualifications to serve on the board consistent with the requirements of this Act.

(b) A director is not entitled to receive compensation for serving as a director, but may be reimbursed for actual reasonable expenses necessarily incurred on behalf of the district or in the discharge of official duties.

SECTION 11.　EX OFFICIO BOARD MEMBERS. The board may establish a category of ex officio directors and may provide for the duties and responsibilities of the ex officio members in bylaws, rules, or regulations to be adopted by the board.

SECTION 12.　BOARD PROCEDURES. (a) The board shall prepare and adopt bylaws for the district, and shall hold regular, special, or emergency meetings at times and on days or dates as specified in those bylaws.

(b) A majority of the directors constitutes a quorum for the transaction of district business, and approval of at least a majority of the directors present at a meeting is necessary for approval of any matter coming before the board, except in a situation in which a weighted vote is required. If a weighted vote is required, a majority of the weighted vote of all directors eligible to vote is necessary for approval of any matter coming before the board.

(c) The board shall provide in its bylaws for the method of execution for all contracts, the signing of checks, and the handling of any other matters approved by the board. The board shall annually elect new officers.

SECTION 13.　BOARD OFFICERS. (a) The officers of the board shall consist of the president, one or more vice-presidents, a secretary, and a treasurer.

(b) The board shall elect a president and any vice-president from its members.

(c) The board may appoint a secretary, one or more assistant secretaries, a treasurer, an assistant treasurer, and other officers that are necessary. The secretary, assistant secretaries, treasurer, and assistant treasurer are not required to be members of the board.

(d) The president shall be the chief executive officer of the district and shall preside over the meetings of the board. Any vice-president may perform all duties and exercise all powers conferred on the president when the president is absent or fails, refuses, or is unable to act.

(e) The secretary of the board or one of the assistant secretaries is responsible for keeping the minutes of the meetings of the board and all official records of the board and may certify as to the accuracy or authenticity of any actions, proceedings, minutes, or records of the board or of the district.

(f) The duties of the other officers may be provided in the bylaws of the district.

SECTION 14. LOCATION OF MEETINGS. The regular meeting place of the board shall be at the place designated in the bylaws.

SECTION 15. EMPLOYEES. The board may appoint and employ all persons, firms, corporations, partnerships, and other entities considered necessary to conduct the affairs of the district, including engineers, attorneys, financial advisors, accountants, a general manager, and other employees or consultants.

SECTION 16. CUSTOMER ADVISORY COUNCIL. (a) The board shall establish a customer advisory council composed of one representative from each customer receiving service from the district.

(b) The members of the customer advisory council may act as provided in the bylaws of the district or rules and regulations of the board, but the customer advisory council may not vote on matters coming before the board.

SECTION 17. SEAL AND BYLAWS. The board shall adopt a seal for the district and may adopt bylaws to govern the matters considered appropriate by the board provided such bylaws are consistent with this Act and the laws of this state.

SECTION 18. CONFLICT OF INTEREST. The members of the board and all other officers of the district are subject to the conflict of interest provisions specified in Chapter 421, Acts of the 63rd Legislature, Regular Session, 1973 (Article 6252–9b, Vernon's Texas Civil Statutes).

SECTION 19. GENERAL POWERS AND DUTIES. (a) Subject to the specific provisions of this Act, the district and its board have the rights, powers, privileges, authority, and functions granted, conferred, contemplated, and described in Article XVI, Section 59, of the Texas Constitution, including the rights, powers, privileges, authority, and functions conferred by Chapter 54, Water Code, relating to municipal utility districts, together with the additional rights, powers, privileges, authority, and functions enumerated, described, expressed, or implied by this Act.

(b) The district may not levy or collect ad valorem taxes.

(c) If any general law is in conflict or inconsistent with this Act, this Act prevails.

SECTION 20. PLAN AND ACQUIRE WORKS AND FACILITIES. The district may plan, lay out, purchase, construct, acquire, own, operate, maintain, repair, and improve, inside or outside its boundaries, any works, improvements, facilities, plants, equipment, and appliances, including any administrative properties and facilities, any permits, franchises, licenses, or contract or property rights, and any levees, drains, waterways, lakes, reservoirs, channels, conduits, sewers, dams, stormwater detention facilities, or other similar facilities and improvements, whether for municipal, industrial, agricultural, flood control, or related purposes, that are necessary, helpful, or incidental to the exercise of any right, power, privilege, authority, or function provided by this Act, including supplying water for municipal, domestic, and industrial uses, and all other beneficial uses or controls; collecting, treating, processing, disposing of, and controlling all domestic or industrial wastes whether in fluid, solid, or composite state; gathering, conducting, diverting, controlling, and treating local storm water or local harmful excesses of water in

the boundaries of the district; and irrigating and altering land elevations in the boundaries of the district where needed.

SECTION 21. ACQUISITION OF PROPERTY; EMINENT DOMAIN. (a) The district may acquire, by purchase or by exercise of the power of eminent domain, subject to this subsection, any land, easements, rights-of-way, or other property or improvements inside or outside the boundaries of the district, including land above the probable high water line around any reservoirs in which the district has an ownership or operational interest, that are needed or are appropriate to carry out the powers and functions of the district.

(b) The power of eminent domain shall be exercised in the manner and with the privileges, rights, and immunities available under the laws of the state, including Chapter 21, Property Code.

(c) The district may not exercise the power of eminent domain to acquire:

(1) any property located in a municipality located in whole or in part in the county without the prior consent by resolution of the governing body of the municipality in whose jurisdiction the subject property is located;

(2) any property located outside the county to be used as a water supply reservoir without the consent of the county or counties in which the reservoir is to be located;

(3) any property owned by the county, any municipality, or any agency or instrumentality of a county or municipality; or

(4) a waterworks system or a wastewater system that is owned by a municipality, a political subdivision of the state, private parties, or a nonprofit corporation.

SECTION 22. ADDITIONAL GENERAL AUTHORITY. The district may provide for:

(1) the acquisition, construction, improvement, maintenance, and operation of wholesale water and wastewater systems and treatment works necessary to provide service to district customers; and

(2) the acquisition, construction, improvement, and maintenance of any water supply, reservoir, or interest in any water supply or reservoir necessary to fully implement the powers and duties of the district as provided by this Act.

SECTION 23. PROVIDING SERVICES OUTSIDE DISTRICT. The district may elect to provide water, wastewater, solid waste, or nonhazardous liquid waste services outside its service area, but the district may not be compelled to supply those services for use outside its service area except by order of the state agency that has jurisdiction over those matters.

SECTION 24. RIGHTS OF BASIC SERVICE AREA. The basic service area has the primary right to water or wastewater treatment capacity and to water supply in each classification that the district secures under permit from the state agency that has jurisdiction.

SECTION 25. RIGHTS PROTECTED. (a) This Act does not compel any customer or prospective customer to secure water or wastewater service from the district, except pursuant to contracts voluntarily executed.

(b) This Act does not alter any outstanding permit, contract, or other obligation, nor does this Act in any manner impair the rights of any entity to own, operate, maintain, or otherwise use or control any water, wastewater, solid waste, or liquid waste system in accordance with the law applicable to that entity.

SECTION 26. DISPOSAL SYSTEMS. (a) The district may exercise the powers needed to establish, acquire, operate, and maintain a regional solid waste disposal system and a nonhazardous liquid waste disposal system.

(b) The district shall provide the services afforded by a disposal system to:

(1) any user as determined by the board if the services are to be rendered in the basic service area of the district; and

(2) any customer if the services are to be rendered outside the basic service area.

SECTION 27. WATER QUALITY RULES AND REGULATIONS. (a) The district may adopt and enforce rules and regulations for protection of water quality in and

flowing to or from the areas in or surrounding the lakes, reservoirs, and other sources of water supply owned, operated, or controlled by the district.

(b) The rules and regulations shall be adopted for the purpose of the prevention of waste or unauthorized use of water controlled by the district and of the regulation of privileges on any land, reservoir, or easement owned or controlled by the district.

(c) The rules and regulations shall be adopted and enforced in accordance with the procedures provided by Subchapter D, Chapter 54, Water Code, and shall be consistent with the applicable rules and regulations of any state agency that has jurisdiction over those sources of water supply.

SECTION 28. RATES AND CHARGES. (a) The district may establish rates and charges to be assessed against customers of the district for each service rendered to those customers. The rates and charges may be established by classes of customers, by project, or by area of service.

(b) If revenue bonds or other obligations payable wholly from revenue are issued, the board shall establish and revise rates of compensation for water sold and for wastewater or other services rendered by the district that will be sufficient to pay the expense of operating and maintaining the facilities of the district, to pay those bonds and obligations as they mature and the interest as it accrues, and to maintain the reserve and other funds as provided by the resolution or order authorizing those bonds or obligations.

SECTION 29. CHARGES, FEES, AND RENTALS. (a) The district may adopt, enforce, and collect all necessary charges, fees, or rentals for providing district facilities or services and may require a deposit for any service or facilities furnished. The district may provide that the deposit bear interest.

(b) The district may discontinue a facility or service to prevent an abuse or enforce payment of an unpaid charge, fee, or rental due to the district.

(c) Municipalities, public agencies, political subdivisions, and any other entities that contract with the district are authorized to establish, charge, and collect fees, rates, charges, rentals, and other amounts for any services or facilities provided pursuant to or in connection with a contract with the district, and to pledge sufficient amounts to make all payments required under the contract.

SECTION 30. DISTRICT AUDIT. All funds and accounts of the district shall be audited by an independent auditor, and a copy of the audit shall be maintained in the official records of the district.

SECTION 31. BONDS, NOTES, AND OTHER OBLIGATIONS. (a) The district may issue its revenue bonds, notes, revenue anticipation notes, bond anticipation notes, short-term obligations, refunding bonds, or other obligations for any of its purposes without an election and on those terms the board determines to be appropriate.

(b) Those obligations may be made payable from all or part of the revenues of the district derived from any lawful source, including any contract with any customer or user of the facilities owned or operated by the district under this Act or from the ownership and operation of any waterworks system, wastewater system, sewer system, solid waste disposal system, or nonhazardous liquid waste system, or any combination of those systems. Additionally, those obligations may be paid from and secured by liens on and pledges of all or part of any of the revenue, income, or receipts derived by the district from its ownership, operation, lease, or sale of the property, buildings, structures, or facilities, including the proceeds or revenues from contracts with any person, firm, corporation, municipality, public agency, or other political subdivision or entity.

SECTION 32. BOND PROCEDURES. (a) The district's bonds or other obligations may be issued to mature serially or otherwise in not to exceed 40 years from their date of issuance, and provision may be made for the subsequent issuance of additional parity obligations, or subordinate lien obligations, under terms or conditions that may be set forth in the resolution authorizing the issuance of the obligations.

(b) The obligations are negotiable instruments within the meaning of Chapter 8, Business & Commerce Code.

(c) The district's bonds or other obligations shall be executed and may be made redeemable before maturity, issued in the form, denominations, and manner, and under the terms, conditions, and details, and sold in the manner, at the price, and under the terms provided by the bond resolution.

(d) The district's bonds and obligations shall bear interest at rates provided in the resolution authorizing the issuance of the bonds or other obligations.

(e) If provided in the authorizing resolution, the proceeds from the sale of the bonds or other obligations may be used for paying interest on those bonds or other obligations during the period of the acquisition or construction of any facilities to be provided through the issuance of the bonds or other obligations, paying expenses of operation and maintenance of facilities, creating a reserve fund for the payment of the principal of and interest on the bonds or other obligations, and creating any other funds.

(f) The proceeds from the sale of bonds or other obligations may be placed on time deposit or invested to the extent and in the manner provided by the authorizing resolution.

(g) The district may pledge all or any part of its revenue, income, or receipts from fees, rentals, rates, charges, or contract proceeds or payments to the payment of the district's bonds or other obligations, including the payment of principal, interest, and any other amounts required or permitted in connection with the bonds or other obligations. The pledged fees, rentals, rates, charges, proceeds, or payments shall be established and collected in amounts that will be at least sufficient, together with any other pledged resources, to provide for the payment of expenses in connection with the bonds or other obligations, and for operation, maintenance, and other expenses in connection with those facilities.

(h) The district's bonds and other obligations may be additionally secured by mortgages or deeds of trust on real property owned or to be acquired by the district, and by chattel mortgages or liens on any personal property appurtenant to that real property. The board may authorize the execution of trust indentures, mortgages, deeds of trust, or other forms of encumbrances. Also, the district may pledge to the payment of the obligations all or any part of any grant, donation, revenue, or income received or to be received from the United States government or any other public or private source.

(i) The district is an issuer within the meaning of Chapter 53, Acts of the 70th Legislature, 2nd Called Session, 1987 (Article 717k–8, Vernon's Texas Civil Statutes), and bonds issued pursuant to this Act, and the appropriate proceedings authorizing their issuance must be submitted to the attorney general for examination, if required to be submitted by Chapter 53, Acts of the 70th Legislature, 2nd Called Session, 1987 (Article 717k–8, Vernon's Texas Civil Statutes). If the bonds recite that they are secured by a pledge of revenue from a contract, a copy of the contract and the proceedings relating to the contract must be submitted to the attorney general. If the attorney general finds that the bonds are authorized and the contract is entered in accordance with law, the attorney general shall approve the bonds and the contract, and the bonds shall be registered by the comptroller. After approval and registration, the bonds and the contract are incontestable in any court or other forum for any reason, and are valid and binding obligations in accordance with their terms for all purposes.

(j) The district shall issue its bonds and other obligations in accordance with Chapter 656, Acts of the 68th Legislature, Regular Session, 1983 (Article 717q, Vernon's Texas Civil Statutes), and the Bond Procedures Act of 1981 (Article 717k–6, Vernon's Texas Civil Statutes), as applicable.

SECTION 33. GENERAL CONTRACT AUTHORITY. (a) The district may enter into contracts with the United States, its agencies, a municipality, or other public or private party considered necessary in the exercise of the powers and purposes of the district.

(b) The district may enter into contracts for the acquisition, purchase, rental, lease, or operation of the water production, water supply, water filtration or purification, water supply facilities, or other water or wastewater facilities that are owned or operated by the contracting party.

(c) The district may acquire water appropriation permits and other necessary permits directly from the appropriate agency of the state or from owners of permits.

(d) Contracts that require a payment of money by the district may be made payable from any general or specific source of funds as determined by the board.

SECTION 34. CONTRACTS BY MUNICIPALITIES. (a) A municipality, public agency, political subdivision, or any nonprofit water supply corporation doing business wholly or partially in the district or a subdistrict may enter into any contract with the district that is considered appropriate by its governing body.

(b) The governing body of an entity listed in Subsection (a) of this section may pledge to the payment of a contract any source of revenue that may be available to the governing body, including the levy and collection of ad valorem taxes, if that entity has the authority to levy and collect those taxes.

(c) To the extent a governing body pledges funds to the payment of the contract that are to be derived from its own water system, its wastewater system, or its combined system, the payments constitute an operating expense of that system.

SECTION 35. DEPOSITORY. (a) The board, by order or resolution, shall designate one or more banks inside or outside the district to serve as depository for the funds of the district.

(b) Except as specifically provided by this Act, funds of the district shall be deposited in the depository bank or banks.

(c) The funds of the district may be invested as provided by law for the investment of county funds and may be invested in accordance with the Public Funds Investment Act of 1987 (Article 842a–2, Vernon's Texas Civil Statutes).

(d) The funds of the district shall be secured in the manner provided by law for investment of public funds.

SECTION 36. REGULATORY POWER OF MUNICIPALITIES. This Act does not exempt the district or any subdistrict or any land located in the district from the terms and provisions of any applicable ordinances, codes, resolutions, platting and zoning requirements, rules, or regulations of any municipality.

SECTION 37. CREATION OF SUBDISTRICTS. To provide for the orderly development of water, wastewater, and other services of the district in its boundaries and to prevent unnecessary duplication of facilities, the district may create subdistricts.

SECTION 38. PETITION. (a) A petition requesting the creation of a subdistrict in the district may be presented to the board of the district.

(b) The petition must be signed by at least 25 persons who own property in the boundaries of the proposed subdistrict, or the petition may be submitted by the governing body of a municipality if accompanied by a resolution of the governing body authorizing the submission of the petition.

(c) A petition must specify:

(1) the metes and bounds of the boundaries of the proposed subdistrict;

(2) the general nature of the improvements to be acquired, constructed, or otherwise implemented in the subdistrict;

(3) the necessity and feasibility of those improvements; and

(4) the proposed method for funding those improvements.

(d) The petition must state on its face whether the power to levy and collect ad valorem taxes in the subdistrict is requested.

(e) If a subdistrict is proposed in the corporate limits or extraterritorial jurisdiction of a municipality, the petition requesting the creation of the subdistrict must be accompanied by an official action of the governing body of the municipality in whose jurisdiction the subdistrict is proposed approving the creation of the subdistrict. If the governing body of the municipality in whose jurisdiction the subdistrict is proposed objects to the creation of the subdistrict, the subdistrict may not be created in the incorporated limits or the extraterritorial jurisdiction of that municipality.

SECTION 39. NOTICE AND HEARING. (a) The board shall set a date for a hearing on a petition not earlier than the 30th day and not later than the 90th day after the day the petition is presented to the district.

(b) Notice of the hearing shall be given to each municipality in whose boundaries or extraterritorial jurisdiction the proposed subdistrict is to be located.

(c) A copy of the notice of the hearing also shall be posted in three public places located in the proposed subdistrict and at the county courthouse not later than the 14th day before the date set for the hearing.

(d) Notice of the hearing shall be published at least one time in a newspaper of general circulation in the county not later than the 10th day before the date of the hearing.

SECTION 40. APPEARANCE AT AND PROCEDURES FOR HEARING. An interested person may appear at the hearing for the purpose of supporting or opposing the creation of the subdistrict. The hearing shall be conducted in accordance with the procedures established by the board.

SECTION 41. BOARD ORDER. (a) After the public hearing, the board shall enter an order in the official records of the district making its findings.

(b) If the board considers the creation of a subdistrict to be feasible and practical and finds that the creation of the proposed subdistrict will be beneficial to the public, will benefit the residents of and the land included in the proposed subdistrict, and will contribute to the orderly growth and development of the regional water and wastewater systems within the district, the board shall enter an order granting the petition and ordering the creation of the subdistrict in accordance with Section 42 of this Act.

(c) The board shall include its findings in the order and shall file the order in the official records of the district.

(d) The order shall define the boundaries of the subdistrict, but the board is not required to include in the subdistrict all of the land described in the petition if the board in its judgment determines that a modification or change in the subdistrict is necessary or beneficial to the public.

(e) If the board finds the subdistrict not to be feasible, practical, or beneficial, the board shall enter an order dismissing the petition and the proposed subdistrict may not be created. The dismissal order does not affect the ability to petition for the creation of a subdistrict covering the same territory at a later time.

SECTION 42. CONFIRMATION ELECTION REQUIREMENT. (a) If the board orders the creation of a subdistrict for which the power to levy and collect ad valorem taxes was not requested in the petition, the subdistrict shall be created and in existence from and after the date stated in the order of the district, without the necessity of a confirmation election in the boundaries of the subdistrict. The subdistrict does not have the authority to levy or collect ad valorem taxes.

(b) If the board enters an order granting a petition that seeks the power to levy and collect ad valorem taxes in the subdistrict, the subdistrict may not be created until a confirmation election is called, conducted, and held by the district in the proposed boundaries of the subdistrict and a majority of the qualified voters voting in the election confirm the creation of the subdistrict. If the subdistrict is confirmed at the confirmation election, the subdistrict may levy and collect ad valorem taxes for the maintenance and operation of the subdistrict and for the payment of contracts of the district. The taxes may not be levied and collected until approval at an election called and held for that purpose.

SECTION 43. CONFIRMATION AND TAX ELECTIONS. (a) A confirmation election required by Section 42 of this Act, and any election to authorize the levy and collection of ad valorem taxes in a subdistrict for maintenance purposes shall be conducted in the manner required by Chapter 54, Water Code, for the levy and collection of maintenance taxes by municipal utility districts.

(b) An election to authorize the levy of taxes in support of contracts must be held in the manner provided by Chapter 54, Water Code, for the issuance of bonds by municipal utility districts.

(c) The confirmation election required by this section, a maintenance tax election, and an election authorizing the levy of taxes to support bonds or contracts of the subdistrict may be combined into a single election and may be held on a date select.d by the board.

(d) Each subdistrict election shall be called and held by the board in accordance with the Election Code and Chapter 54, Water Code.

SECTION 44. STATUS OF SUBDISTRICTS. (a) A subdistrict is a conservation and reclamation district under Article XVI, Section 59, of the Texas Constitution with the limited powers granted in this section.

(b) The subdistrict constitutes a political subdivision and a body politic and corporate under the law of this state.

(c) A subdistrict has the powers specified in this Act and the same powers as the district, and is subject to the same limitations.

(d) A subdistrict may not provide services outside its boundaries, except that it may provide retail water and sewer services in its customer service area as certificated by a state regulatory agency.

SECTION 45. SUBDISTRICT GOVERNING BOARD. (a) A subdistrict is governed by a board of supervisors consisting of at least five members, as determined by the board at the time the creation petition is granted.

(b) The initial board of supervisors shall be appointed by the district from among the residents of the subdistrict.

(c) The district shall make the appointments for terms specified in the order creating the subdistrict but not to exceed four years.

(d) The initial supervisors are subject to removal, with or without cause, by action of the district's board.

(e) Vacancies on the board of supervisors shall be filled by the district's board for the unexpired term.

(f) Except for the initial supervisors and before the issuance of bonds, notes, or other obligations of the subdistrict, members of the board of supervisors shall be elected in the manner provided by Chapter 54, Water Code, for directors of municipal utility districts. The election shall be held on the first Saturday in May. At the initial election of supervisors, the supervisors' positions shall be divided by the district's board into two groups as nearly equal as possible for the purpose of electing initial supervisors for two-year terms and four-year terms as provided by Section 54.103(a), Water Code. Successor supervisors shall serve four-year terms.

SECTION 46. GENERAL POWERS OF SUBDISTRICTS. (a) A subdistrict may exercise the powers provided by this Act and shall own and manage the affairs, works, and projects of the subdistrict subject to any contracts with the district.

(b) The issuance of bonds by the subdistrict is not effective until the issuance is approved by official action of the district's board.

SECTION 47. TAXES OF SUBDISTRICTS. In a subdistrict that is authorized to levy and collect ad valorem taxes, the tax rates shall be established by the board of supervisors on the basis of an annual budget established at the same time and in the same manner as provided by law for counties. Taxes shall be levied by the board of supervisors.

SECTION 48. SUPERVISORS' COMPENSATION. The members of the board of supervisors are not entitled to receive compensation for serving as supervisors but may be reimbursed for actual reasonable expenses necessarily incurred on behalf of the subdistrict or in the discharge of their official duties.

SECTION 49. STATUS OF SUBDISTRICT. A subdistrict may only become a participant of the district.

SECTION 50. CONVERSION OF WATER SUPPLY CORPORATION TO A SUBDISTRICT. (a) On the adoption of a conversion resolution by the board of directors of any nonprofit water supply corporation doing business wholly or partially in the boundaries of the district, the board may consider the question of converting the nonprofit water supply

corporation to a subdistrict by following the procedures provided by this Act for creation of subdistricts and this section.

(b) The resolution required by Subsection (a) of this section shall include, in addition to the information required by Section 38 of this Act, a plan of conversion, including the proposed method for the transfer of assets and the assumption of debts to the subdistrict.

(c) Notwithstanding any provision of this Act to the contrary, any nonprofit water supply corporation that was a member of the Denton County Steering Committee in connection with the Denton County Water and Wastewater Study Regional Master Plan for 2010 may become either a contract member or a participant in accordance with this Act.

SECTION 51. MEETINGS OF BOARD OF SUPERVISORS. The board of supervisors of a subdistrict shall hold regular, special, or emergency meetings at those times and on those dates the board determines.

SECTION 52. SUBDISTRICT OFFICE; MEETING PLACE. The board of supervisors of each subdistrict shall designate a meeting place in the subdistrict as the regular office and meeting place, but the regular meeting place may be at the regular meeting place of the district if approved by order of the district.

SECTION 53. COLLECTION OF TAXES IN SUBDISTRICTS. (a) The county tax assessor-collector shall maintain the tax rolls and collect taxes for any subdistrict located in the unincorporated area of the county and having taxing power in the same manner as for taxes for the county. The tax assessor-collector for any other subdistrict shall be selected and shall perform the duties determined by the board of supervisors.

(b) Reimbursement of the costs of the tax assessor-collector for the services shall be paid by the subdistrict.

(c) Taxes and other revenues collected in a subdistrict shall be used solely for purposes in the subdistrict, except that the costs of administration of the affairs of a subdistrict may be paid to the district in accordance with contracts between the district and the subdistrict.

(d) All taxes and revenues of a subdistrict as collected shall be deposited as public funds into accounts of the subdistrict approved by the district.

(e) All accounts of a subdistrict shall be audited by an independent auditor, and a copy of the audit shall be maintained in the official records of the subdistrict and the district.

(f) The funds of a subdistrict may be deposited or invested as permitted for public funds of the district.

SECTION 54. CREATION EXPENSES. The district is authorized to pay all costs and expenses incurred in the creation and organization of the district, including the reimbursement of costs and expenses incurred by the Denton County Steering Committee in the preparation of the Denton County Water and Wastewater Study Regional Master Plan for 2010, and the Upper Trinity Municipal Water Authority, Inc., in the development and implementation of that study. The district is authorized to succeed to and assume the rights, privileges, duties, and responsibilities, including contractual obligations, incurred by the Upper Trinity Municipal Water Authority, Inc., a nonprofit corporation created to serve on an interim basis pending the creation of the district.

SECTION 55. TAX EXEMPTION. The accomplishment of the purposes stated in this Act being for the benefit of the people of the state and for the improvement for their properties and industries, the district and the subdistricts in carrying out the purposes of this Act are performing an essential public function under the constitution and are not required to pay any tax or assessment on any property or project owned, operated, leased, or controlled by the district or any part of that property, and the bonds or other obligations issued under this Act and their transfer and the income from those bonds or other obligations, including the profits made on their sale, at all times are free from taxation in the state.

SECTION 56. NOTICE. The legislature specifically finds and declares that the requirements of Article XVI, Section 59(d) and Section 59(e), of the Texas Constitution, to the extent applicable, have been met and accomplished in due course, time, and order, that

all notice required to be given relating to this Act has been given, that all approvals required to be obtained pursuant to this Act have been obtained, and that the legislature has the authority and power to enact this Act.

SECTION 57. EMERGENCY. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended, and that this Act take effect and be in force from and after its passage, and it is so enacted.

Passed by the House on May 5, 1989, by the following vote: Yeas 134, Nays 1; passed by the Senate on May 20, 1989, by the following vote: Yeas 31, Nays 0.

Approved June 16, 1989.

Effective June 16, 1989.

---

## CHAPTER 1054

### H.B. No. 3136

AN ACT

relating to the travel expenditures made by the Hidalgo County Drainage District No. 1.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. The Hidalgo County Drainage District No. 1 may not spend more than $6,000 for the payment of travel expenses during a fiscal year.

SECTION 2. This Act takes effect September 1, 1989.

SECTION 3. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended.

Passed by the House on May 16, 1989, by a non-record vote; passed by the Senate on May 26, 1989, by the following vote: Yeas 31, Nays 0.

Approved June 16, 1989.

Effective Sept. 1, 1989.

---

## CHAPTER 1055

### H.B. No. 3146

AN ACT

relating to exempting certain motor vehicles used by certain licensed child-care facilities from taxes on the sale, use, or rental of motor vehicles.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. Subchapter E, Chapter 152, Tax Code, is amended by adding Section 152.093 to read as follows:

*Sec. 152.093. MOTOR VEHICLES SOLD TO CERTAIN LICENSED CHILD-CARE FACILITIES. (a) The taxes imposed by this chapter do not apply to a motor vehicle:*

*(1) purchased, used, or rented by a qualified residential child-care facility; and*

*(2) intended for use primarily in transporting the children residing in the facility under a state license.*

*(b) In this section, "qualified residential child-care facility" means a child-care facility:*

SECTION 2. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended, and that this Act take effect and be in force from and after its passage, and it is so enacted.

Passed the Senate on April 25, 1995: Yeas 31, Nays 0; passed the House on May 24, 1995, by a non-record vote.

Approved June 12, 1995.

Effective August 28, 1995, 90 days after date of adjournment.

---

## CHAPTER 494

### S.B. No. 1657

#### AN ACT

relating to the boundaries of the Upper Trinity Regional Water District, to weighted voting by contracting entities, and to the validation of certain actions of the district.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. Subsection (c), Section 4, Chapter 1053, Acts of the 71st Legislature, Regular Session, 1989, is amended to read as follows:

(c) The boundaries of the district are coterminous with the boundaries of the county plus the entire area in the boundaries of any contract member or participating member, a portion of whose incorporated limits is partially in the boundaries of the county as those boundaries existed on the effective date of this Act, *and including the area within the boundaries of the City of Irving, Dallas County, Texas.*

SECTION 2. Chapter 1053, Acts of the 71st Legislature, Regular Session, 1989, is amended by adding Section 4A to read as follows:

*Sec. 4A. EXPANSION OF BOUNDARIES. (a) The boundaries of the district may be expanded to include the area within the boundaries of the City of Irving, Dallas County, Texas, if the district and the City of Irving execute a contract member's contract or a participating member's contract not later than the second anniversary of the effective date of this section.*

*(b) Approval of a contract member's contract between the district and the City of Irving requires a three-quarters majority vote of the district's board of directors. Approval of a participating member's contract between the district and the City of Irving requires a three-quarters majority vote of the weighted vote of all directors eligible to vote.*

SECTION 3. Section 7, Chapter 1053, Acts of the 71st Legislature, Regular Session, 1989, is amended by adding Subsection (g) to read as follows:

*(g) Regardless of the date on which an entity became a member, the entity is not entitled to a number of weighted votes that exceeds 25 percent of the weighted votes of all directors eligible to vote for a capital project.*

SECTION 4. All resolutions, orders, and other acts or attempted acts of the board of directors of the Upper Trinity Regional Water District relating to any election, contract, or issuance of bonds or other obligations and the expenditure of funds in payment of the bonds and all other governmental and proprietary actions by the board of directors of that district are validated in all respects. All the resolutions, orders, and other acts or attempted acts of the board of directors of the Upper Trinity Regional Water District and all elections, contracts, issuances of bonds or other obligations, and payments of the district are valid as though they originally had been legally authorized or accomplished.

SECTION 5. Section 4 of this Act does not apply to or affect litigation pending on the effective date of this Act in any court of competent jurisdiction in this state to which the district is a party.

SECTION 6. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended, and that this Act take effect and be in force from and after its passage, and it is so enacted.

Passed the Senate on May 8, 1995: Yeas 30, Nays 0; passed the House on May 24, 1995, by a non-record vote.

Approved June 12, 1995.

Effective August 28, 1995, 90 days after date of adjournment.

---

# CHAPTER 495

## S.B. No. 1691

### AN ACT

relating to the conveyance of certain real property by the Austin Independent School District to the Austin Community College District.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. (a) The Austin Independent School District may convey all right, title, and interest in all or part of the real property described by Section 1, Chapter 824, Acts of the 62nd Legislature, Regular Session, 1971, to the Austin Community College District for mutually agreed consideration paid to the Austin Independent School District.

(b) The conveyed property must be used by the Austin Community College District for public educational purposes consistent with Section 1, Chapter 824, Acts of the 62nd Legislature, Regular Session, 1971. The Austin Independent School District retains a right of reverter in the conveyed property, and title to the property shall automatically revert to and vest in the Austin Independent School District if the Austin Community College District ceases to use the property for public educational purposes.

(c) A conveyance under this Act does not invoke the right of reverter retained by the state in Section 1, Chapter 824, Acts of the 62nd Legislature, Regular Session, 1971.

SECTION 2. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended, and that this Act take effect and be in force from and after its passage, and it is so enacted.

Passed the Senate on May 12, 1995: Yeas 31, Nays 0; passed the House on May 24, 1995, by a non-record vote.

Approved June 12, 1995.

Effective August 28, 1995, 90 days after date of adjournment.

---

# CHAPTER 496

## S.B. No. 1694

### AN ACT

relating to the administration, powers, and duties of the Greater Greenspoint Management District of Harris County and political subdivisions contracting with the district, including the powers to issue bonds and levy taxes.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. LEGISLATIVE DECLARATION. (a) The legislature finds, determines, and declares that, in addition to those purposes set forth in Chapter 817, Acts of the 72nd

(b) The Health and Human Services Commission shall comply with any prerequisite imposed under the federal law to receiving the grant.

SECTION 3. The state agency responsible for implementing the demonstration project required by Section 32.053, Human Resources Code, as added by this Act, shall request and actively pursue any necessary waivers or authorizations from the Health Care Financing Administration of the United States Department of Health and Human Services or other appropriate entities to enable the agency to implement the demonstration project not later than January 1, 2002. The agency may delay implementing the demonstration project until the necessary waivers or authorizations are granted.

SECTION 4. This Act takes effect September 1, 2001.

Passed the Senate on March 22, 2001: Yeas 30, Nays 0, one present, not voting; and that the Senate concurred in House amendment on April 23, 2001, by a viva-voce vote; passed the House, with amendment, on April 19, 2001, by a non-record vote.

Approved May 3, 2001.

Effective September 1, 2001.

---

# CHAPTER 46

## S.B. No. 835

### AN ACT

relating to the directors of the Upper Trinity Regional Water District and the powers and duties of the district; providing a criminal penalty.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. Subsection (d), Section 6, Chapter 1053, Acts of the 71st Legislature, Regular Session, 1989, is amended to read as follows:

(d) Those entities that contract with the district after *March 13, 2000,* [two years from the effective date of this Act] are entitled to representation on the board only pursuant to the rules established by the board for the admission of board members *and member entities. For admission of entities, the board may establish rules regarding:*

*(1) membership on the board;*

*(2) the authority of board members to vote; and*

*(3) the weight to be given to votes on matters requiring a weighted vote.*

SECTION 2. Subsection (c), Section 21, Chapter 1053, Acts of the 71st Legislature, Regular Session, 1989, is amended to read as follows:

(c) The district may not exercise the power of eminent domain to acquire:

(1) any property located in a municipality located in whole or in part in the *district* [county] without the prior consent by resolution of the governing body of the municipality in *which* [whose] jurisdiction *of* the subject property is located, *except for the purpose of acquiring easements for pipeline purposes in municipalities that had not appointed a director who serves on the board or who served on the board on January 1, 2001*;

(2) any property located outside the county to be used as a water supply reservoir without the consent of the county or counties in which the reservoir is to be located;

(3) any property owned by the county, any municipality, or any agency or instrumentality of a county or municipality; or

(4) a waterworks system or a wastewater system that is owned by a municipality, a political subdivision of the state, private parties, or a nonprofit corporation.

SECTION 3. Section 27, Chapter 1053, Acts of the 71st Legislature, Regular Session, 1989, is amended by adding Subsections (d) through (h) to read as follows:

*(d) Under a contract with a county, municipality, or water district, the district may adopt and enforce rules applicable in the boundaries of that county, municipality, or water district and in other areas under the jurisdiction of the county, municipality, or water district to:*

*(1) preserve and protect the quality and sanitary condition of all water, sanitary sewage, and storm water that may affect a water supply of the county, municipality, or water district or the district or the waters of the state; or*

*(2) prevent waste or unauthorized use of water, sanitary sewage, or storm water under the jurisdiction of a county, municipality, or water district or the district.*

*(e) Rules adopted under Subsection (d) of this section:*

*(1) may not exceed the authority of the county, municipality, or water district;*

*(2) must be consistent with and no more stringent than state or federal requirements;*

*(3) must conform to the terms of the contract; and*

*(4) are not applicable within a municipality that is not a party to the contract or does not consent to the rules being applicable within the municipality.*

*(f) The district shall publish once a week for two consecutive weeks in one or more newspapers with general circulation in the district a notice of the substance of the rules adopted under Subsection (d) of this section and of any penalties for a violation of the rules.*

*(g) A penalty for a violation of the rules may not take effect before the fifth day after the date of the second publication of the notice.*

*(h) A violation of a rule adopted under this section is a Class C misdemeanor.*

SECTION 4. Subsection (c), Section 38, Chapter 1053, Acts of the 71st Legislature, Regular Session, 1989, is amended to read as follows:

(c) A petition must specify:

(1) the [metes and bounds of the] boundaries of the proposed subdistrict *in a manner satisfactory to and approved by the district's executive director and general counsel*;

(2) the general nature of the improvements to be acquired, constructed, or otherwise implemented in the subdistrict;

(3) the necessity and feasibility of those improvements; and

(4) the proposed method for funding those improvements.

SECTION 5. All resolutions, orders, contracts, and other acts or attempted acts of the board of directors of the Upper Trinity Regional Water District relating to any election, contract, or issuance of bonds or other obligations and the expenditure of funds in payment of the bonds and all other governmental and proprietary actions by the board of directors, officers, agents, employees, and contractors of that district are validated in all respects. All the resolutions, orders, contracts, and other acts or attempted acts of the board of directors, officers, agents, employees, and contractors of the Upper Trinity Regional Water District and all elections, contracts, issuances of bonds or other obligations, and payments of the district are valid as though they originally had been legally authorized or accomplished.

SECTION 6. Section 5 of this Act does not apply to or affect litigation pending on the effective date of this Act in any court of competent jurisdiction in this state to which the Upper Trinity Regional Water District is a party.

SECTION 7. (a) The proper and legal notice of the intention to introduce this Act, setting forth the general substance of this Act, has been published as provided by law, and the notice and a copy of this Act have been furnished to all persons, agencies, officials, or entities to which they are required to be furnished by the constitution and other laws of this state, including the governor, who has submitted the notice and Act to the Texas Natural Resource Conservation Commission.

(b) The Texas Natural Resource Conservation Commission has filed its recommendations relating to this Act with the governor, lieutenant governor, and speaker of the house of representatives within the required time.

(c) All requirements of the constitution and laws of this state and the rules and procedures of the legislature with respect to the notice, introduction, and passage of this Act are fulfilled and accomplished.

SECTION 8. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2001.

Passed the Senate on March 15, 2001: Yeas 30, Nays 0, one present, not voting; passed the House on April 20, 2001: Yeas 142, Nays 0, two present, not voting.

Approved May 3, 2001.

Effective May 3, 2001.

---

# CHAPTER 47

## S.B. No. 989

### AN ACT

relating to the mission of Prairie View A&M University.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. Section 87.104, Education Code, is amended to read as follows:

Sec. 87.104. PURPOSE OF THE UNIVERSITY. In addition to its designation as a statewide general purpose institution of higher education and its designation as a land-grant institution, Prairie View A&M University is designated as a statewide special purpose institution of higher education for instruction, research, and public service programs [which are] dedicated to:

(1) enabling students [with latent aptitudes, talents, and abilities and] of diverse economic, ethnic, and cultural backgrounds to realize their full potential;

(2) assisting small and medium-sized communities to achieve their optimal growth and development; and

(3) assisting small and medium-sized agricultural, business, and industrial enterprises to manage their growth and development effectively.

SECTION 2. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2001.

Passed the Senate on March 22, 2001: Yeas 30, Nays 0, one present, not voting; passed the House on April 20, 2001: Yeas 142, Nays 0, two present, not voting.

Approved May 3, 2001.

Effective May 3, 2001.

# APPENDIX H

SECTION 1.   Section 101.004, Election Code, is amended by amending Subsection (j) and adding Subsection (k) to read as follows:

(j) If the early voting clerk determines that an application that is submitted before the time prescribed by Subsection (e)(1) does not contain the information that is required for registration under Title 2, the clerk shall notify the applicant of that fact.  *If the applicant has provided a telephone number or an address for receiving mail over the Internet, the clerk shall notify the applicant by that medium.*

*(k)* If the applicant submits the missing information before the time prescribed by Subsection (e)(1), the applicant is entitled to receive a full ballot to be voted by mail under this chapter.   If the applicant submits the missing information after the time prescribed by Subsection (e)(1), the applicant is entitled to receive a full ballot to be voted by mail for the next election that occurs:

(1) in the same calendar year; and

(2) at least 30 days after the date the information is submitted.

SECTION 2.   This Act takes effect September 1, 2003.

Passed by the House on May 2, 2003, by a non-record vote;  passed by the Senate on May 28, 2003:  Yeas 31, Nays 0.

Approved June 20, 2003.

Effective September 1, 2003.

---

## CHAPTER 688

### H.B. No. 2660

AN ACT
relating to the establishment of minimum levels of water conservation in water conservation plans.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1.   Section 11.1271, Water Code, is amended by amending Subsection (c) and adding Subsections (d), (e), and (f) to read as follows:

(c) *Beginning May 1, 2005, all water conservation plans required under this section must include specific, quantified 5–year and 10–year targets for water savings.   The entity preparing the plan shall establish the targets.   Targets must include goals for water loss programs and goals for municipal use in gallons per capita per day.*

*(d) The commission and the board jointly shall identify quantified target goals for water conservation that water suppliers and other entities may use as guidelines in preparing water conservation plans.   Goals established under this subsection are not enforceable requirements.*

*(e) The commission and board jointly shall develop model water conservation programs for different types of water suppliers that suggest best management practices for achieving the highest practicable levels of water conservation and efficiency achievable for each specific type of water supplier.*

*(f) The commission shall adopt rules establishing criteria and deadlines for submission of water conservation plans, including any required amendments, and for submission of implementation reports.*

SECTION 2.   Section 15.106, Water Code, is amended by adding Subsection (b–1) to read as follows:

*(b–1) Beginning May 1, 2005, all water conservation plans required under this section must include specific, quantified 5–year and 10–year targets for water savings.   The entity preparing the plan shall establish the targets.   Targets must include goals for water loss programs and goals for municipal use in gallons per capita per day.*

SECTION 3.   Section 17.125, Water Code, is amended by adding Subsection (b–1) to read as follows:

*(b–1) Beginning May 1, 2005, all water conservation plans required under this section must include specific, quantified 5–year and 10–year targets for water savings. The entity preparing the plan shall establish the targets. Targets must include goals for water loss programs and goals for municipal use in gallons per capita per day.*

SECTION 4. Section 17.277, Water Code, is amended by adding Subsection (b–1) to read as follows:

*(b–1) Beginning May 1, 2005, all water conservation plans required under this section must include specific, quantified 5–year and 10–year targets for water savings. The entity preparing the plan shall establish the targets. Targets must include goals for water loss programs and goals for municipal use in gallons per capita per day.*

SECTION 5. Section 17.857, Water Code, is amended by adding Subsection (b–1) to read as follows:

*(b–1) Beginning May 1, 2005, all water conservation plans required under this section must include specific, quantified 5–year and 10–year targets for water savings. The entity preparing the plan shall establish the targets. Targets must include goals for water loss programs and goals for municipal use in gallons per capita per day.*

SECTION 6. Not later than September 1, 2004, the Texas Commission on Environmental Quality and the Texas Water Development Board shall take the actions necessary to comply with Section 11.1271, Water Code, as amended by this Act.

SECTION 7. (a) This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2003.

(b) The change in law made by this Act to Section 11.1271, Water Code, applies to a holder of an existing permit, certified filing, or certificate of adjudication as described in Section 11.1271(b), Water Code, regardless of whether the permit, certified filing, or certificate of adjudication is obtained before, on, or after that date.

(c) The changes in law made by this Act to Sections 15.106, 17.125, 17.277, and 17.857, Water Code, apply only to applications for financial assistance filed with the Texas Water Development Board on or after the effective date of this Act.

Passed by the House on May 2, 2003: Yeas 126, Nays 0, 2 present, not voting; passed by the Senate on May 28, 2003: Yeas 31, Nays 0.

Approved June 20, 2003.

Effective June 20, 2003.

———

## CHAPTER 689

### H.B. No. 2661

#### AN ACT

relating to the use of graywater.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. Section 26.0311, Water Code, is amended to read as follows:

Sec. 26.0311. STANDARDS FOR CONTROL OF *GRAYWATER* [GREYWATER]. (a) In this section, *"graywater"* ["greywater"] means wastewater from clothes washing machines, showers, bathtubs, handwashing lavatories, and sinks that are not used for disposal of hazardous or toxic ingredients. *The term does not include wastewater:*

*(1) that has come in contact with toilet waste;*

*(2) from the washing of material, including diapers, soiled with human excreta; or*

*(3) from sinks used for food preparation or disposal.*

2117